1  **GUTRIDE SAFIER LLP**
   SETH A. SAFIER (State Bar No. 197427)
2  ANTHONY PATEK (State Bar No. 228964)
   100 Pine Street, Suite 1250
3  San Francisco, CA 94111
   Telephone: (415) 336-6545
4  Facsimile:  (415) 449-6469

5
   Attorneys for Plaintiffs
6

7                UNITED STATES DISTRICT COURT FOR THE

8                  NORTHERN DISTRICT OF CALIFORNIA

9
   ANDREAS KNÜTTEL, MATTHEW              CASE NO. _____
10 JURANEK, AND ADRIANA CARLIN as
   individuals, on behalf of themselves, the general
11 public and those similarly situated,
                                         **CLASS ACTION COMPLAINT FOR**
12      Plaintiffs,                      **VIOLATION OF THE CALIFORNIA**
                                         **CONSUMERS LEGAL REMEDIES**
13                                       **ACT; UNLAWFUL TRADE**
                                         **PRACTICES; FRAUD, DECEIT,**
14           v.                          **AND/OR MISREPRESENTATION;**
                                         **FALSE ADVERTISING; and UNJUST**
15 OMAZE, INC., a Delaware Corporation   **ENRICHMENT**

16      Defendant.

17                                       JURY TRIAL DEMANDED

18

19

20

21

22

23

24

25

26

27

28

---

-1-

Class Action Complaint

1
2                                    **<u>INTRODUCTION</u>**

3         1.      Plaintiffs Andreas Knüttel, Matthew Juranek, and Adriana Carlin, by and through

4    their counsel, bring this class action against Defendant Omaze, Inc. ("Omaze" or "Defendant") to

5    seek redress for Omaze's deceptive and unlawful practices and to stop Omaze from continuing to

6    operate illegal lotteries and mislead the general public into believing (among other things) that

7    most, if not all, of their "donations" are going to charity when, in fact, the overwhelming majority

8    of their "donations" are pocketed by Omaze.

9         2.      Omaze solicits donations through the internet, selling chance to win prizes as part

10   of various alleged charitable fundraising "campaigns." Omaze prominently identifies a charitable

11   cause for each supposed fundraising campaign. Examples of campaign web pages are attached as

12   Exhibits A & B.

13        3.      But the payments Omaze solicits from the public are not really "donations" to the

14   marketed charity. They are payments to Omaze, only a small portion of which is used to benefit

15   the highlighted cause. What Omaze hides in its fine print (which very few, if any, consumers ever

16   read and understand) is that Omaze takes the lion's share of the revenue for itself.  Only after

17   Omaze takes its cut (for both expenses and profit) does any money get distributed to the marketed

18   charity. Omaze estimates that only about 15% of the money it raises for "Omaze-sponsored" prize

19   campaigns are given to the marketed charity.

20        4.      In truth, Omaze's charitable fundraising is just a front for illegal lotteries. Under

21   California law, a "lottery" includes any scheme to distribute property by chance among persons

22   who have paid any valuable consideration for the chance of obtaining such property. That

23   describes Omaze's business perfectly.

24        5.      Omaze told the public for years that its system worked "just like a raffle." That

25   was false because, among other things, raffles are legally required to donate 90% of gross receipts

26   to charity, which Omaze has never done. Further, it is illegal under California law to conduct

27   raffles over the internet.

28

6. More recently—and likely because its campaigns do not comply with the legal requirements for raffles—Omaze began characterizing its campaigns as "sweepstakes." But for most of Omaze's campaigns, this characterization is also false. Although they involve distribution of prizes by chance, sweepstakes do not require payment of consideration by anyone. While Omaze does distribute some free entries, it requires a minimum number of participants to purchase entry before it will distribute the prize, thereby ensuring its own profits. Further, sweepstakes entries must be offered and distributed to the general public on the same terms and conditions, regardless of whether a participant pays for entry into the sweepstakes. In contrast, Omaze sells chances to win prizes and experiences to people for profit; that is the essence of its business. The more the person pays, the higher their chance of winning.

7. Omaze set up its lottery to favor people who pay more money, and advertises its lottery in way that encourages larger payments. It does so by prominently stating that higher "donations" receive more entries (and even more entries per dollar in many cases) and by creating the impression that paying results in more entries than free entries. For example, in a given campaign, a "donation" of $10 will buy 100 "entries," while a donation of $2,000 gets 20,000 "entries." For most of its history, Omaze failed to notify consumers adequately of their ability to enter for free, made it cumbersome to do so, and made it difficult to determine one's chances of winning with a free entry relative to a paid entry. In context, given the displayed scale of entries, reasonable consumers believe the chances to win as a result of free entries will be less than chances from paid entries.

8. While Omaze touts its activities as charitable, Omaze takes most of every dollar received, and the primary service it provides is gambling. Its activities do not fit with the classic models of a raffle or sweepstakes. In a raffle, the prizes are donated, and the overwhelming bulk of gross revenues (>90%) go to the charity. In Omaze's case, Omaze purchases luxury goods, sells chances to win them, and then donates a minor fraction (~15%) of the gross receipts. In a sweepstakes, a company uses non-gambling revenues from goods and services to pay for a prize which is used as a promotion for that company's business (e.g., to promote McDonald's food). Here, in contrast, Omaze's lottery entries are the only products being sold; Omaze has no other

business to promote. And while a business carries the risk that increased sales from its sweepstakes will not cover the costs of its promotion (because no one has to buy anything to enter into the sweepstakes), the public pays for Omaze's self-promotion, because, if the donations associated with a campaign do not exceed the cost of the campaign, Omaze simply postpones the "drawing" for the prize until it has received enough payments to make a profit. Although Omaze purports to distribute entries in to it sweepstakes for free, it is not true that everyone can enter for free; Omaze allows free entries but, more importantly, *requires* a substantial number of people to pay in order to hold a drawing. A legal sweepstake cannot be manipulated in this way to ensure that the operator profits. Nor can the operator of an illegal, for-profit lottery claim they are not doing so by allowing a few people to enter the drawing for free.

9.      In sum, Omaze solicits, receives, and requires payment of consideration by a significant portion of the participants, which means its "campaigns" are not legal sweepstakes, but instead illegal lotteries.

10.     Omaze further violates California sweepstakes laws by failing to publish the odds of winning its purported sweepstakes and the actual rules under which they are operated. Because Omaze requires a minimum number of paid entries to cover its costs and make a profit, it can estimate the minimum number of paid entries that it must receive before it can conduct its "drawing," which allows it to estimate the odds of an entry winning.  But Omaze does not publish the odds of winning for any of its contests; instead, Omaze simply states that the odds of winning will depend on the number of entries. Each time Omaze postpones drawings until it has received enough payments to make a profit, it is changing the rules of its sweepstakes mid-contest. Each posted deadline that is not met is not only a false and deceptive advertisement, but also a violation of California law requiring sweepstakes administrators to publish the actual date of their sweepstakes drawings. Such actions are a violation of California laws regarding the running of lotteries and sweepstakes, and thereby further violate California's Consumer Legal Remedies Act and Unfair Competition Law.

11.     Omaze's entire business is built on this foundation of deception. If Omaze was honest with the public, and clearly disclosed that (a) only about 15% of any payment actually

goes to the charitable cause marketed in a particular campaign and (b) participants can now enter for free and get as many entries as someone who pays the maximum amount (and thus far more entries than anyone who pays smaller amounts, such as $10 or $25), almost everyone would enter for free and Omaze's business would collapse.

12.     Further, participants would be less likely to spend money on "entries" if they knew that Omaze retained the right to postpone the drawing until enough "donations" had reached a minimum amount sufficient to cover Omaze's costs and ensure a profit.

13.     The fact that Omaze is engaged in a for-profit, private lottery is underscored by numerous venture capital firms investments in it. Omaze's shift to distributing luxury prizes by chance was accompanied by a $30M increase in seed funding by venture capital firms. Venture capital firms, which have a fiduciary duty to their investors, seek out companies that are likely to generate high returns on the venture firms' investments.  Charities, whose entire purpose is to give money away, do not fit that model. Lotteries do. In essence, Omaze uses the fact that some revenues are donated to charity to camouflage its for-profit lottery as a charitable activity.

14.     Plaintiffs bring this action on behalf of themselves, a class of similarly situated individuals, and the general public.

15.     Plaintiffs seek an order against Defendant awarding injunctive relief and requiring Defendant to, among other things: (1) to comply with applicable law, as set forth in detail below; (2) require Defendant to offer refunds to any Class member who purchased entries in any Omaze campaign; and (3) pay damages and restitution to Plaintiffs and Class members.

**PARTIES**

16.      Plaintiff Andreas Knüttel is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Jose, California.

17.      Plaintiff Matthew Juranek is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Gabriel, California.

18.      Plaintiff Adriana Carlin is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Palmdale, California.

19.      Defendant Omaze, Inc. is a Delaware corporation headquartered in Los Angeles, CA and registered with the State of California. Omaze maintains its principal place of business at 5735 W. Adams Blvd, Los Angeles, CA 90016. Omaze, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the United States and/or State of California.

**JURISDICTION, VENUE, APPLICABLE LAW**

20.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs.

21.      This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

22.      The injuries, damages, and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant maintains its principal place of business within, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California. Defendant's wrongful acts and omissions occurred in California and were carried out and/or directed from Defendant's California headquarters by California personnel over California technological infrastructure.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

24.     In accordance with California Civil Code Section 1780(d), Plaintiffs concurrently file herewith a declaration establishing that they have standing as California consumers to pursue CLRA claims. (Plaintiff's declaration is attached hereto as Exhibit C.)

25.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

### I.     **OMAZE MISREPRESENTS LOTTERY PURCHASES AS DONATIONS.**

26.     Omaze is registered as a commercial fundraiser for charitable purposes under California Government Code §§ 12586 and 12599. By law, a commercial fundraiser for charitable purposes cannot solicit funds for charity in its capacity as a commercial fundraiser for charity until and unless it has been hired by a charity to do so.

27.     Omaze operates omaze.com, an online platform offering a chance to win a prize in exchange for a "donation" to one or more charitable causes. Omaze runs two general types of fundraising campaigns: celebrity campaigns and "Omaze-owned" campaigns. Celebrity campaigns generally involve an experience with a celebrity while Omaze-owned campaigns generally involve an expensive item such as a luxury car or vacation.

28.     Each prize is the subject of its own campaign, with its own "experience page" on Omaze's website. Omaze advertises each campaign as a distinct "sweepstakes." Each experience page offers the opportunity to enter the drawing for that prize by donating to charity in return for "entries."

29.     At all times from the date of Omaze's founding in 2009 up to the present, each experience page took people who indicated their desire to donate money in exchange for contest "entries" (e.g., by clicking on some form of "donate" or "enter" button) to a donation page to process a financial transaction.

30.     On information and belief, all consumers who "donated" money through Omaze necessarily viewed both the experience page and the donation page for the contest they entered, as this was the only way donors could "donate" through Omaze.

31.     Although Omaze's website had other pages, including a landing page (i.e., www.omaze.com), Official Rules page, and Terms of Use page, the Omaze website was structured in a way such that donors did not have to view those other web pages in order to donate.

32.     Omaze also advertised via email and Facebook and other third-party platforms. Its advertisements touted individual campaigns with hyperlinks that led to the specific campaign being advertised. As such, on information and belief, people who were solicited to donate via email or ads on third party sites necessarily viewed the Omaze experience page and donation page for the campaign to which they donated.

33.     Omaze was founded in 2009. In its earliest iterations, Omaze asked for $5 donations in return for a chance to have an "experience" with a celebrity. For example, its August 30, 2012 website advertised: "You donate $5 for the chance to win." Omaze further advertised that "the more you donate, the better your chances of winning." By November 2012, Omaze had raised the minimum amount to $10.

34.      In those early years, Omaze's donation pages were a simple shopping cart interface listing a "ticket price," quantity (which was filled in by the purchaser), and total "price." Above the purchase interface was text stating "btw, your donation is about to improve a life. Feeling pretty good about yourself? You should." The page included no disclosure that Omaze would deduct expenses and fees from the amount being "donated" to charity. By referencing "ticket" sales, Omaze's early shopping cart page mimicked a charity raffle.

35.     By 2013, the Omaze shopping cart listed three different entry amounts, plus an option to purchase a user-defined number of entries (i.e., an option to fill in the amount of money the donor wished to give). Omaze replaced references to "tickets" with "entries." The price per "entry" decreased with the total amount purchased, declining from $10 for a single "entry" to $7 per "entry" for 10 or more "entries." In a prominent text box on the upper right portion of the

page, the shopping cart included the name of a charity under the word "Benefiting." The cart also indicated that "your contributions help" the named charity. The 2013 cart included an easily overlooked footnote in smaller font with "NO PURCHASE, PAYMENT, OR CONTRIBUTION NECESSARY TO ENTER OR WIN. Contributing will not improve likelihood of winning." The footnote further stated, "[m]ake a $10 or more donation and be automatically entered, or to enter without contributing, click here." "Here" was an embedded hyperlink that took the reader to the official rules page, which did not actually allow them to enter for free, but provided instructions on how to do so by mail.

36.    Starting in 2015, Omaze's shopping cart page listed roughly ten different "donation" amounts, each a large box with photo, next to a suggested dollar amount ranging from $10 "base level donation" to a $25,000 "World Changer" donation. At the top of the page, Omaze printed: "Select any donation.  Earn chances to win & also receive rewards." The right side of the page listed information about the charity the contribution was supposed to "support," along with a small list of FAQs, including "What percent goes to charity?" Clicking on the question caused the following drop-down answer to appear: "Eighty percent of the net proceeds go to the charity. Omaze is a for-profit charity that raises funds and awareness for our cause partners. While we don't charge an up-front fee to our non-profit partners, we do keep twenty percent of the net proceeds to cover the services we provide." Omaze did not define "net proceeds" or how they were calculated, nor did it provide any concrete indication of what absolute percent of the total contribution went to the charity. There was still no link for free entries on the campaign or donation page; if readers found any mention of free entry, they were simply directed to the official rules, which gave instructions for entry by mail.

37.    Since March 2018, individual experience pages for each campaign have showed the phrases "donate to win" and "donations benefit a great cause" directly above a large "enter now" button, visible at the top of each experience page.

38.    From roughly March 2018 to the present, Omaze has had "donors" select their contribution amount on the experience page. Each experience page currently offers donors four amounts, each identified as a donation amount on a large, clickable radio button: "donate $10,"

"donate $25," "donate $50," or "donate $100." Donors who give $10 or $25 dollars receive 100 and 250 entries, respectively, in the given prize drawing. Donors who give $50 or $100 receive "double entries," for 1,000 and 2,000 entries, respectively. Clicking the "donate" amount radio button takes the donor to Omaze's shopping cart page, with the chosen amount and number of entries listed in the shopping cart. It is possible to click donation amounts multiple times to purchase multiples or combinations of the listed entry amounts (i.e., clicking $10 and $25 shows two purchases in the shopping cart, for a total of $35). Below the amount chosen, the shopping cart states "Supporting [the charity beneficiary]."

39.     In clicking on the "donate" buttons and proceeding to checkout and pay, consumers are not required to review or approve the Terms of Use (an entirely separate web page, accessed by inconspicuous link at the bottom of certain pages), "Official Rules" (also a separate page, accessed by inconspicuous link at the bottom of certain pages), or the fine print below the heading "Stuff our Lawyers want You to Read" on the experience page.

40.     Donors who gave money after entering the site through the omaze.com landing page (as opposed to those who went directly to an experience page from an email or ad on a third-party site such as Facebook) were exposed to even more misleading information.

41.     For example, Omaze's August 30, 2012 landing page declared "You donate $5 for the chance to win." It further advertised that "the more you donate, the better your chances of winning." Clicking on a "How It Works" link at the top of Omaze's landing page brought up a pop-up window that said, among other things, that "[t]he process works just like a charity raffle," where "the proceeds are delivered to benefit a specific social cause." The 2012 landing page did not disclose how "proceeds" were calculated, and did not describe them as "net" proceeds after deduction of expenses and Omaze's fees.

42.     By indicating that its sweepstakes work "just like a charity raffle," Omaze gave the impression that essentially all proceeds (≥90% of gross receipts) went to charity, as required by law for charity raffles.  Omaze continued making this misrepresentation until late 2015.

43.     In 2014, Omaze's landing page identified the various charity beneficiaries of its campaigns as "partners." But Omaze did not file any fundraising agreements with those charities with the California Charitable Fundraising Registry.

44.     The October 2015 web page solicited people to review the campaigns offered by Omaze and "donate to a great cause for a chance to win." But sweepstake purchases went mostly to Omaze, and were thus not "donations."

45.     For the Christmas holiday season in 2016, Omaze changed its landing page to play up the "game" experience. Its new banner touted "Extraordinary Experiences" in large letters, with "for a $10 donation, anyone has the chance to win" line immediately underneath the title. Below the banner, Omaze stated in large letters: "donate to win a once-in-a-lifetime experience, and support an amazing cause." Again, Omaze's characterization of payments as "donations" was false.

46.     In February of 2017, Omaze changed its landing page slogan to "Good Things Come to Those Who Give" with "When Everybody Donates, Cool Things Happen" in smaller print just below the title slogan. Further down in the landing page (below the area that automatically appeared on screen), Omaze's landing page included the statement "donate to win once-in- a-lifetime experience and support an amazing cause." The Good Things Come to Those Who Give theme remained Omaze's landing page until approximately May 2020.

47.     From March to September of 2015, Omaze stated, in the "how it works" pop-up on its landing page, that "proceeds (donations minus expenses and platform fees)" were donated to charity. Starting around October 2015, Omaze stated that "All net proceeds (donations less campaign expenses and platform fees)" were paid to charity. Omaze removed these statements around March 2016.  Clicking on a "Find Out How" radio button on Omaze's 2017 landing page led to a "How It Works" page that indicated halfway down the page, in a section titled "where does the money go," that Omaze kept 20% of donations as a professional fee for its services. Omaze removed that statement in March 2018.  Although none of the above statements were necessarily effective—because people who clicked on ads on third party sites were never directed to Omaze's landing pages—Omaze apparently concluded they were still too visible. On

information and belief, Omaze moved its explanations of how much money actually goes to the marketed charities to less visible areas (such as the fine print at the bottom of its very long experience pages) to obscure how little of the money paid to it actually went to these charities.

48. The percentage of Omaze "donations" that actually goes to charity has dropped substantially over the years since Omaze was founded. In 2015, when the bulk of Omaze's "experiences" were celebrity-sponsored campaigns, Omaze raised roughly $659k, of which $463k (70%) was actually donated to charity. In 2018, after the introduction of Omaze-owned campaigns focusing on luxury-item prizes, Omaze took $38M in revenue, of which only $19M (50%) went to charity. In 2019, Omaze took $64M in revenue, of which $19M went to cover Omaze's expenses. Omaze took $13M (20%) in fees. Only $22M (34%) went to charity.

49. Reasonable consumers believe that they are donating to the particular charities marketed with each Omaze campaign, not paying the bulk of their money to Omaze.

50. For example, Exhibit A is an example of an Omaze experience page, showing that the charity "GivePower" was marketed as the beneficiary of the fundraising. In fine print, under the heading "stuff our lawyers want you to read," GivePower was identified as the "Designated Grantee." The fine print then states: "All donations made in connection with a fundraising campaign are paid to Charities Aid Foundation of America ("CAFA"), an IRS-recognized, U.S. public charity whose mission is to make giving internationally and domestically safe, easy and effective for U.S. donors. CAFA prequalifies each grantee that has been designated; "Designated Grantee", as an eligible recipient of CAFA grants. At the end of each fundraising campaign, so long as the Designated Grantee continues to qualify as an eligible recipient of CAFA grants, CAFA will make a grant to the Designated Grantee of the net proceeds of the fundraising campaign.*"

51. At the very bottom of the experience page—in a location few, if any, readers will see—a footnote to the fine print states "*Omaze also invests in securing the prizes for the typical Omaze Owned campaign, so for these, from every dollar you donate, 15 cents is used by CAFA to make a grant to the associated charity. If there are multiple charities, then grants of equal share are made to each charity. 70 cents is typically used to actually get the prize, process payments and

advertise to awesome people like you (Omaze Owned campaigns require more significant marketing efforts by Omaze and do not rely (or rely to a much smaller degree) on the work and name of celebrities to help raise awareness and promote the campaign). The remaining 15 cents of your dollar goes to Omaze—it's used to cover the cost of providing and maintaining the technology and team that makes this all happen."

52.     Pursuant to an agreement between Omaze and CAFA, dated December 1, 2017, Omaze retained custody and control of the payments it received, would deduct its expenses, costs, and a "professional services and management fee" (equal to 20% of proceeds after deducting expenses and costs), and would then transfer the "Net Proceeds" to CAFA. The agreement stipulated that donations could be transferred to a CAFA bank account to comply with state law, but the amount of money that Omaze collected from its campaigns, the amount of money CAFA would get, and the amount ultimately directed to the promoted charities associated with the campaigns were set by the agreement; such amounts were not affected by ministerial details regarding which bank account held certain amounts at certain times.

53.     In 2019, the agreement between Omaze and CAFA was amended to provide that for certain campaigns, the Net Proceeds will be calculated as fifteen percent of the gross amount of all "Donations," and for certain other campaigns, the Net Proceeds will be calculated as sixty percent of the gross amount of all "Donations."

54.     CAFA then directs certain amounts from the "Net Proceeds" to the promoted charities associated with the campaigns. For participating in this this scheme, CAFA collects a fee or percentage of the "Net Proceeds" determined by Omaze.

55.     Omaze's advertising tricks entry purchasers into believing all or most of their payments are donations to the promoted charities (or "Designated Grantees").

56.     In truth, only a small percentage of the total money "donated" to Omaze-owned campaigns actually goes to the promoted charity (or "Designated Grantee") and only 60 percent of the money "donated" to celebrity experience campaigns goes to the promoted charity.

57.     For Omaze-owned campaigns, Omaze does not collect a small, fixed amount from each donation, and then donate the remainder to the promoted charity. Rather, Omaze either

(a) takes **all** of the donations up to the amount of its expenses and costs, and then takes a substantial percentage of every donation thereafter (above the Omaze-determined breakeven point) as profit; or (b) simply takes 85% of every single dollar. In aggregate, Omaze keeps the majority of every dollar collected for Omaze-owned campaigns and a large percentage of every dollar received for other campaigns. Such a profit scheme is inconsistent with Omaze's representations that consumers' payments are "donations" to the charities.

58.     Any superficial use of CAFA's bank accounts (such as Omaze transferring money to a CAFA bank account, and then getting 80% or more of the money back) does not constitute the charitable "donations" consumers reasonably believed they were making. Omaze's conduct is a bait-and-switch, prominently framing the price of its lottery tickets as a donation, while burying the fact that most money goes to Omaze's expenses and fees in fine print that is not displayed to a casual reader.

59.     Omaze's conduct described above violates California's Consumer Legal Remedies Act (CLRA) and Unfair Competition Law (UCL) by misrepresenting the price of its lottery entries as charitable donations. In truth, Omaze's platform is a for-profit private lottery that donates a small percentage of its revenue to charitable causes.

## II.     OMAZE CONDUCTS ILLEGAL LOTTERIES.

60.     Omaze's conduct also violates the CLRA and UCL because it violates the laws governing lotteries and sweepstakes. Omaze is essentially running a gambling enterprise in which money is exchanged for a chance to win a prize. Omaze misleads consumers into purchasing entries in its sweepstakes when they could enter for free. Further Omaze treats paying entrants differently depending on the amount of money paid, in violation of the laws governing sweepstakes. Because its contests do not meet the legal requirements for sweepstakes, they are illegal lotteries or raffles under California law.

61.     California law strictly regulates games of chance. *See* Cal. Penal Code §§ 319-329; Cal. Bus. & Prof. Code §§ 17539 *et seq.* California law recognizes at least three types of games of chance: lotteries, sweepstakes, and raffles. *Id.*

62.     Under California law, a "lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." Cal. Penal Code § 319. With a few exceptions, such as state-run lotteries, "[e]very person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor. Cal. Penal Code 320.

63.     Because Omaze's "sweepstakes" do not meet the statutory requirements for a legal exception to the law against private lotteries (such as raffles and sweepstakes), they are illegal.

**A.     Omaze's Lotteries Are Not Legal Raffles.**

64.     Raffles for the benefit of a nonprofit or charitable organization are a form of legal lottery. "Raffle" is statutorily defined as "a scheme for the distribution of prizes by chance among persons who have paid money for paper tickets that provide the opportunity to win these prizes." Cal. Penal Code § 320.5(b). To qualify as a raffle, a lottery must meet numerous requirements. Among these is the requirement that each ticket have a matching stub, and the winner being drawn by chance from a draw among the matching stubs. *Id*., § 320.5(b)(2). At least 90% of raffle gross receipts must go to a charitable purpose for the raffle to qualify as an exemption to the general prohibition against private lotteries. *Id*., § 320.5(b)(4)(A). Raffles may not be conducted over the internet. *Id*., § 320.5(f)(2).

65.     As noted above, Omaze characterized its lotteries as working "just like a raffle" for years. Omaze gives each person who pays money (and free entrants) "stubs" in the form of electronic entries. The winner of each lottery is then selected by randomly selecting an entry from among those submitted. And like raffles, the *celebrity* experiences that Omaze distributes are presumably donated prizes, because the celebrities are theoretically donating their time and efforts. (In contrast, Omaze purchases the luxury items distributed as prizes in Omaze-owned campaigns.)

66.     To the extent Omaze's lotteries are raffles, they are illegal. Omaze does not give at least 90% of gross receipts to charity. Further, because Omaze's lottery entries are sold over the internet, its lotteries violate California's statutory prohibition against online raffles.

67.     California Penal Code 320.5(m) exempts raffles from certain legal requirements if they satisfy all of the following requirements: (1) It involves a general and indiscriminate distribution of the tickets; (2) the tickets are offered on the same terms and conditions as the tickets for which a donation is given; and (3) *the scheme does not require <u>any</u> of the participants to pay for a chance to win.* This statutory provision echoes the case law regarding the distinction between sweepstakes and lotteries. As set forth below, Omaze's campaigns do not satisfy these requirements.

**B.     Omaze's Lotteries Are Not Legal Sweepstakes.**

68.     A "sweepstakes" is "a procedure, activity, or event, for the distribution, donation, or sale of anything of value by lot, chance, predetermined selection, or random selection that is not unlawful under other provisions of law." Cal. Bus. Prof. Code § 17539.

69.     Unlike raffles, which are allowed only for charitable purposes, sweepstakes developed as a form of commercial promotion used to incentivize sales of a legitimate commercial product or service. *See People v. Shira*, 62 Cal. App. 3d 442, 458 (1976). Sweepstakes are, in essence, a form of advertising. The cost of the prize is essentially an advertising expense, spent by the business doing the promotion in hopes of generating enough sales to cover the cost of the prize. A well-known example is McDonald's Monopoly Sweepstakes, in which users collect Monopoly-themed tickets, each of which has the potential to award a prize. Although the promotion generates millions of dollars in sales for McDonalds, *McDonalds does not require <u>any</u> of the participants to pay for a chance to win.* Even if no one purchased McDonald's food, the company would still distribute all of the prizes eventually (as long as consumers requested free tickets).

70.     Omaze's scheme is used to drive internet traffic to Omaze's website and generate sales of Omaze lottery "entries" (i.e., tickets). Omaze's lotteries do not incentivize or promote

-15-

any other legitimate product or service; the fundamental thing Omaze's "sweepstakes" promote are themselves.

71.     Legally, sweepstakes are differentiated from lotteries in that they do not require the entrants to provide consideration (i.e., payment) to participate. Further, both case law and statutes provide that, to qualify as a sweepstakes, there must be a general and indiscriminate dissemination of free tickets.  *See Shira*, 62 Cal. App. 3d at 459; Cal. Bus. Prof. Code § 17539.15(b)-(d), (l)(1). This means both that the sweepstakes sponsor must truly not require anyone to pay for entry, and that all of the entries (whether belonging to people who donated or paid for something other than the entry or belonging to people who simply requested free entries) must compete in the game of chance on identical terms. Merely allowing some members of the public to play for free does not change a lottery into a sweepstakes if there is not a general and indiscriminate dissemination of tickets.

72.     As noted above, Omaze's campaigns are not sweepstakes for at least three reasons.

### 1.     Omaze Requires Consideration From Consumers as a Group

73.     The fact that Omaze postpones or cancels drawings (as occurred in Plaintiffs' experiences and as Omaze readily admits on multiple campaign pages, see, e.g., Exhibit B) establishes that Omaze require its participants, as a group, to provide consideration to enter into its Omaze-owned "sweepstakes." If it did not, it would not be able to cover the costs of the prizes. Because Omaze's drawings *require* payment of consideration by at least some participants—as opposed to not requiring any participants to pay— they are lotteries, not sweepstakes.

74.     Unlike sweepstakes, where the sponsor bears the risk that the sales they generate will not cover the costs of the prize they offer, Omaze runs no risk of losing the money it has spent to advertise its lotteries; if its ticket sales do not cover the costs of the prize, it just extends the campaign and postpones the drawing date until it has generated enough money to cover its costs.

75.     Alternatively, if Omaze does not postpone drawings for campaigns where paid entries did not exceed costs, there would be no net proceeds to pass on to charity for those campaigns. Thus, if Omaze did not postpone its drawings for those campaigns, its representations

that payments were supporting charity would be entirely false. Either way, Omaze is violating California law.

### 2. Omaze Offers More Entries to People Who Pay More Money, and Discriminates Between Paid and Free Entries

76.     During most of its existence, Omaze made it substantially more difficult to enter its gambling contest without payment than with payment. At all times, Omaze has given paid and unpaid entrants different numbers of "entries." Omaze has also given paid entrants different numbers of "entries," with larger "donations" receiving a larger number of entries and a lower price per entry.

77.     For much of Omaze's history, the only mention of free entry on any experience page or any checkout page—if free entry was mentioned at all—was in fine print at the bottom of the page, which required scrolling far down through multiple sections of the webpage. That link did not always provide a convenient form of free entry. In contrast, each experience page contained a large radio button encouraging visitors to "enter to win" with "entries starting at $10 a pop." Clicking the radio button led to the shopping cart, where one could purchase entries online.

78.     For much of Omaze's history, likely into 2016 and perhaps later, consumers who wished to participate without paying any money had to submit certain information or a form by mail, with each mailing limited to a single entry.

79.     Somewhere between 2016-2018, Omaze introduced the ability to submit free entries online. However, Omaze continued to obscure the ability to submit free entries and made it difficult for consumers to find this option. According to statements in its own rules, Omaze provided a link to this option, called "Alternative Method of Entry," not adjacent to the donation options but **in fine print at the bottom of each experience page**, where it was unlikely to be viewed.

80.     From about 2019 to the present, each Omaze experience page contained a link, entitled "enter without contributing" that was listed in much smaller font beneath the large radio buttons inviting visitors to "donate." The link to enter without contributing leads to a page for an "Alternative Form of Entry," which requests contact information but which does not state how many entries will be assigned by this participation method.

81.     At all times from 2009 to present, Omaze has offered different terms and conditions to participants based on entry amount. Omaze has always given better chances (more entries) to those who paid more money. Moreover, for at least the past few years, Omaze has given large donations extra entries, so that paying more to Omaze disproportionately increases the purchaser's likelihood of winning. Omaze has consistently and prominently marketed the advantage of larger donations, to provide an incentive for consumers to pay more money. See, e.g., Exhibit A.

82.     Looking at the payment options, with more chances assigned to larger amounts, consumers reasonably believe that (a) paying for entries will yield better chances than entering for free and (b) the more one pays, the better one's chances. Reasonable consumers have no reason to suspect that entering for free would result in better chances than some of the lower payment options; such a result is counterintuitive.

83.     Omaze's conduct violates California Business & Professions Code § 17539.15(c), which states that "[s]weepstakes entries not accompanied by an order for products or services shall not be subjected to any disability or disadvantage in the winner selection process to which an entry accompanied by an order for products or services would not be subject." § 17539.15(l)(1) further states that a "sweepstakes sponsor may not charge a fee as a condition of receiving a monetary distribution or obtaining information about a prize or sweepstakes."  Omaze violates this provision by providing unpaid entries a lower chance of winning than certain paid entries. Omaze obfuscates this fact by using the term "entry" to refer both to the request for entry and the number of chances (i.e., selection entries) provided to the person who submitted the entry-request. A single free entry-request receives fewer chances to win (selection entries) than certain paid entry-requests.

84.     Omaze's conduct violates Cal. Bus. Prof. Code § 17539.15(d), which prohibits sweepstakes solicitation materials from representing that "an entry in the promotional sweepstakes accompanied by an order for products or services will . . . be more likely to win than an entry not accompanied by an order for products or services or that an entry not accompanied by an order for products or services will have a reduced chance of winning a prize in the promotional sweepstakes." To the extent Omaze's website discloses that increasing the donated amount will secure additional entries, it necessarily implies that people who donate will have a greater chance of winning than people who do not. It also necessarily implies that people who donate more will have a greater chance of winning than people who donate less. This encourages people to donate more, which in turn increases Omaze's profit.

85.     Omaze has changed how it has weighted free entries over time. For a substantial period of time prior to July 2017, Omaze provided those who participate for free the number of entries corresponding to the average "donation," which would be determined after the fundraising period closed. Starting around July 1, 2017, Omaze "automatically assigned 200 entries" to each free entry, which was "equivalent to the donation entries you get when you donate $20." In January 2020, Omaze stated "Each free entry is automatically assigned 2,000 entries (equivalent to the donation entries you get when you donate $100)." To date, free entrants continue to receive 2,000 entries.

86.     This discriminated against people who contributed a below-average amount, by giving them fewer entries than they could have gotten for free. For example, free entrants currently get 2,000 "entries" per entry form, whereas people donating $10 only get 100 "entries." Omaze also discriminated against small donors in favor of large donors, by giving large donors a better price per "entry" than small donors. In effect, Omaze penalized people who gave donations in below-average amounts.

87.     Omaze's conduct also discriminated against free entrants for most of its history, because it was difficult to enter for free and they were given fewer entries than people who made large donations. Free entrants were also allowed fewer entries per "transaction" (i.e., only one per mailing).

88.     At the same time, Omaze's website contained statements that purchasing entries would not affect one's chances of winning.  These statements were false, since entrants who made large payments were actually given far more "entries" than people who made below average "donations," and people who made below average "donations" were given fewer entries than unpaid entrants.

89.     Because the chances of winning are contingent on whether the participant makes a small or large donation, or no donation at all, Omaze does not engage in a general and indiscriminate dissemination of tickets. Beyond that, Omaze solicited payments in exchange for increased chances to win both by (a) by actually offering more entries to those who paid more money and (b) by misleading people to believe that paying money increased their chances relative to participating without payment. Each of Omaze's campaigns is therefore an illegal lottery, not a sweepstakes.

90.     Accordingly, Omaze solicits and receives payments from consumers in exchange for more chances to win.

### 3.     Omaze Violates Disclosure Laws Regarding Sweepstakes.

91.     Omaze's failure to publish accurate deadlines, rules, and odds of winning are further evidence that it is conducting illegal lotteries, as such failures are part of Omaze's efforts to hide the fact that it receives and requires consideration in exchange for chances to win prizes. But even if Omaze's drawings were deemed not to be lotteries (i.e., even if one did not view them as requiring consideration), Omaze's failure to publish accurate deadlines, rules, and odds of winning would still violate California law.

92.     Promotions that use the offer of incentive (i.e., a prize) to induce the recipient to visit a location, attend a sales presentation, or contact a sales person are required to include a statement of the odds of receiving each incentive (i.e., prize) or a calculated estimate of those odds based on prior experience. Cal. Bus. Prof. Code § 17537.1(a)(1)(C). Omaze's sweepstakes scheme is subject to § 17537.1, as Omaze is using the possibility of winning a prize to induce consumers to visit the location of Omaze's web site, attend a virtual sales presentation (in the form of web advertising), and/or contact a sales person (in the form of Omaze's online ticket

seller).

93.     Under California law, it is unlawful for any person making an offer subject to California Business & Professions Code § 17537.1(a), or any employee, agent, or independent contractor employed or authorized by that person, to offer any incentive "when the person knows or has reason to know that the offered item will not be available in a sufficient quantity based upon the reasonably anticipated response to the offer." *Id.*, § 17537.1(b). To the extent Omaze has reason to know that prizes may not be awarded as advertised if lottery sales are insufficient, it has violated this prohibition.

94.     "It is unlawful for any person making an offer subject to [California Business & Professions Code § 17537.1(a)], or any employee, agent, or independent contractor employed or authorized by that person, to fail to provide any offered incentive which any recipient who has responded to the offer in the manner specified therein, who has performed the requirements disclosed therein, and who has met the qualifications described therein, is entitled to receive, unless the offered incentive is not reasonably available and the offer discloses the reservation of a right to provide a raincheck, or a like or substitute incentive, if the offered incentive is unavailable." *Id.*, § 17537.1(c). To the extent Omaze fails to award prizes on the dates originally advertised if lottery sales are insufficient, it has violated this prohibition.

95.     California Business & Professions Code § 17539 identifies "a compelling need for more complete disclosure of rules and operation of contests in which money or other valuable consideration may be solicited," finds that prior methods of disclosure were inadequate, and makes clear that §§ 17539.1 through 17539.3 "shall be interpreted so as to provide maximum disclosure to and fair treatment of persons who may or do enter such contests."

96.     Accordingly, it is illegal to misrepresent in any manner the odds of winning any prize in a sweepstakes. *Id.*, § 17539.1(a)(3). Further, "Solicitations made to persons in this state offering the opportunity to participate in a sweepstakes shall, with respect to each prize offered, set forth clearly, conspicuously, and in easily readable letters the odds of receiving that prize, described in whole Arabic numerals in a format such as: '1 chance in 100,000' or '1:100,000.'" *Id.*, § 17539.5(e). "If the odds depend upon the number of entries and the number of persons

solicited is controlled by the sponsor of the promotion, the solicitation shall set forth the reasonable expectation of entries." *Id.* Omaze must "disclose information about the date or dates the final winner or winners will be determined." *Id.*, § 17539.15(j). It is illegal for a person running a sweepstakes to "Fail[] to award and distribute all prizes of the value and type represented." *Id.*, § 17539.1(a)(7).

97.     It is illegal under California law to conduct a sweepstakes without "clearly and conspicuously disclos[ing], at the time of the initial contest solicitation, at the time of each precontest promotional solicitation and each time the payment of money is required to become or to remain a contestant, the total number of contestants anticipated based on prior experience and the percentages of contestants correctly solving each puzzle used in the three most recently completed contests conducted by the person." Cal. Bus. Prof. Code § 17539.1(a)(1). It is also illegal to misrepresent in any manner, the rules, terms, or conditions of participation in a contest. *Id.*, § 17539.1(a)(4). Pursuant to California Business & Professions Code § 17539 and the preamble of § 17539.1 (stating that "the following unfair acts or practices undertaken by, or omissions of, any person in the operation of any contest or sweepstakes are prohibited"), these prohibitions apply to both contests and sweepstakes.

98.     Because it controls the number of emails and ads for its lotteries, as well as access to its website, Omaze controls the number of persons it solicits. Omaze has also conducted enough sweepstakes to estimate the number of entries expected for each campaign. Omaze also controls the minimum amount of money for which it will hold a drawing and the maximum number of entries it will provide to any one person. Omaze was required to calculate and to conspicuously disclose both the estimated number of entries expected and the estimated odds of winning its sweepstakes. *Id.*, § 17539.5(e).

99.     But Omaze does not publish the odds of winning its contests or a calculated estimate of those odds. Instead, Omaze simply states that "Odds of winning depend on the number of entries held." This fails to satisfy the requirements of California Business & Professions Code §§ 17539.1(a) and 17539.5(e).

100.     Omaze publishes a "deadline to enter" and "winner announced" date on each of its campaign experience pages, without publishing the need to obtain a certain amount of money or the possibility that the drawing will be delayed until that amount is reached. This violates multiple statutory requirements for sweepstakes, including California Business & Professions Code §§ 17539.1(a)(4) and 17539.15(j).

### 4.     Omaze Profits from the Amount Gambled.

101.     In a promotional sweepstakes, free entries may be given to those who pay for separate products or services. If a consumer purchases more than one product or service, the company may provide an entry for each purchase, but the company also has to actually provide additional products or services to the consumer for each purchase.

102.     Here, Omaze provides additional entries and collects additional profit for larger amounts of money, *without providing any additional product or service to the consumer* (other than the lottery entries themselves). Once the consumer reaches the experience page and is willing to donate to the marketed charity, the only difference between donating $10 and $50 is the amount of money being transferred and the number of entries Omaze provides; there is no other good or service that Omaze provides at that point.

103.     Moreover, Omaze does not collect a small, fixed amount for its services and then donate everything else (however much it may be) to the promoted charity. Rather, Omaze retains the majority of every dollar collected for Omaze-owned campaigns and about 40% of each dollar received in other campaigns. So the additional money solicited largely goes to Omaze for the cost of running the lottery and for its own profit.

### PLAINTIFFS' EXPERIENCES

### Andreas Knüttel

104.     Starting in approximately 2017, Plaintiff Andreas Knüttel has purchased multiple Omaze sweepstakes entries. Mr. Knüttel entered Omaze contests involving prize items (e.g., cars).

-23-

105.    On at least one occasion, Mr. Knüttel paid Omaze money, in an amount of approximately $50, for entries into a drawing for a Tesla 3 automobile, only to later be informed that the drawing would not occur on the published date.

106.    Relying on Omaze's experience pages for the above campaigns (as well as others), Knüttel visited the Omaze website, where Omaze solicited him for contributions, using a campaign experience page that stated money donated would go to various charities. Mr. Knüttel created an Omaze account, signed up for Omaze's emails, and purchased numerous entries into multiple sweepstakes.

107.    When Mr. Knüttel clicked on an email or ad to view a given Omaze campaign, he was taken to that campaign's experience page. These pages consistently characterized money paid for sweepstakes entries as "donations."

108.    Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Mr. Knüttel believed that most of the money he paid went to charity.

109.    Mr. Knüttel believed that paying to participate in the sweepstakes drawing awarded more entries than "free" entry.

110.    All told, Mr. Knüttel paid hundreds of dollars to Omaze during the period from roughly 2017 until October 2020.

111.    Several of Mr. Knüttel's "donations" were in the amount of $50.

112.    Mr. Knüttel was not aware that people who entered for free received more entries than people such as him who donated money up to a certain amount. If Mr. Knüttel had been aware that he was not competing on the same terms as people who entered for free, and that he was at a disadvantage relative to those who entered for free, Mr. Knüttel would not have purchased the sweepstakes entries, or would have purchased fewer of them.

113.    Mr. Knüttel was interested in participating in Omaze's sweepstakes for free, but was unable to do so easily, and believed that free entries had a lower chance of winning than paid entries. Combined with the belief that money he paid would go to charity, this led him to purchase sweepstakes entries he would not have purchased if he could have submitted multiple free entries at one time.

114.    Omaze's sweepstakes solicitations to Mr. Knüttel all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.

**Matthew Juranek**

115.    Starting in 2015, Plaintiff Matthew Juranek has purchased multiple Omaze sweepstakes entries. Mr. Juranek entered Omaze Contests involving consumer experiences (e.g., attending the Star Wars movie premiere) and prize items (e.g., cars).

116.    On at least one occasion, Mr. Juranek paid Omaze money, in an amount of approximately $25, for entries into a drawing for a Tesla 3 automobile, only to later be informed that the drawing would not occur on the published date.

117.    In other instances, particularly prior to 2019, Mr. Juranek wished to participate in the contests without paying, but either (1) was unable to do so because information on how to do so was not easily accessible or (2) paid to enter because "free" entry was more onerous than paying.

118.    Relying on Omaze's experience pages for the above campaigns (as well as others), Juranek visited the Omaze website, where Omaze solicited him for contributions, using a campaign experience page that stated money donated would go to various charities.  Mr. Juranek created an Omaze account, signed up for Omaze's emails, and purchased numerous entries into multiple sweepstakes.

119.    When Mr. Juranek clicked on an email or ad to view a given Omaze campaign, he was taken to that campaign's experience page. These pages consistently characterized money paid for sweepstakes entries as "donations."

120.    Mr. Juranek liked the fact that the money he was paying would go to charity, and purchased the donations due, at least in part, to the representation that the money would go to

charity. Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Mr. Juranek believed that most of the money he paid went to charity.

121. Mr. Juranek believed that paying to participate in the sweepstakes drawing awarded more entries than "free" entry.

122. All told, Mr. Juranek paid hundreds of dollars to Omaze during the period from 2015 until October 2020. Plaintiff Juranek would not have purchased the Omaze sweepstakes entries, or would have purchased fewer of them, had Defendant not misrepresented the purchase as donations to the charities identified by Omaze.

123. Many of Mr. Juranek's "donations" were in the $25-$50 range.

124. Mr. Juranek was not aware that people who entered for free received more entries than people such as him who donated money up to a certain amount. If Mr. Juranek had been aware that he was not competing on the same terms as people who entered for free, and that he was at a disadvantage relative to those who entered for free, Mr. Juranek would not have purchased the sweepstakes entries, or would have purchased fewer of them.

125. Mr. Juranek was interested in participating in Omaze's sweepstakes for free, but was unable to do so easily. The ability to enter for free was not disclosed on the campaign page. When he was able to find information on entering for free, he initially found it impossible to enter for free online, because only paid entries were allowed to enter online. This led him to purchase sweepstakes entries that he would not have paid for if he could have entered for free online. Combined with the belief that money he paid would go to charity, this led him to purchase sweepstakes entries he would not have purchased if he could have submitted multiple free entries at one time.

126. Omaze's sweepstakes solicitations to Mr. Juranek all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.

**Adriana Carlin**

127.    In or around March 2016, Plaintiff Angela Carlin learned of an Omaze sweep-stakes for a chance to "Sit Front Row At Kobe's Last Game Ever." Omaze's sweepstakes included the chance to high-five Kobe and his teammates on the court before the game, with airfare and four-star hotel accommodations included.

128.    Ms. Carlin visited the Omaze website, where Omaze solicited her for contributions, using a campaign experience page that stated money donated would go to three charities: the Kobe & Vanessa Bryant Family Foundation, dedicated to improving the lives of youth and families in need; the Positive Coaching Alliance LA, a nonprofit working with youth and high-school athletes to develop "better athletes, better people"; and After-School All-Stars, Los Angeles, which provides underserved youth with exciting and enriching after-school programs.  Ms. Carlin created an Omaze account, signed up for Omaze's emails, and purchased $100 worth of entries into the "Kobe's Last Game" sweepstakes.

129.    Ms. Carlin was excited by the opportunity to see Kobe's last game, and was also happy that the money paid would go to charity. At no time did Plaintiff Carlin realize that only 15% of their donation would actually go to the charity beneficiary identified in the Omaze campaign.

130.    In just three-and-a-half weeks, the Kobe Bryant campaign raised a "gross" total of over $680,000. Omaze publicized the "gross" total, but did not publicize the net total that was actually delivered to the charities.

131.    After the Kobe Bryant sweepstakes ended, Ms. Carlin continued to receive Omaze solicitations via email and Facebook.

132.    When Ms. Carlin clicked on an email or ad to view a given Omaze campaign, she was taken to that campaign's experience page. These pages consistently characterized money paid for sweepstakes entries as "donations."

133.    Ms. Carlin liked the fact that the money she was paying would go to charity, and purchased the donations due, at least in part, to the representation that the money would go to

charity.  Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Ms. Carlin believed that 80-90% of the money she paid went to charity.

134.     All told, Ms. Carlin paid approximately $650 to Omaze during the period from March 2016 until October 2020. Plaintiff Carlin would not have purchased the Omaze sweepstakes entries, or would have purchased fewer of them, had Defendant not misrepresented the purchase as donations to the charities identified by Omaze.

135.     Many of Ms. Carlin's "donations" were in the $10-$25 range.

136.     Ms. Carlin was not aware that people who entered for free received more entries than people such as her who donated money up to a certain amount. If Ms. Carlin had been aware that she was not competing on the same terms as people who entered for free, and that she was at a disadvantage relative to those who entered for free, Ms. Carlin would not have purchased the sweepstakes entries, or would have purchased fewer of them.

137.     Ms. Carlin was interested in participating in Omaze's sweepstakes for free, but was unable to do so easily. The ability to enter for free was not disclosed on the campaign page. When she was able to find information on entering for free, she initially found it impossible to enter for free online, because only paid entries were allowed to enter online.  This led her to purchase sweepstakes entries that she would not have paid for if she could have entered for free online. After Omaze provided an online form for free entry, she discovered that she could do only a single submission, with a cooldown required before doing additional entries, even though no such limitation was disclosed on the campaign page. Combined with the belief that money she paid would go to charity, this led her to purchase sweepstakes entries she would not have purchased if she could have submitted multiple free entries at one time.

138.     Omaze's sweepstakes solicitations to Ms. Carlin all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.

**CLASS ALLEGATIONS**

139.   Plaintiffs bring this class action lawsuit on behalf of the following proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

The Class: All natural persons within the United States who between April 13, 2017, or earlier date within the applicable statute of limitations, and the date of preliminary approval donated money to charity via Omaze.

The Omaze-Owned Campaign Subclass: All Class Members who donated money to charity through an Omaze-owned campaign on the Omaze platform.

The California Subclass: All Class Members who reside in the State of California.

The California Omaze-Owned Campaign Subclass: All California Subclass Members who donated money to charity through an Omaze-owned campaign on the Omaze platform.

140.   This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

141.   Numerosity:  Plaintiffs do not know the exact size of the Class, but they estimate it is composed of tens of thousands, and potentially hundreds of thousands, of Class Members. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

142.   Common Questions Predominate:  This action involves questions of law and fact common to the potential class members because each class member's claim derives from the same deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover.  The questions of law and fact common to the Class include, but are not limited to, the following:

    a.   Whether Defendant's conduct violates the CLRA;

    b.   Whether Defendant deceptively misrepresented or misled consumers to believe that consumers' payments were "donations" to charities;

    c.   Whether Defendant operated illegal lotteries;

    d.   Whether Defendant violated laws governing raffles and/or sweepstakes;

    e.   Whether Defendant's conduct is unlawful or unfair in violation of the Unfair Competition Law, California Business and Professions Code §17200, *et seq.*;

    f.   The amount of profits and revenues earned by Defendant as a result of the misconduct;

    g.   Whether class members and/or the general public are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

    h.   Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

143.   Typicality:  Plaintiffs' claims are typical of the claims of other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct by Defendant, as described herein. Further, Defendant's wrongful conduct caused the damages of each member of the Class. Plaintiffs and the Classes have suffered injury in fact as a result of Defendant's false representations. Plaintiffs and the Classes each gave money to Omaze under the false impression that they were donating all proceeds to charity, as part of an illegal lottery run by Defendant in violation of the law.

144.   Adequacy of Representation:  Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the classes. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are

determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

145.    Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

146.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### PLAINTIFFS' FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Plaintiffs, the Class and the Subclasses**

147.    Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

148.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of services to consumers.

149.    Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

150.    The operation of the Omaze Platform to solicit, facilitate, and/or effectuate donations to the promoted charities (or "Designated Grantees"), the operation of the Omaze

Platform to market and sell lottery entries, and the lottery entries purchased through the Omaze

Platform are "goods" and/or "services" within the meaning of Cal. Civ. Code § 1761(a), (b).

151.    Omaze's acts and practices described herein have violated, and continue to violate, § 1770(a)(1), -(2), -(5), -(9), -(13), -(14), and –(a)(26) of the CLRA. Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help" to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free. Omaze also advertised an illegal financial product, for reasons set forth herein, in violation of § 1770(a)(26).

152.    These violations were intended to and did result in Plaintiffs and similarly situated consumers paying more money to Omaze than they would have if Omaze had not engaged in such violations and/or if Plaintiffs and consumers had known the truth about the matters alleged herein.

153.    Plaintiffs seek, on behalf of themselves, the Class and Subclass Members, and the general public, an injunction to (i) enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2) and (ii) mandate that Defendant, without limitation, stop misrepresenting that payments are donations to certain charities, conspicuously and adequately inform consumers how much of each payment

goes to Omaze and how much goes to each identified charity, conspicuously and adequately inform consumers of the entries assigned when entering for free, and conspicuously and adequately inform consumers of their estimated odds of winning each Omaze drawing. Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's conduct on Plaintiffs and the public at large.  If the injunction is not entered and Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs, the Subclass Members, and the general public will continue to suffer harm.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it was not entitled.  Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

154.    On or around December 3, 2020, Plaintiffs provided Defendant with notice and demand that, within 30-days, it correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, statutory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

155.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' SECOND CAUSE OF ACTION
### (Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.* ("UCL"))
### On Behalf of Plaintiffs, the Class, and the Subclasses

156.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

157.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

158.    Defendant has engaged, and continues to engage, in unlawful and unfair practices by, without limitation (i) violating the CLRA as described herein; (ii) violating California Penal Code §§ 319, 320, 321, and 322, which prohibit operating or participating in illegal lotteries; (iii) violating Cal. Penal Code § 320.5, which requires 90% of gross receipts for raffles to go to charity and prohibits online raffles; and (iv) violating Cal. Bus. & Prof. Code §§ 17537.1, 17539.1, 17539.15, and 17539.5, which regulate sweepstakes.

159.    Plaintiffs and those similarly situated were harmed by Omaze's unlawful and unfair business practices. But for Omaze's violations of law and public policy regarding lotteries, sweepstakes, and raffles, Plaintiffs Knüttel and Juranek and those similarly situated would not have paid any money at all to enter into Omaze's drawings or would have paid less.

160.    Defendant has also engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) falsely representing that Plaintiffs' and consumers' payments were "donations" to certain charities; and (ii) misleading Plaintiffs and similarly situated consumers into believing that paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.

161.    Plaintiffs and those similarly situated relied to their detriment on Omaze's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated

been adequately informed and not deceived by Omaze, they would not have paid any money at all to enter into Omaze's drawings or would have paid less.

162.    Defendant's acts and omissions are likely to deceive the general public.

163.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

164.    As a direct and proximate result of such actions, Plaintiff and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the class members lost the amount they "donated" through Omaze.

165.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

166.    Plaintiff seeks, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

167.    Plaintiff seeks, on behalf of those similarly situated, and the general public, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

168.    Plaintiff seeks, on behalf of themselves, those similarly situated, and the general public, an injunction to (i) prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein and (ii) mandate that Defendant, without limitation, stop misrepresenting that payments are donations to certain charities, conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity, stop conducting illegal lotteries, assign equal weight to all methods of entry, conspicuously and adequately inform consumers of the entries assigned when entering for

free, and conspicuously and adequately inform consumers of their true odds of winning each Omaze drawing or Omaze's best estimate of the odds of winning. Such misconduct by Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's ongoing and future conduct on Plaintiffs and the public at large. Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled.  Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

169.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Code Civ. P. § 1021.5.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of All Plaintiffs, the Class and the Subclasses**

170.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

171.    Defendant has fraudulently and deceptively informed Plaintiffs and the Class Members that led reasonable consumers to believe that they were donating to charity when, in fact, the bulk of revenues went to Omaze.  Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help" to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that

higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.  Defendant also omitted the fact that it was operating an illegal lottery as a for-profit enterprise.

172.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase entries into Omaze's lotteries. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

173.    Plaintiffs and the Class Members relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not paying any money at all to enter into Omaze's drawings or paying less.

174.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, (a) purchase entry into Defendant's lotteries under the belief that they were donating to charity; (b) purchase lottery entries on terms that disadvantaged Plaintiffs; (c) pay a price premium for lottery entries based on Defendant's fraud, deceit, misrepresentations and/or omissions.

175.    Plaintiffs and those similarly situated justifiably and reasonably relied on

Defendant's fraud, deceit, misrepresentations and/or omissions, and, accordingly, were damaged by Defendant.

176.    As a direct and proximate result of Defendant's' fraud, deceit, misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid to Omaze.

177.    Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiffs, the Class and the Subclasses**

178.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

179.    Within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising, marketing, and sale of entries into it illegal lotteries.

180.    Defendant made representations and statements (by omission and commission) that led reasonable consumers to believe that they were donating to charity when, in fact, the bulk of revenues went to Omaze. Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help" to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances

to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.  Defendant also omitted the fact that it was operating an illegal lottery as a for-profit enterprise.

181.    Plaintiffs and the Class Members relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not paying any money at all to enter into Omaze's drawings or paying less.

182.    Defendant's acts and omissions are likely to deceive the general public.

183.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

184.    The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

185.    As a direct and proximate result of such actions, Plaintiffs and the Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and Class Members lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased or paid for entry into Defendant's lotteries but for representations and omissions that they were donating to charity; (b) they would not have purchased lottery entries on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for lottery entries based on Defendants' misrepresentations and omissions; and/or (d) Defendant's lotteries did not have the characteristics, benefits, or quantities promised.

186.   In the event that Plaintiffs are unable to establish a legal claim for damages, they will have no adequate remedy at law.  Plaintiffs seek, in the alternative, on behalf of themselves and the Class Members, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

187.   Plaintiffs seek, on behalf of themselves, the Class Members, and the general public, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

188.   Plaintiff seeks, on behalf of themselves, those similarly situated, and the general public, an injunction to (i) prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein and (ii) mandate that Defendant, without limitation, stop misrepresenting that payments are donations to certain charities, conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity, stop conducting illegal lotteries, assign equal weight to all methods of entry, conspicuously and adequately inform consumers of the entries assigned when entering for free, and conspicuously and adequately inform consumers of their true odds of winning each Omaze drawing or Omaze's best estimate of the odds of winning. Such misconduct by Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's ongoing and future conduct on Plaintiffs and the public at large. Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code

alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Plaintiff Ross, the Class, and the Subclasses**

189.    Plaintiffs reallege and incorporate the above paragraphs of this Class Action Complaint as if set forth herein.

190.    Plaintiffs and members of the Class conferred benefits on Defendants by paying to participate in Omaze drawings for prizes.

191.    Defendants have knowledge of such benefits. Defendants have been unjustly enriched in retaining the financial profits derived from Plaintiff and Class members' purchases of Omaze lottery entries. Retention of those moneys under these circumstances is unjust and inequitable because Defendant operated an illegal lottery and misrepresented the lottery purchases as donations to charity. These misrepresentations and charges caused injuries to Plaintiff and members of the Class because they would not have paid Defendants' lottery fees had the true facts been known.

192.    In the event that Plaintiffs have no adequate remedy at law, because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, Defendant must provide non-restitutionary disgorgement of the financial profits that it obtained as a result of their unjust conduct to Plaintiffs and members of the Class for their unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, those similarly situated, and the general public, respectfully requests that the Court enter judgment against Defendant as follows:

A.    Certification of the proposed Class and Subclasses, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this

Class Action Complaint

Complaint, including, without limitation, conducting any illegal lottery, raffle, or sweepstake, and misrepresenting to members of the public that all donations made to Omaze go to charity;

C.  An award of compensatory damages in an amount to be determined at trial on all causes of action except number two (UCL), number four (FAL), and number five (UNJUST ENRICHMENT);

D.  An award of statutory damages in an amount to be determined at trial on all causes of action except number two (UCL), number four (FAL), and number five (UNJUST ENRICHMENT);

E.  An award of punitive and/or exemplary damages in an amount to be determined at trial on all causes of action except number two (UCL), and number five (UNJUST ENRICHMENT);

F.  In the event an adequate remedy is not available at law, an award of restitution in an amount to be determined at trial on cause of action number two (UCL), and/or recission under causes of action three (Fraud, Deceit, and Misrepresentation) and four (FAL);

G.  In the event an adequate remedy is not available at law, an award of non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of their unjust conduct in an amount to be determined at trial on cause of action number five (UNJUST ENRICHMENT);

H.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.  For reasonable attorneys' fees and the costs of suit incurred; and

J.  For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

///

1

Dated: April 15, 2021                                  **GUTRIDE SAFIER LLP**

2

3

4

5

6                                                      Seth A. Safier, Esq.
                                                       Anthony Patek, Esq.
7                                                      100 Pine Street, Suite 1250
                                                       San Francisco, CA 94111

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A





52 days left

*Support GivePower and*

# Win a 2020 Tesla Model S Performance and $20,000

**YOU WILL:**

- Score a 2020 Tesla Model S Performance and $20,000 with the car's taxes and shipping costs covered
- Go 0 to 60 mph in 2.3 seconds, reach 348 miles on a full charge and hit a top speed of 163 mph (but please don't)
- Drive stress-free thanks to Autopilot, Full Self-Driving Capability and a HEPA air filtration system capable of eliminating any trace of outside bacteria or pollutants

 Enter to win    A winner is drawn    Donations benefit a great cause!

**enter now**


givepower

## what you'll get



Imagine driving away with the safest and fastest accelerating car on the road: a 2020 Tesla Model S Performance! You'll enjoy an extra long charge range, best-in-class storage, noise engineering fit for a recording studio and clean air thanks to its massive HEPA air filter (you can set it on "BioWeapon Defense Mode"). Plus, your new whip will come fully equipped with Tesla's Self-Driving Capability so you can say "goodbye" to your fear of parallel parking and "hello" to the future of driving. One last thing? We're hooking you up with $20,000, and covering the car's taxes and shipping costs.

- Maximum Seating: 5 seats
- Transmission: Automatic
- Powertrain: All-electric
- Drivetrain: Dual Motor AWD
- Interior/Exterior Color: TBD (photos don't show the actual car you'll receive)
- Charge Range: 348 miles
- Top Speed: 163 mph
- Maximum Horsepower: 762 HP
- Maximum Torque: 723 lb-ft
- Acceleration: 0-60 mph in 2.3 seconds
- MSRP (Car + Cash): $134,000
- Special features: Autopilot, Autopark, Summon and Full Self-Driving Capability, 17" infotainment system, heated seats with individual controls, HEPA air filtration system, 21" wheels, LED headlights, panoramic glass roof and best-in-class cargo storage

*No donation or payment is necessary to enter or win this sweepstakes.*

# who you'll help



Roughly 2.2 billion people around the world do not have access to safely-managed drinking water. GivePower is on a mission to help. The nonprofit uses its deep solar expertise to power and provide clean water, food security and light to regions in need around the world. Omaze has teamed up with GivePower to help fund GivePower Solar Water Farms in regions of Colombia. These water farms purify and desalinate water sourced sustainably from the ocean, providing a long-term, renewably-powered drinking water solution for many living in brutally dry conditions.



# entry levels

_Choose the amount below. No donation or payment is necessary to enter or win this sweepstakes._

**most popular!**

### 250 entries to win

**donate $25**

---

### 100 entries to win

# 100
## entries

**100 entries**
100 chances to win a 2020 Tesla Model S Performance and $20,000

**donate $10**

---

**most popular!**

### 250 entries to win



# 250
## entries

**250 entries**
250 chances to win a 2020 Tesla Model S Performance and $20,000

**donate $25**

---

**double entries!**

### 1,000 entries to win



# 1,000
## entries

**1000 entries**
1000 chances to win a 2020 Tesla Model S Performance and $20,000

**donate $50**

---

**double entries!**

### 2,000 entries to win



# 2,000
## entries

**2000 entries**
2000 chances to win a 2020 Tesla Model S Performance and $20,000

**donate $100**

enter without contributing

# Hey! You may also want to...



*Support Represent Justice and*

**Win an Officially Licensed 1967 Ford Mustang "Eleanor" and $20,000**



*Support Anti-Recidivism Coalition and*

**Win a Mercedes-AMG GT 63 S and $20,000**



*Support Big Green and*

**Win Your Very Own Tesla Model Y Performance**

**browse all experiences**

# stuff our lawyers want you to read

**Winners:**
You ("Winner")

**Sweepstakes Start Date:**
June 25, 2020

**Deadline to Enter:**
September 29, 2020 at 11:59pm PT

**Winner Announced:**
On or around October 14, 2020

**Approximate Retail Value:**
$134,000

**Timing:**
TBD

**Location:**
TBD

**Sponsor:**
Omaze, Inc. ("Sponsor")

**Designated Grantee:**
GivePower ("Designated Grantee")

All donations made in connection with a fundraising campaign are paid to Charities Aid Foundation of America ("CAFA"), an IRS-recognized, U.S. public charity whose mission is to make giving internationally and domestically safe, easy and effective for U.S. donors. CAFA prequalifies each grantee that has been designated; "Designated Grantee", as an eligible recipient of CAFA grants. At the end of each fundraising campaign, so long as the Designated Grantee continues to qualify as an eligible recipient of CAFA grants, CAFA will make a grant to the Designated Grantee of the net proceeds of the fundraising campaign.*

**Prize Provider:**
Omaze, Inc. ("Prize Provider")

**Details:** Winner will receive a 2020 Tesla Model S and $20,000 USD.

**Details:** Winner will receive a 2020 Tesla Model S and $20,000 USD.

In the United States (US), the Grand Prize will be delivered with US sales tax, shipping fees, and registration paid. If the winner is a US resident, Omaze will also provide 25% of the ARV, excluding any cash prize component, to the US winner to put towards any required US income taxes.

In all other countries the Grand Prize will be shipped (net of all taxes) to the nearest deliverable location, at the Winner's expense. Any applicable import duties, registration costs, or further taxes or duties of any nature due in the destination country will be the responsibility of the Winner.

Should the winner not wish to take delivery of the Grand Prize, the Winner may elect to take a cash alternative which is 75% of the ARV. Please note that no additional funds will be provided, if the cash alternative is elected. This specifically includes but is not limited to a US resident not receiving the 25% that would have been provided for taxes.

Omaze reserves the right not to deliver a prize to certain countries. In such case, the winner will be required to take the cash alternative.

The vehicle prize is to be provided on an "as is" basis without any representations and warranties whatsoever. Sponsor does not represent or warrant that the vehicle adheres to or is in compliance with any applicable country, state or federal safety, environmental and/or other standards and requirements in order for the vehicle to be legally operational or certified for use on public roadways. It is the sole responsibility of the winner to evaluate the vehicle and ensure that it satisfies all applicable standards and legal requirements for its intended use and operation.

All third party names and trademarks are the property of their respective owners. "Tesla" is a registered trademark of Tesla, Inc. This sweepstake is not sponsored, endorsed, or affiliated in any way with Tesla, Inc. or their affiliates.

**Age to Enter:** You must be at least 18 years old to win.

**Ineligible Countries:** Winners must not be residents of Belgium, Cuba, Iran, Iraq, Italy, North Korea, Singapore, Sudan, Syria or Thailand

**Eligibility Notes:**

In certain countries, local rules and laws may restrict or prohibit the award of certain prizes or impose additional restrictions on participation. Entry is subject to all local laws. See our Sweepstakes Official Rules for more details. Employees, officers, and directors of Sponsor, Designated Charity, or Prize Provider, and members of their immediate families and households, are not eligible to win.

Individuals may not receive more than one grand prize within the same 18 month period. Individuals may not receive more than one minor prize within the same sweepstakes.

**How to Enter:**

Visit Omaze.com to utilize any of our methods of entry. See our Sweepstakes Official Rules for more details. Odds of winning depend on the number of entries held.

**Winner Confirmation Process:**

Within 10 business days of campaign close, we'll use an automated random drawing process to draw a potential winner(s) for that campaign. A confirmation process, which may include a background check, will then take place to ensure the potential winner meets the legal standards required. Winner and, if applicable, their guest(s) agree to cooperate fully with Omaze in Omaze conducting any background check(s), which includes providing information requested by Omaze including, but not limited to, full legal names and addresses. If the Prize includes meeting a celebrity, meeting a public figure, or attending a special event and any background check indicates, in Omaze's sole discretion, that the potential winner or the potential winner's guest(s) pose a danger to or may harm the reputation of any person or entity involved in the sweepstakes, Omaze may disqualify said winner and move on to the next randomly drawn potential winner. Pending a positive outcome of the confirmation process, an Omaze representative will notify the potential winner via email and/or phone. The potential winner must respond within the time period designated in the notification, or Omaze may move on to another randomly drawn potential winner. Before confirming a potential winner as the winner, Omaze may require the potential winner to confirm their eligibility. Once that's done, the potential winner and guest(s) must execute and return all required documents within the time frame specified by Omaze. If you do not execute and return all required documents within the time frame specified by Omaze, you will forfeit the Prize and Omaze will move on to another randomly drawn potential winner.

NO PURCHASE, PAYMENT, OR CONTRIBUTION NECESSARY TO ENTER OR WIN. Contributing will not improve chances of winning. Void where prohibited.

**Transparency:**

At Omaze, we believe fundraising should be about impact, not percentages. Our model allows us, in partnership with Charities Aid Foundation America (we call them CAFA), to really make a difference and disrupt the way society traditionally thinks about charitable giving.

Here's how it works: Omaze and CAFA work together to offer incredible prizes and experiences that anyone can potentially win. You don't have to donate to enter, but if you do, your donation to CAFA is then used to make a charitable grant to a great cause, which we love. Omaze pays for everything that's needed to run the sweepstakes, which means the only ones taking a chance are the entrants (you!)—not the designated grantee. The organizations can spend less time worrying about raising funds, and instead focus their energy on doing awesome work.

*Omaze also invests in securing the prizes for the typical Omaze Owned campaign, so for these, from every dollar you donate, 15 cents is used by CAFA to make a grant to the associated charity. If there are multiple charities, then grants of equal share are made to each charity. 70 cents is typically used to actually get the prize, process payments and advertise to awesome people like you (Omaze Owned campaigns require more significant marketing efforts by Omaze and do not rely (or rely to a much smaller degree) on the work and name of celebrities to help raise awareness and promote the campaign). The remaining 15 cents of your dollar goes to Omaze—it's used to cover the cost of providing and maintaining the technology and team that makes this all happen.

The result? Causes get a grant with no risk and no overhead or investment, our lucky winners get awesome prizes, and everyone else gets to help a great cause and spread joy!

To learn more about how we support causes in partnership with CAFA, see our Terms of Use.



## Coming soon:
## Your dream come true.

*Sign up so you don't miss it!*



Enter your email address | **keep me posted**

By completing this form you're signing up to receive our emails. No pressure — you can unsubscribe at any time

**follow us on:**

Questions? Contact weloveyou@omaze.com

| about us | find an experience | work with us | causes | omaze stories | help center | do not sell my info |



Copyright © 2020, Omaze, Inc. All Rights Reserved.

Careers     Official Rules     Terms of Use     Privacy Policy

BBB ACCREDITED BUSINESS

# EXHIBIT B



Omaze    Support Earth Month   Cars   Cash   Celebrity   Travel    Winners    Blog    About Us    Sign In



ENDED APRIL 25, 2018

## Thanks to everyone who supported Big Green

*for a chance to*

## Win a Tesla® Model S® P100D




**Congrats!**

RICHARD M.

Las Vegas, NV

## Explore more chances to win-win!

1 / 3    ‹   ›



**Support Access Fund**

Win a Sprinter Van with an $80,000 Vansmith Conversion



**Support African Community & Co...**

Win a Himalaya Land Rover Defender 110 EV and $20,000



**Support Golden Triangle Asian Ele...**

Stay in a Jungle Bubble Above an Elephant Habitat in Thailand



**Support GivePower and 501CTHREE**

Win a Custom Tesla Model S and $20,000

**Browse all experiences**

## stuff our lawyers want you to read    ✕

# stuff our lawyers want you to read ✕

**Winners:**
You ("Winner")

**Timing:**
TBD 2018

**Location:**
TBD

**Sponsor:**
Omaze, Inc. ("Sponsor")

**Charity:**
Big Green ("Charity")

All donations made in connection with a fundraising campaign are paid to Charities Aid Foundation of America ("CAFA"), an IRS-recognized, U.S. public charity whose mission is to make giving internationally and domestically safe, easy and effective for U.S. donors. CAFA prequalifies each Charity as an eligible recipient of CAFA grants. At the end of each fundraising campaign, so long as the Charity continues to qualify as an eligible recipient of CAFA grants, CAFA will make a grant to the Charity of the net proceeds of the fundraising campaign.

**Prize Provider:**
Omaze ("Prize Provider")

**Details:** Win a Tesla Model S P100D in midnight silver metallic with $20,000 cash in the trunk.

Performance Details:
· 100 kWh battery
· Performance all-wheel drive
· 0-60mph: 2.5sec
· Top speed: 155mph
· Mile range (EPA): 350mi

Safety Details:
· Automatic emergency braking and collision avoidance
· Eight airbags
· Electronic stability and traction control
· Auto-dimming / Power folding side mirrors
· LED turning lights
· LED fog lights
· Two latch child seat attachments

Convenience Details:
· Air suspension with GPS memory
· Front and rear trunks storage space: 31.6 cubic ft
· Keyless entry
· Power liftgate
· Software updates via Wi-Fi
· Custom audio
· 400 kWh free annual Supercharger credits
· Sunroof
· 21" carbon wheels
· GPS-operated garage door opener

Standard Interior Details:
· Black premium interior
· Ventilated seats
· Dark headliner
· Ashwood decor

Premium Upgrade Details:
· Premium air filtration system
· Custom audio system with 11 speakers and an 8" subwoofer
· Front and rear seat heaters, heated steering wheel, wiper blade defrosters, and washer nozzle heaters
· Premium audio system with more power, tweeters, surround speakers and subwoofer
· Tinted glass roof with ultraviolet and infrared protection
· Auto dimming, power folding, heated side mirrors
· LED fog lamps
· Center console with covered storage and docking for two smartphones

Warranty Details:
· 4 year, 50,000 mile limited vehicle warranty
· 8 year, unlimited mile drive unit and battery warranty

Total Suggested Retail Price(USD) $142,500

"Tesla" and "Model S" are registered trademarks of Tesla Motors, Inc. This sweepstakes is not sponsored, endorsed, or affiliated in anyway with Tesla Motors, Inc.

**Sweepstakes Start Date:**
September 12th, 2018

**Deadline to Enter:**
December 4th, 2018 at 11:59pm PST

*NOTE: This campaign has been extended. The new deadline to enter is January 4th, 2019 at 11:59 PST.

**Deadline to Enter:**
December 4th, 2018 at 11:59pm PST

*NOTE: This campaign has been extended. The new deadline to enter is January 4th, 2019 at 11:59 PST.

**Winner Announced:**
On or around January 18th, 2019

**Approximate Retail Value:**
$162,500

**Who's Eligible:**
You must be at least 18 years old to win. Employees, officers, and directors of Sponsor, Charity, or Prize Provider, and members of their immediate families and households, are not eligible to win.

If Winner and/or Guest reside outside the country where experience will take place, Winner and/or Guest must have current, valid passports, and be able to travel to the experience location(s). If they are unable to travel to the experience location(s), they will forfeit the prize. Winners must not be residents of Africa, Asia, Belgium, Cuba, Iran, Iraq, Italy or Syria. In certain countries, local rules and laws may restrict or prohibit the award of certain prizes or impose additional restrictions on participation. In addition, certain countries prohibit the importation of a previously owned vehicle. Entry is subject to all local laws. See our Sweepstakes Official Rules for more details. Employees, officers, and directors of Sponsor, Charity, or Prize Provider, and members of their immediate families and households, are not eligible to win.

Individuals may not receive more than one major/grand prize and one minor prize within the same 18 month period.

**How to Enter:**
Visit Omaze.com to utilize any of our methods of entry. Receive bonus entries for donations. See our Sweepstakes Official Rules for more details.

**Selection Process:**
Conditional Winners will be chosen through a random selection process by Omaze or its representative. Odds of winning depend on the number of tickets held. A verification process will take place during which conditional Winners will be required to sign paperwork re-confirming their eligibility and their ability to participate on given dates. Omaze may also perform background checks, at its discretion, before an official Winner is announced.

NO PURCHASE, PAYMENT, OR CONTRIBUTION NECESSARY TO ENTER OR WIN. Contributing will not improve chances of winning. Void where prohibited.

•••••••••••••••••

**Fundraising Transparency**

This Experience is part of a fundraising campaign for Charities Aid Foundation America ("CAF America"), which is a globally recognized United States 501(c)(3) public charity (Federal Tax ID # 43-1634280). CAF America retains exclusive control over all donations raised in this Experience.

**(a) How it works:** Omaze and CAF America work together to offer incredible Experiences, like this one. You don't have to donate to enter, but if you do, 100% of your donation goes to CAF America, who then distributes the donations, minus the Experience fees and costs, to the nonprofit(s) identified on the experience page (the "Designated Grantee(s)"). Our model allows CAF America and the non-profit grantees to spend less time worrying about raising funds and instead focus their energy on doing awesome work.

**(b) Where your donation goes:** For Experiences like this one, we first account for the actual costs of the Experience (e.g., Prize costs, payment processing fees, and advertising to awesome people like you). After those Experience costs are paid, fifty percent (50%) of the remaining donations (the "Adjusted Donations") go to the Designated Grantee(s) via grant from CAF America. (If there are multiple Designated Grantees, then this amount is equally distributed among them). CAF America also retains a small percentage of the total donations (less than 1%) to cover its own operating costs. Omaze uses the remaining amount to cover our costs

**(c) Designated Grantee Eligibility:** Before every Experience, CAF America confirms the Designated Grantee(s) as eligible to receive grants. In the rare case where, after the launch of an Experience but before distribution of the donations, a Designated Grantee fails to maintain eligibility (per CAF America's grant-making policies and/or applicable laws), then CAF America may (i) withhold distribution of the donations until the Designated Grantee is eligible or (ii) reassign the donations to another nonprofit that supports a similar cause. If CAF America reassigns the donations to an alternate organization, the Experience page will be updated to identify what entity(ies) received the grant(s).

**(d) When will the Designated Grantee get the money?** Omaze sends 100% of donations from this Experience to CAF America within 2 business days of Omaze's receipt of the donation. The speed at which CAF America distributes the donations to the Designated Grantee(s) depends on the classification of the Experience and can be anywhere from 2 weeks after Omaze received your donation to 90 days from the close of the Experience. In circumstances where a Designated Grantee fails to maintain eligibility to receive grants, the above grant distribution timeframes may be impacted.

For Experiences where the grant amount is a percentage of total donations (e.g., Premiere and Owned Experiences), CAF America will distribute the donations via multiple grants throughout the duration of the Experience, usually within 10-15 business days following CAF America's receipt of donations from Omaze.

For Experiences where the grant amount is a percentage of Adjusted Donations (total donations minus Experience costs), CAF America will distribute donations after reconciliation of all Experience costs (usually within 15-90 days following the close of the Experience).



## Coming soon: Your dream come true.

*Sign up so you don't miss it!*

Enter your email address     **keep me posted**

By completing this form you're signing up to receive our emails. No pressure — you can unsubscribe at any time

**follow us on:**

  

Questions? Contact weloveyou@omaze.com

about us     find an experience     business inquiries     winner stories     help center     do not sell my info


Copyright © 2021, Omaze, Inc. All Rights Reserved.

Careers     Official Rules     Terms of Use     Privacy Policy     State Disclosures



# Exhibit C

**EXHIBIT C**

I, Andreas Knüttel, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Civil Code § 1780(d) and California Code of Civil Procedure section § 2015.5.

3.      From 2017 to 2020, I purchased multiple entries into prize drawings conducted by Omaze. I made the purchases in San Jose, California, where I resided at the time and where I continue to reside.

4.      I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed in San Jose, California on ____4/15/2021____.


DocuSigned by:

*Andreas Knüttel*

9DA1DDB22AE84CD...
_____
Andreas Knüttel