**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
ANTHONY PATEK (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469
seth@gutridesafier.com
anthony@gutridesafier.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

ANDREAS KNÜTTEL, MATTHEW JURANEK, AND ADRIANA CARLIN as individuals, on behalf of themselves, the general public and those similarly situated,

　　Plaintiffs,

　　　　　v.

OMAZE, INC., a Delaware Corporation

　　Defendant.

CASE NO. 2:21-cv-09034-SB-PVC

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; UNLAWFUL TRADE PRACTICES; FRAUD, DECEIT, AND/OR MISREPRESENTATION; FALSE ADVERTISING; and UNJUST ENRICHMENT**

JURY TRIAL DEMANDED

**INTRODUCTION**

1.      Plaintiffs Andreas Knüttel, Matthew Juranek, and Adriana Carlin, by and through their counsel, bring this class action against Defendant Omaze, Inc. ("Omaze" or "Defendant") to seek redress for Omaze's deceptive and unlawful practices and to stop Omaze from continuing to operate illegal lotteries and mislead the general public into believing (among other things) that most, if not all, of their "donations" are going to charity when, in fact, the overwhelming majority of their "donations" are pocketed by Omaze.  (Plaintiffs file this First Amended Complaint with leave of the Court, pursuant to the Order entered November 30, 2021.  See Dkt. 62.)

2.      Omaze solicits donations through the internet, selling chance to win prizes as part of various alleged charitable fundraising "campaigns." Omaze prominently identifies a charitable cause for each supposed fundraising campaign.

3.      But the payments Omaze solicits from the public are not really "donations" to the marketed charity. They are payments to Omaze, only a small portion of which is used to benefit the highlighted cause. What Omaze hides in its fine print (which very few, if any, consumers ever read and understand) is that Omaze takes the lion's share of the revenue for itself.  Only after Omaze takes its cut (for both expenses and profit) does any money get distributed to the marketed charity. Omaze estimates that only about 15% of the money it raises for "Omaze-sponsored" prize campaigns are given to the marketed charity.

4.      In truth, Omaze's charitable fundraising is just a front for illegal lotteries. Under California law, a "lottery" includes any scheme to distribute property by chance among persons who have paid any valuable consideration for the chance of obtaining such property. That describes Omaze's business perfectly.

5.      Omaze told the public for years that its system worked "just like a raffle." That was false because, among other things, raffles are legally required to donate 90% of gross receipts to charity, which Omaze has never done. Further, it is illegal under California law to conduct raffles over the internet.

6.    More recently—and likely because its campaigns do not comply with the legal requirements for raffles—Omaze began characterizing its campaigns as "sweepstakes." But for most of Omaze's campaigns, this characterization is also false. Although they involve distribution of prizes by chance, sweepstakes do not require payment of consideration by anyone. While Omaze does distribute some free entries, it requires a minimum number of participants to purchase entry before it will distribute the prize, thereby ensuring its own profits. Further, sweepstakes entries must be offered and distributed to the general public on the same terms and conditions, regardless of whether a participant pays for entry into the sweepstakes. In contrast, Omaze sells chances to win prizes and experiences to people for profit; that is the essence of its business. The more the person pays, the higher their chance of winning.

7.    Omaze set up its lottery to favor people who pay more money, and advertises its lottery in way that encourages larger payments. It does so by prominently stating that higher "donations" receive more entries (and even more entries per dollar in many cases) and by creating the impression that paying results in more entries than free entries. For example, in a given campaign, a "donation" of $10 will buy 100 "entries," while a donation of $2,000 gets 20,000 "entries." Omaze also has provided those who pay with "bonus" entries, with a chance to win more entries or prizes using a "lottery spinner, and with opportunities to purchase discounted entries. Omaze prominently markets the benefits of paying money to participate in its drawings. By contrast, for most of its history, Omaze failed to notify consumers adequately of their ability to enter for free, made it cumbersome to do so, and made it difficult to determine one's chances of winning with a free entry relative to a paid entry. In context, given the displayed scale of entries and the incentives to pay higher amounts, reasonable consumers believe the chances to win as a result of free entries will be less than chances from paid entries.

8.    While Omaze touts its activities as charitable, Omaze takes most of every dollar received, and the primary service it provides is gambling. Its activities do not fit with the classic models of a raffle or sweepstakes. In a raffle, the prizes are donated, and the overwhelming bulk of gross revenues (>90%) go to the charity. In Omaze's case, Omaze purchases luxury goods, sells chances to win them, and then donates a minor fraction (~15%) of the gross receipts. In a

sweepstakes, a company uses non-gambling revenues from goods and services to pay for a prize which is used as a promotion for that company's business (e.g., to promote McDonald's food). Here, in contrast, Omaze's lottery entries are the only products being sold; Omaze has no other business to promote. And while a business carries the risk that increased sales from its sweepstakes will not cover the costs of its promotion (because no one has to buy anything to enter into the sweepstakes), the public pays for Omaze's self-promotion, because, if the donations associated with a campaign do not exceed the cost of the campaign, Omaze simply postpones the "drawing" for the prize until it has received enough payments to make a profit.

9. Although Omaze purports to distribute entries in to its drawings for free, it is not true that everyone can enter for free; Omaze allows free entries but, more importantly, *requires* a substantial number of people to pay in order to hold a drawing. A legal sweepstake cannot be manipulated in this way to ensure that the operator profits. Nor can the operator of an illegal, for-profit lottery claim they are not doing so by allowing a few people to enter the drawing for free.

10. In sum, Omaze solicits, receives, and requires payment of consideration by a significant portion of the participants, which means its "campaigns" are not legal sweepstakes, but instead illegal lotteries.

11. Omaze further violates California sweepstakes laws by failing to publish the odds of winning its purported sweepstakes and the actual rules under which they are operated. Because Omaze requires a minimum number of paid entries to cover its costs and make a profit, it can estimate the minimum number of paid entries that it must receive before it can conduct its "drawing," which allows it to estimate the odds of an entry winning.  But Omaze does not publish the odds of winning for any of its contests; instead, Omaze simply states that the odds of winning will depend on the number of entries. Each time Omaze postpones drawings until it has received enough payments to make a profit, it is changing the rules of its sweepstakes mid-contest. Each posted deadline that is not met is not only a false and deceptive advertisement, but also a violation of California law requiring sweepstakes administrators to publish the actual date of their sweepstakes drawings. Such actions are a violation of California laws regarding the running of

lotteries and sweepstakes, and thereby further violate California's Consumer Legal Remedies Act and Unfair Competition Law.

12.     Omaze's entire business is built on this foundation of deception. If Omaze was honest with the public, and clearly disclosed that (a) only about 15% of any payment actually goes to the charitable cause marketed in a particular campaign and (b) participants can now enter for free and get as many entries as someone who pays the maximum amount (and thus far more entries than anyone who pays smaller amounts, such as $10 or $25), almost everyone would enter for free and Omaze's business would collapse.

13.     Further, participants would be less likely to spend money on "entries" if they knew that Omaze retained the right to postpone the drawing until enough "donations" had reached a minimum amount sufficient to cover Omaze's costs and ensure a profit.

14.     The fact that Omaze is engaged in a for-profit, private lottery is underscored by numerous venture capital firms investments in it. Omaze's shift to distributing luxury prizes by chance was accompanied by a $30M increase in seed funding by venture capital firms in a series B financing, plus an additional $85M in a series C finance round in 2020. Venture capital firms, which have a fiduciary duty to their investors, seek out companies that are likely to generate high returns on the venture firms' investments.  Charities, whose entire purpose is to give money away, do not fit that model. Lotteries do. In essence, Omaze uses the fact that some revenues are donated to charity to camouflage its for-profit lottery as a charitable activity.

15.     Plaintiffs bring this action on behalf of themselves, a class of similarly situated individuals, and the general public.

16.     Plaintiffs seek an order against Defendant awarding injunctive relief and requiring Defendant to, among other things: (1) to comply with applicable law, as set forth in detail below; (2) require Defendant to offer refunds to any Class member who purchased entries in any Omaze campaign; and (3) pay damages and restitution to Plaintiffs and Class members.

1

**PARTIES**

2      17.     Plaintiff Andreas Knüttel is, and at all times alleged in this Class Action

3  Complaint was, an individual and a resident of San Jose, California.

4      18.     Plaintiff Matthew Juranek is, and at all times alleged in this Class Action

5  Complaint was, an individual and a resident of San Gabriel, California.

6      19.     Plaintiff Adriana Carlin is, and at all times alleged in this Class Action Complaint

7  was, an individual and a resident of Palmdale, California.

8      20.     Defendant Omaze, Inc. is a Delaware corporation headquartered in Los Angeles,

9  CA and registered with the State of California. Omaze maintains its principal place of business at

10  5735 W. Adams Blvd, Los Angeles, CA 90016. Omaze, directly and through its agents, has

11  substantial contacts with and receives substantial benefits and income from and through the

12  United States and/or State of California.

13                **JURISDICTION, VENUE, APPLICABLE LAW**

14      21.     This Court has subject matter jurisdiction over this action pursuant to the Class

15  Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class

16  members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of

17  interest and costs.

18      22.     This Court has supplemental jurisdiction over any state law claims pursuant to 28

19  U.S.C. Section 1367.

20      23.     The injuries, damages, and/or harm upon which this action is based occurred or

21  arose out of activities engaged in by Defendant within, affecting, and emanating from, the State

22  of California. Defendant maintains its principal place of business within, regularly conducts

23  and/or solicits business in, engages in other persistent courses of conduct in, and/or derives

24  substantial revenue from services provided to persons in the State of California. Defendant has

25  engaged, and continues to engage, in substantial and continuous business practices in the State of

26  California. Defendant's wrongful acts and omissions occurred in California and were carried out

27  and/or directed from Defendant's California headquarters by California personnel over California

28  technological infrastructure.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

25.     In accordance with California Civil Code Section 1780(d), Plaintiffs concurrently file herewith a declaration establishing that they have standing as California consumers to pursue CLRA claims. (Plaintiff's declarations are attached hereto as Exhibits A-C.)

26.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

## I.     OMAZE MISREPRESENTS LOTTERY PURCHASES AS DONATIONS.

27.     Omaze operates omaze.com, an online platform offering a chance to win a prize in exchange for a "donation" to one or more charitable causes. Omaze runs two general types of fundraising campaigns: celebrity campaigns and "Omaze-owned" campaigns. Celebrity campaigns generally involve an experience with a celebrity while Omaze-owned campaigns generally involve an expensive item such as a luxury car or vacation.

28.     Each prize is the subject of its own campaign, with its own "experience page" on Omaze's website. Omaze advertises each campaign as a distinct "sweepstakes." Each experience page offers the opportunity to enter the drawing for that prize by donating to charity in return for "entries." Examples of campaign web pages for 2020 and 2018 are attached as Exhibits D & E, respectively.

29.     All of Omaze's campaign solicitations for a given time period use a common format, with identical organization and common disclosures. Details such as the specific prize and beneficiary may change, but Omaze's basic message and solicitation strategy are common across campaigns. Omaze's standard template for its solicitations has changed from time to time, but all solicitations can be placed within a few small categories. From 2017 forward, Omaze has used the same basic template at all times, with minor periodic changes. Pre-2017 examples provide historical context for Omaze's activities from 2017 onward.

A.    **Omaze's Campaign and Payment Pages Use a Common Theme that Creates the False Impression Payments are Charitable Donations.**

30.    At all times from the date of Omaze's founding in 2009 up to the present, each experience page took people who indicated their desire to donate money in exchange for contest "entries" (e.g., by clicking on some form of "donate" or "enter" button) to a donation page to process a financial transaction.

31.    On information and belief, all consumers who "donated" money through Omaze necessarily viewed both the experience page and the donation page for the contest they entered, as this was the only way donors could "donate" through Omaze.  The experience page (sometimes also referred to as a "campaign" page) and payment pages were the only pages that users necessarily viewed in order to purchase chances to win Omaze's drawings.

32.    Although Omaze's website had other pages, including a landing page (i.e., www.omaze.com), Official Rules page, and Terms of Use page, the Omaze website was structured in a way such that donors did not have to view those other web pages in order to donate. Omaze included links to the "Official Rules" and "Terms of Use" in inconspicuous locations, and in small font, toward the bottom of the campaign pages, amidst or below dense legal terms. For certain pages, the legal terms were not displayed by default but had to be accessed by expanding a section called "stuff our lawyers want you to read."  Consumers were not required to view the Official Rules or Terms of Use, or any disclosures about the allocation of money, in order to enter, and Omaze designed their webpages so that it was unlikely consumers would view such information in the course of participating in Omaze's lotteries. Omaze did not include a statement on its checkout page (just below the "Continue to payment" button) notifying consumers that they are agreeing to Omaze's Terms of Use and Official Rules until March 2, 2021, after this lawsuit was filed.

33.    Omaze also advertised via email and Facebook and other third-party platforms. Its advertisements touted individual campaigns with hyperlinks that led to the specific campaign being advertised. As such, on information and belief, people who were solicited to donate via email or ads on third party sites necessarily viewed the Omaze experience page and donation page for the campaign to which they donated.  As described in further detail below, the most prominent

information on each experience page is a description of the prize, a description of a charity whom the campaign us supposed to benefit, and the words "Donate" and "Enter." As described above, people directed to Omaze from third party web sites did not necessarily view Omaze's Terms of Use page or Official Rules page.

34.    Omaze was founded in 2009. In its earliest iterations, Omaze asked for $5 donations in return for a chance to have an "experience" with a celebrity. For example, its August 30, 2012 website advertised: "You donate $5 for the chance to win." Omaze further advertised that "the more you donate, the better your chances of winning." By November 2012, Omaze had raised the minimum amount to $10.

35.    In those early years, Omaze's donation pages were a simple shopping cart interface listing a "ticket price," quantity (which was filled in by the purchaser), and total "price." Above the purchase interface was text stating "btw, your donation is about to improve a life. Feeling pretty good about yourself? You should." The page included no disclosure that Omaze would deduct expenses and fees from the amount being "donated" to charity. By referencing "ticket" sales, Omaze's early shopping cart page mimicked a charity raffle.

36.    By 2013, the Omaze shopping cart listed three different entry amounts, plus an option to purchase a user-defined number of entries (i.e., an option to fill in the amount of money the donor wished to give). Omaze replaced references to "tickets" with "entries." The price per "entry" decreased with the total amount purchased, declining from $10 for a single "entry" to $7 per "entry" for 10 or more "entries." In a prominent text box on the upper right portion of the page, the shopping cart included the name of a charity under the word "Benefiting." The cart also indicated that "your contributions help" the named charity. The 2013 cart included an easily overlooked footnote in smaller font with "NO PURCHASE, PAYMENT, OR CONTRIBUTION NECESSARY TO ENTER OR WIN. Contributing will not improve likelihood of winning." The footnote further stated, "[m]ake a $10 or more donation and be automatically entered, or to enter without contributing, click here." "Here" was an embedded hyperlink that took the reader to the official rules page, which did not actually allow them to enter for free, but provided instructions on how to do so by mail.

37.     Starting in 2015, Omaze's shopping cart page listed roughly ten different "donation" amounts, each a large box with photo, next to a suggested dollar amount ranging from $10 "base level donation" to a $25,000 "World Changer" donation. At the top of the page, Omaze printed: "Select any donation.  Earn chances to win & also receive rewards." The right side of the page listed information about the charity the contribution was supposed to "support," along with a small list of FAQs, including "What percent goes to charity?" Clicking on the question caused the following drop-down answer to appear: "Eighty percent of the net proceeds go to the charity. ***Omaze is a for-profit charity*** that raises funds and awareness for our cause partners. While we don't charge an up-front fee to our non-profit partners, we do keep twenty percent of the net proceeds to cover the services we provide." (Emphasis added; Omaze's characterization of itself as a "for-profit charity" was false and misleading, as Omaze was not, and never has been, a charity.) Omaze did not define "net proceeds" or how they were calculated, nor did it provide any concrete indication of what absolute percent of the total contribution went to the charity. There was still no link for free entries on the campaign or donation page; if readers found any mention of free entry, they were simply directed to the official rules, which gave instructions for entry by mail.

38.     Since March 2018, individual experience pages for each campaign have showed the phrases "donate to win" and "donations benefit a great cause" directly above a large "enter now" button, visible at the top of each experience page.

39.     From roughly March 2018 to the present, Omaze has had "donors" select their contribution amount on the experience page. Each experience page currently offers donors four amounts, each identified as a donation amount on a large, clickable radio button: "donate $10," "donate $25," "donate $50," or "donate $100." Donors who give $10 or $25 dollars receive 100 and 250 entries, respectively, in the given prize drawing. Donors who give $50 or $100 receive "double entries," for 1,000 and 2,000 entries, respectively. Clicking the "donate" amount radio button takes the donor to Omaze's shopping cart page, with the chosen amount and number of entries listed in the shopping cart. It is possible to click donation amounts multiple times to purchase multiples or combinations of the listed entry amounts (i.e., clicking $10 and $25 shows

two purchases in the shopping cart, for a total of $35). Below the amount chosen, the shopping cart states "Supporting [the charity beneficiary]."

40.     In clicking on the "donate" buttons and proceeding to checkout and pay, consumers are not required to review or approve the Terms of Use (an entirely separate web page, accessed by inconspicuous link at the bottom of certain pages), "Official Rules" (also a separate page, accessed by inconspicuous link at the bottom of certain pages), or the fine print below the heading "Stuff our Lawyers want You to Read" on the experience page.

41.     Donors who gave money after entering the site through the omaze.com landing page (as opposed to those who went directly to an experience page from an email or ad on a third-party site such as Facebook) were exposed to even more misleading information.

42.     For example, Omaze's August 30, 2012 landing page declared "You donate $5 for the chance to win." It further advertised that "the more you donate, the better your chances of winning." Clicking on a "How It Works" link at the top of Omaze's landing page brought up a pop-up window that said, among other things, that "[t]he process works just like a charity raffle," where "the proceeds are delivered to benefit a specific social cause." The 2012 landing page did not disclose how "proceeds" were calculated, and did not describe them as "net" proceeds after deduction of expenses and Omaze's fees.

43.     By indicating that its sweepstakes work "just like a charity raffle," Omaze gave the impression that essentially all proceeds (≥90% of gross receipts) went to charity, as required by law for charity raffles.  Omaze continued making this misrepresentation until late 2015.

44.     The October 2015 web page solicited people to review the campaigns offered by Omaze and "donate to a great cause for a chance to win." But drawing purchases went mostly to Omaze, and were thus not "donations."

45.     For the Christmas holiday season in 2016, Omaze changed its landing page to play up the "game" experience. Its new banner touted "Extraordinary Experiences" in large letters, with "for a $10 donation, anyone has the chance to win" line immediately underneath the title. Below the banner, Omaze stated in large letters: "donate to win a once-in-a-lifetime experience,

and support an amazing cause." Again, Omaze's characterization of payments as "donations" was false.

46.     In February of 2017, Omaze changed its landing page slogan to "Good Things Come to Those Who Give" with "When Everybody Donates, Cool Things Happen" in smaller print just below the title slogan. Further down in the landing page (below the area that automatically appeared on screen), Omaze's landing page included the statement "donate to win once-in- a-lifetime experience and support an amazing cause." The Good Things Come to Those Who Give theme remained Omaze's landing page until approximately May 2020.

47.     Omaze's disclosure of how much money goes to charity has changed over time, bit has generally required users to actively investigate fine print and hunt for hidden disclosures. From March to September of 2015, Omaze stated, in the "how it works" pop-up (i.e., a disclosure only visible if the user clicked on it) on its landing page, that "proceeds (donations minus expenses and platform fees)" were donated to charity. Starting around October 2015, Omaze stated that "All net proceeds (donations less campaign expenses and platform fees)" were paid to charity. Omaze removed these statements around March 2016.  Clicking on a "Find Out How" radio button on Omaze's 2017 landing page led to a "How It Works" page that indicated halfway down the page, in a section titled "where does the money go," that Omaze kept 20% of donations as a professional fee for its services. Omaze removed that statement in March 2018.  Although none of the above statements were necessarily effective—because people who clicked on ads on third party sites were never directed to Omaze's landing pages—Omaze apparently concluded they were still too visible. Omaze moved its explanations of how much money actually goes to the marketed charities to less visible areas (such as the fine print at the bottom of its very long experience pages).  On information and belief, it did this to obscure how little of the money paid to it actually went to these charities.

48.     Reasonable consumers believe that they are donating to the particular charities marketed with each Omaze campaign, not paying the bulk of their money to Omaze.

49.     Exhibit D is an example of an Omaze experience page from 2020, showing that the charity "GivePower" was marketed as the beneficiary of the fundraising. The lead headline on the

page is "Win a 2020 Tesla Model S Performance and $20,000." "Support GivePower" is shown in fine print above the headline, in low contrast font. The charity info is disclosed in a section titled "Who You'll Help," which is read by scrolling down.  Scrolling several pages, in fine print, under the heading "stuff our lawyers want you to read," GivePower was identified as the "Designated Grantee." The fine print then states: "All donations made in connection with a fundraising campaign are paid to Charities Aid Foundation of America ("CAFA"), an IRS-recognized, U.S. public charity whose mission is to make giving internationally and domestically safe, easy and effective for U.S. donors. CAFA prequalifies each grantee that has been designated; "Designated Grantee", as an eligible recipient of CAFA grants. At the end of each fundraising campaign, so long as the Designated Grantee continues to qualify as an eligible recipient of CAFA grants, CAFA will make a grant to the Designated Grantee of the net proceeds of the fundraising campaign.*"

50.     At the very bottom of the experience page—in a location few, if any, readers will see due to the need to scroll down through multiple pages of text—a footnote to the fine print states "*Omaze also invests in securing the prizes for the typical Omaze Owned campaign, so for these, from every dollar you donate, 15 cents is used by CAFA to make a grant to the associated charity. If there are multiple charities, then grants of equal share are made to each charity. 70 cents is typically used to actually get the prize, process payments and advertise to awesome people like you (Omaze Owned campaigns require more significant marketing efforts by Omaze and do not rely (or rely to a much smaller degree) on the work and name of celebrities to help raise awareness and promote the campaign). The remaining 15 cents of your dollar goes to Omaze—it's used to cover the cost of providing and maintaining the technology and team that makes this all happen."

51.     In 2019, the agreement between Omaze and CAFA was amended to provide that for certain campaigns, the Net Proceeds will be calculated as fifteen percent of the gross amount of all "Donations," and for certain other campaigns, the Net Proceeds will be calculated as sixty percent of the gross amount of all "Donations."

52.     CAFA then directs certain amounts from the "Net Proceeds" to the promoted charities associated with the campaigns. For participating in this this scheme, CAFA collects a fee or percentage of the "Net Proceeds" determined by Omaze.

53.     Omaze's advertising tricks entry purchasers into believing all or most of their payments are donations to the promoted charities (or "Designated Grantees").

54.     In truth, only a small percentage of the total money "donated" to Omaze-owned campaigns actually goes to the promoted charity (or "Designated Grantee") and no more than 60 percent of the money "donated" to celebrity experience campaigns goes to the promoted charity.

55.     For Omaze-owned campaigns, Omaze does not collect a small, fixed amount from each donation, and then donate the remainder to the promoted charity. Rather, Omaze either (a) takes (or has taken) **all** of the donations up to the amount of its expenses and costs, and then takes a substantial percentage of every donation thereafter (above the Omaze-determined breakeven point) as profit; or (b) simply takes (or has taken) 85% of every single dollar. In aggregate, Omaze keeps the majority of every dollar collected for Omaze-owned campaigns and a large percentage of every dollar received for other campaigns. Such a profit scheme is inconsistent with Omaze's representations that consumers' payments are "donations" to the charities.

56.     Pursuant to an agreement between Omaze and CAFA dated December 1, 2017, Omaze retained custody and control of the payments it received, would deduct its expenses, costs, and a "professional services and management fee" (equal to 20% of proceeds after deducting expenses and costs), and would then transfer the "Net Proceeds" to CAFA. The agreement stipulated that donations could be transferred to a CAFA bank account to comply with state law, but the amount of money that Omaze collected from its campaigns, the amount of money CAFA would get, and the amount ultimately directed to the promoted charities associated with the campaigns were set by the agreement; such amounts were not affected by ministerial details regarding which bank account held certain amounts at certain times.

57.     Omaze filed disclosures of its agreements with CAFA with the Department of Charitable Trusts as part of Omaze's 2020 charitable fundraiser registration.

58.     According to that disclosure, as of 2017, Omaze calculated "net proceeds" by deducting (i) "reasonable and necessary expenses," (ii) "the cost of any prizes and rewards purchased and provided by Omaze," and (iii) "a professional services and management fee paid to Omaze equal to 20% of the gross donation amount after the amounts described in clauses (i) and (ii)."

59.     In 2019, the agreement between Omaze and CAFA was amended to provide that for certain campaigns, the Net Proceeds will be calculated as fifteen percent of the gross amount of all "Donations," and for certain other campaigns (i.e., celebrity campaigns), the Net Proceeds will be calculated as sixty percent of the gross amount of all "Donations."  This is not the fee arrangement described on Omaze's web site; it differs in that is suggests that Omaze will pass through 15% and 60%, respectively, of gross proceeds without regard to whether proceeds cover Omaze's costs and fees.

60.     Despite this, Omaze routinely misrepresents that all of its revenues are donations. For example, its web site loudly proclaimed in 2020 that it had "raised $130M for charity." Omaze feeds this or similar false claims to its third party partners and media outlets as well (see, e.g., Foundr interview, Donut Media McLaren drawing ad on YouTube).  But the $130M was Omaze's gross revenue, not the amount that went to charity. Most of that $130M went to cover Omaze's costs and fees.

61.     The misleading nature of Omaze's marketing is exacerbated by its use of third party influencers and social media personalities.  Omaze uses these people to promote its fundraising efforts, but the influencer and social media posts contain no disclosure of Omaze's fees or for-profit nature, and sometimes falsely state that all proceeds go to charity.  For example, Omaze's first McLaren prize drawing used a YouTube video ad in which the spokesperson from partner Donut Media stated that "all proceeds go the men's health research," and posted an Omaze ad stating "all donations support men's health and wellness," even though Omaze purchased the McLaren for $250,000 and used proceeds of the "sweepstakes" to cover that cost. See https://www.youtube.com/watch?v=9hyLy_boTEs.

62.     Similar misrepresentations by other putative charitable fundraisers have been deemed fraud.  In *Illinois ex rel. Madigan v. Telemarketing Associates Inc.*, 538 U.S. 600, 605-606 (2003), the United States Supreme Court held that a complaint pleading that fundraisers falsely represented that 'the funds donated would go to further . .  charitable purposes', when in fact 'the amount . . . paid over to charity was merely incidental to the fundraising effort,' which was conducted primarily 'for the private pecuniary benefit of' the fundraisers" stated a claim for relief that can survive a motion to dismiss.  The Court ruled that "Our prior decisions [including *Riley v. National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988)] do not rule out, as supportive of a fraud claim against fundraisers, any and all reliance on the percentage of charitable donations fundraisers retain for themselves. *Madigan*, 538 U.S. at 606. While bare failure to disclose that information directly to potential donors does not suffice to establish fraud, when nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener, the First Amendment leaves room for a fraud claim."  Omaze makes such intentionally misleading statements, including its characterization of lottery ticket payments as "donations," its characterization of gross revenue it uses to cover its fees and expenses as money "raised for charity," its characterization of its private lottery as a sweepstakes, and its characterization that it does not require anyone to pay to participate in the lottery.

63.     In *Madigan*, the charitable fundraiser retained approximately 85% of donations as fees and costs—the same proportion that Omaze keeps for its Omaze-owned campaigns.  At trial after remand, that organization, VietNow, was found liable for false advertising and "egregious fraud," and ultimately dissolved after prosecution by Illinois and 23 other states. See https://www.chicagotribune.com/investigations/ct-vietnow-met-20171106-story.html.).  Omaze's conduct parallels that of VietNow with respect to amounts actually donated to charitable causes.

64.     In addition to constituting common law fraud and misrepresentation, Omaze's conduct violates California's Consumer Legal Remedies Act (CLRA) and Unfair Competition Law (UCL) by misrepresenting the price of its lottery entries as charitable donations. In truth, Omaze's platform is a for-profit private lottery that donates a small percentage of its revenue to charitable causes.  Plaintiffs do not allege that fundraisers are always required to prominently

disclose the percentage of funds that go to the actual charitable cause marketed as the beneficiary. But fundraisers cannot mislead the public either. Here, Omaze's constant and repeated mischaracterization of amounts paid, and its revenues, as donations to charity are misleading because the small percentage of funds going to the marketed charity falls far below the level reasonable consumers are led to believe and because such a large percentage goes to enrich Omaze and its investors for operating an illegal for-profit lottery.

65.     Omaze maintains individual accounts for participants and tracks participation entries for drawings, marketing, and other purposes.  Accordingly, Omaze has records of every drawing entry purchased and/or assigned to each individual Plaintiff, as well as records of the representations made on each of the campaign webpages for the drawings in which each Plaintiff participated.

**B.      Omaze's Landing, Official Rules, and Terms of Use Pages Further Misled Consumers By Prominently Describing Payments as Donations.**

66.     As noted above, Omaze has two types of campaigns: celebrity experiences and "Omaze-Owned."  Omaze began by "raffling" off celebrity experiences.  But starting in 2018, Omaze shifted to more profitable Omaze-owned campaigns in which Omaze purchases expensive items such as homes, cars, and vacations and then distributes them by random drawing to people who "donate" to the Omaze-owned campaign.  Omaze-owned campaigns are now Omaze's main business.

67.     In an interview with Foundr (www.foundr.com) published in June 2021, Omaze founder and CEO Matt Pohlson described the events that led Omaze to implement Omaze-owned campaigns.

68.     According to Pohlson, "For the first six years, we were highly focused on celebrity experiences, and it was going well."

69.     But he then realized that "there was a limit how big we were going to be doing celebrity stuff, just celebrity stuff, because we didn't control our own destiny.  And six months before I had left, we had done this campaign with Daniel Craig where you got to go to New York, you got to the Aston Martin track, you got to drive around this one-of-a-kind Aston Martin.  Then

you got to keep the Aston Martin.  It was supposed to raise $300,000, and it raised $2.1M.  And halfway through, our marketing team was really smart, and they said, 'What if there was no Daniel Craig, but if it's just the car, and that performed really well?'"  (Based on review of YouTube, the Aston Martin campaign described by Mr. Pohlson was launched in or around March of 2017.)

70.     Pohlson continued: "So we then decided to take a leap, and go buy a $250k McLaren, and offer it with just Omaze distribution, and no talent."  That campaign raised $1.9M.  (N.B., in at least one ad for the McLaren campaign on YouTube, posted September 10, 2018, the person in the ad stated that "all the proceeds go to men's health research."  Assuming Omaze used proceeds of the drawing to cover the cost of the McLaren, that statement that all proceeds go to men's health research is false.)

71.     Pohlson's response was "Wow, that changes everything."  A month later, the company announced a switch from 300 celebrity experiences per year to 50 celebrity experiences per year.

72.     According to Pohlson, Omaze then went "all-in on what we call 'Omaze-owned,' which was the, you know, McLaren, or reducing student debt, or ride around in a custom sprinter van.  And the business just exploded. . .  Revenue's grown 500% with headcount growing only 10%."

73.     Later in the same interview, Pohlson noted "So we have two sides of the business, right?  We have the celebrity side and the prize side.  So the first thing I want to say is that we have a philosophy in the charity space that is maybe controversial, but, um, is what I think is needed which is that we are focused on not the percentages that the charities get, but on the dollars that the charities get.  We believe that the charity space has been held down in the past because it's not been allowed to hire great people, it's not allowed to invest in marketing.  These are things that for-profit companies do to scale, you know [unintelligible]. . .  With that in mind, we believe in building a company that is very profitable. . . "

74.     He continued, "So, with all that preamble, our model is that, on the celebrity side of the business, 60% of the donations go the charity." He estimated marketing costs for raising $1M on that side as $250k.

75.     "On the prize side, it's a different model. So let's say we do a million dollar campaign with a Lamborghini. . . .   So with the Lamborghini, $400,000 in cost, plus marketing is more expensive because we don't have talent promoting it through their channels.  So there's another $300,000 in marketing, and then what's left over is $300,000. We say to charities, **15% is guaranteed to go to you**, and we will have the rest.  Sometimes that will be less than 15% because **we may lose money on the car**. But as we get better it will be more that accrues back to us.  But that's what we get for taking the risks, and for you guys [i.e., the charity], you're just getting checks sent to you, so it's a great deal. And they love it, we have a 100% repeat rate with our charities"  (Emphasis added.)

76.     Mr. Pohlson's above statement admits the possibility of Omaze losing money if its revenues do not cover costs.  The possibility of loss provides a motive to ensure campaigns are profitable, and a motive to delay drawings.

77.     His comment also suggests a flat 15% of gross revenue for each Omaze-owned campaign will be donated, irrespective of whether costs are covered.  That representation is inconsistent with Omaze's public statements on its web site, which indicate Omaze splits net proceeds (which could be $0) with CAFA.  As Mr. Pohlson made the statement in a 2021 interview after this lawsuit was filed, it is possible this Omaze changed its practices in response to this lawsuit.

78.     Mr. Pohlson's comments also demonstrate that Omaze understands the need to develop accurate projections of the number and amount of donations required to make each campaign profitable.  That same information used to project Omaze's revenue requirements would allow it to calculate estimates of the odds of winning each campaign, which it is required by law to publish, but does not.

79.     Mr. Pohlson's description is also misleading, in that it states there is a 100% repeat rate for its charities (plural), when Omaze, in fact, contracts with only one charity: CAF America.

### C.  California Attorney Investigation into Omaze Operations

80.  Omaze's activities have resulted in multiple investigations by and settlements with state attorneys general. While some stem from Omaze's failure to comply with registration requirements for charitable fundraisers, at least one stems from its failure to comply with requirements for sweepstakes under California law.

81.  Omaze is registered as a commercial fundraiser for charitable purposes under California Government Code §§ 12586 and 12599. By law, a commercial fundraiser for charitable purposes cannot solicit funds for charity in its capacity as a commercial fundraiser for charity until and unless it has been hired by a charity to do so.

82.  In 2014, Omaze's landing page identified the various charity beneficiaries of its campaigns as "partners." But Omaze did not file any fundraising agreements between it and those charities with the California Charitable Fundraising Registry, as required by law.

83.  Omaze let its registration as a commercial fundraiser lapse in January 2019.

84.  Around January 15, 2019, Omaze conducted an "Omaze Dream House sweepstakes."  This was an Omaze-Owned campaign.

85.  In or around January 2019, the California Attorney General opened an investigation into Omaze, based, inter alia, on Omaze's failure to register properly as a commercial fundraising organization.

86.  In connection with that investigation, the California Attorney General requested information regarding Omaze's Dream House "Sweepstakes."  According to a public May 2019 settlement agreement signed by the California Attorney General and Omaze, Omaze subsequently cancelled the Dream House "sweepstakes" and returned all "donations" made to that campaign before the settlement was reached.

87.  As part of a subsequent January 2020 settlement, the California AG required Omaze to modify its campaign and payment pages.  Specifically, the California AG required Omaze to change its "user flow" so that the ability to enter sweepstakes for free was advertised as prominently as the ability to purchase entries.    The 2020 Settlement Agreement also required Omaze to allow online submissions of requests for free entry, and not obscure or interfere with

the ability to do so.  As described below in section II.B.2.a, Omaze had not done so at all times, and obscured the ability to do so since at least 2018.

88.    The January 2020 Settlement Agreement also prohibits changes to Omaze's web site without notice to the California AG that "are reasonably likely to alter whether or not free entries are offered on the same terms and conditions as paid entries," or are "reasonably likely to restrict the public's awareness of the or access to the ability to enter a campaign for free." These changes in 2020 were presumably made to comply with Penal Code § 320.5(m)'s requirement of a "general and indiscriminate distribution of the tickets."

89.    Omaze implemented the changes required under the 2020 Settlement on at least some web pages no later than March 2020.

90.    However, since 2021, Omaze has been facially violating its Settlement Agreement by publishing experience pages that failed to depict "Enter without Contributing" in the same font and color as the "donate" buttons.  On information and belief, Omaze made these changes without first contacting the California AG, even though the deemphasis of the free entry button is reasonably likely to restrict the public's awareness of or ability to enter a campaign for free.

91.    Omaze has also continued to obfuscate the ability to enter for free when people attempt to enter using a mobile app.  For example, a YouTube video posted August 12, 2021, titled "Omaze is 1000% scam, and here's one solid proof!" shows a person attempting to enter Omaze's "Win Two Seats on One of the FIRST Virgin Galactic Flights to Space" without making a contribution.  The video shows a smart phone browser visiting the web address fame.omaze.com/65810078.  As the user scrolls down, payment buttons with bright pink "donate" buttons are easily visible.  In contrast, there is no button for unpaid entry; instead, the phrase "enter without contributing" is displayed in fine print in a low contrast color below the "donate" radio buttons.  This layout and format is exactly the same as the one that Omaze agreed not to use in the 2020 California AG Settlement Agreement.

92.    The "Omaze is 1000% Scam" video continues by clicking the "Enter without Contributing" button, and proceeds to show interactions that suggest the "Alternative Method of Entry" is a sham.  The user proceeds to enter a number of promo codes, many of which are

randomly selected profane words.  Each time, the Omaze web site responds with "Success!" follow by a number of entries (e.g., "Success! +500 entries" for promo code "scamomaze500"). The fact that entry of any random word with a number results in a success message suggests that the entire "Alternate Method of Entry" mechanism is fraudulent.

93.     The January 2020 Settlement Agreement also requires that Omaze "will not provide any advantage or bonus entries toward winning any prize, experience, or thing of value to any participant in connection with a payment unless it is offered on the same terms and conditions to participants who enter for free."  As described further below in Section II, Omaze has, and continues, to give paid and unpaid requests to participate different numbers of chances to win, with larger paid entries given more chances to win than smaller paid entries, and with unpaid entries often receiving a smaller overall chance to win than larger paid entries.

94.     The January 2020 Settlement Agreement also required Omaze to deposit all funds with CAF America within five business days, rather than holding gross revenues and delivering only net proceeds after deduction of costs and fees as set forth in Omaze's 2017 fundraising agreement with CAFA.

95.     Any superficial use of CAFA's bank accounts (such as Omaze transferring money to a CAFA bank account, and then getting 80% or more of the money back) does not constitute the charitable "donations" consumers reasonably believed they were making. Omaze's conduct is a bait-and-switch, prominently framing the price of its lottery tickets as a donation, while burying the fact that most money goes to Omaze's expenses and fees in fine print that is not displayed to a casual reader.

96.     The State of Florida Department of Agricultural and Consumer Affairs also brought a series of complaints against Omaze in 2017 and 2018. The exact nature of the State of Florida's complaints is unknown to Plaintiffs at this time, but Omaze settled them by paying fees and agreeing to submit registration packets for charitable fundraising.

97.     When Omaze expanded into the UK, its activities ran afoul of regulators there as well.  The UK Advertising Standards Agency filed a complaint because Omaze failed to disclose adequately that people could enter for free.

**D.     The Omaze-Owned Business Model Uses "Donations" to Generate Profits For Itself and Its Investors.**

98.     The percentage of Omaze "donations" that actually goes to charity has dropped substantially over the years since Omaze was founded, particularly since its shift to Omaze-owned campaigns as its primary business model. In 2015, when the bulk of Omaze's "experiences" were celebrity-sponsored campaigns, Omaze raised roughly $659k, of which $463k (70%) was donated to charity. In 2017, the year before introduction of Omaze-owned campaigns, Omaze reported approximately $750,000 in revenue to the California Department of Charitable Trusts, with roughly $450k passed through to CAFA.  In 2018, after the introduction of Omaze-owned campaigns focusing on luxury-item prizes, Omaze took $38M in revenue, of which only $19M (50%) went to CAFA. In 2019, Omaze took $64M in revenue, of which $19M went to cover Omaze's expenses. Omaze took $13M (20%) in fees. Only $22M (34%) went to CAFA. In 2020, Omaze reported $104M in revenue, with only $20M (19%) going to CAFA.

99.     As the above numbers demonstrate, Omaze's introduction of "Omaze-owned sweepstakes has tripled its revenues from 2018 to 2021, while the amount it passes through to charity has remained steady at ~$20M/year.  By way of comparison, Network for Good, a charitable fundraiser that made a software platform that facilitates fundraising by charities, took in $682M in revenue in 2020, $675M of which (99%) was passed through to charity.

100.     Over the same period of 2018 to 2021, Omaze has raised approximately $115M in investor funding.  In contrast, Network for Good raised only $10M in funding, despite having raised $650M more for charity than Omaze.  This is not surprising, as Network for Good took in only $7M in revenue (fees and costs) in 2020, whereas Omaze made $85M in revenue ($20M fees and $65M to cover costs). Investors were attracted to Omaze by its high returns on investment, not its fundraising prowess. Omaze's high return on investment is not the product of any technological or business innovation.  Rather, it stems from Omaze's expansion as a gambling enterprise.

E.     **When Informed of Omaze's Business Model, Many Consumers Find Omaze's Conduct Deceptive and Deem it a Lottery.**

101.    In November 2021, the YouTube publisher Slidebean did a story on Omaze's business model, which included a description of how much of Omaze's revenue went to costs and fees, and how little actually went to charity. The video was posted with the title "Is Omaze a Scam?"   Of commenters who opined on Omaze's business model, many felt that Omaze was a scam, lottery, and/or suspicious business model.

102.    In May 2021, "How the Money Works" published a story describing Omaze's business model on YouTube.  This story also included a description of how much of Omaze's revenue went to costs and fees, and how little actually went to charity, as well as a comparison of how the payout odds for Omaze were much worse than raffles and state-run lotteries. In comments in response to that story, a substantial percentage of viewers opined that Omaze was a scam and/or a private lottery.

103.    This is prima facie evidence that a substantial proportion of consumers find Omaze's conduct deceptive and misleading.

II.     **OMAZE CONDUCTS ILLEGAL LOTTERIES.**

104.    Omaze's conduct violates the CLRA and UCL because it violates the laws governing lotteries and sweepstakes. Omaze is essentially running a gambling enterprise in which money is exchanged for a chance to win a prize. Omaze misleads consumers into purchasing entries in its sweepstakes when they could enter for free. Further, Omaze treats paying entrants differently depending on the amount of money paid, in violation of the laws governing sweepstakes. Because its contests do not meet the legal requirements for sweepstakes, they are illegal lotteries or raffles under California law.

105.    California law strictly regulates games of chance. *See* Cal. Penal Code §§ 319-329; Cal. Bus. & Prof. Code §§ 17539 *et seq.* California law recognizes at least three types of games of chance: lotteries, sweepstakes, and raffles. *Id.*

106.    Under California law, a "lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such

property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." Cal. Penal Code § 319. With a few exceptions, such as state-run lotteries, "[e]very person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor. Cal. Penal Code 320.

107.    Because Omaze's "sweepstakes" do not meet the statutory requirements for a legal exception to the law against private lotteries (such as raffles and sweepstakes), they are illegal.

### A.    Omaze's Lotteries Are Not Legal Raffles.

108.    Raffles for the benefit of a nonprofit or charitable organization are a form of legal lottery. "Raffle" is statutorily defined as "a scheme for the distribution of prizes by chance among persons who have paid money for paper tickets that provide the opportunity to win these prizes." Cal. Penal Code § 320.5(b). To qualify as a raffle, a lottery must meet numerous requirements. Among these is the requirement that each ticket have a matching stub, and the winner being drawn by chance from a draw among the matching stubs. *Id*., § 320.5(b)(2). At least 90% of raffle gross receipts must go to a charitable purpose for the raffle to qualify as an exemption to the general prohibition against private lotteries. *Id*., § 320.5(b)(4)(A). Raffles may not be conducted over the internet. *Id*., § 320.5(f)(2).

109.    As noted above, Omaze characterized its lotteries as working "just like a raffle" for years. Omaze gives each person who pays money (and free entrants) "stubs" in the form of electronic entries. The winner of each lottery is then selected by randomly selecting an entry from among those submitted. And like raffles, the *celebrity* experiences that Omaze distributes are presumably donated prizes, because the celebrities are theoretically donating their time and efforts. (In contrast, Omaze purchases the luxury items distributed as prizes in Omaze-owned campaigns.)

110.    To the extent Omaze's lotteries are raffles, they are illegal. Omaze does not give at least 90% of gross receipts to charity. Further, because Omaze's lottery entries are sold over the internet, its lotteries violate California's statutory prohibition against online raffles.

111.    California Penal Code 320.5(m) exempts raffles from certain legal requirements if they satisfy all of the following requirements: (1) It involves a general and indiscriminate distribution of the tickets; (2) the tickets are offered on the same terms and conditions as the tickets for which a donation is given; and (3) ***the scheme does not require <u>any</u> of the participants to pay for a chance to win.*** This statutory provision echoes the case law regarding the distinction between sweepstakes and lotteries. As set forth below, Omaze's campaigns do not satisfy these requirements.

**B.    Omaze's Lotteries Are Not Legal Sweepstakes.**

112.    A "sweepstakes" is "a procedure, activity, or event, for the distribution, donation, or sale of anything of value by lot, chance, predetermined selection, or random selection that is not unlawful under other provisions of law." Cal. Bus. Prof. Code § 17539.

113.    Unlike raffles, which are allowed only for charitable purposes, sweepstakes developed as a form of commercial promotion used to incentivize sales of a legitimate commercial product or service. *See People v. Shira*, 62 Cal. App. 3d 442, 458 (1976). Sweepstakes are, in essence, a form of advertising. The cost of the prize is essentially an advertising expense, spent by the business doing the promotion in hopes of generating enough sales to cover the cost of the prize. A well-known example is McDonald's Monopoly Sweepstakes, in which users collect Monopoly-themed tickets, each of which has the potential to award a prize. Although the promotion generates millions of dollars in sales for McDonalds, *McDonalds does not require <u>any</u> of the participants to pay for a chance to win.* Even if no one purchased McDonald's food, the company would still distribute all of the prizes eventually (as long as consumers requested free tickets).

114.    Omaze's scheme is used to drive internet traffic to Omaze's website and generate sales of Omaze lottery "entries" (i.e., tickets or "chances to win"). Omaze's lotteries do not incentivize or promote any other legitimate product or service; the fundamental thing Omaze's "sweepstakes" promote are themselves.

115.    Legally, sweepstakes are differentiated from lotteries in that they do not require the entrants to provide consideration (i.e., payment) to participate. Further, both case law and

statutes provide that, to qualify as a sweepstakes, there must be a general and indiscriminate dissemination of free tickets.  *See Shira*, 62 Cal. App. 3d at 459; Cal. Bus. Prof. Code § 17539.15(b)-(d), (l)(1). This means both that the sweepstakes sponsor must truly not require anyone to pay for entry, and that all of the entries (whether belonging to people who donated or paid for something other than the entry or belonging to people who simply requested free entries) must compete in the game of chance on identical terms. Merely allowing some members of the public to play for free does not change a lottery into a sweepstakes if a minimum number of people are required to pay, or if there is not a general and indiscriminate dissemination of tickets.

116.    This understanding of California's lottery laws is further set forth in Penal Code § 320.5(m), which states that "a raffle shall be exempt from this section" only if, inter alia, "[t]he scheme does not require any of the participants to pay for a chance to win."  Since Omaze's scheme requires at least some participants to pay for a chance to win, it fails to meet § 320.5(m)'s requirements for exemption from the regulations governing raffles.

117.    As noted above, Omaze's campaigns are not sweepstakes, for reasons discussed in detail below.

### 1.    Omaze Requires Consideration From Consumers as a Group

118.    The fact that Omaze postpones or cancels drawings (as occurred in Plaintiffs' experiences and as Omaze readily admits on some campaign pages, see, e.g., Exhibit E) establishes that Omaze require its participants, as a group, to provide consideration to enter into its Omaze-owned "sweepstakes." If it did not, it would not be able to cover the costs of the prizes. Because Omaze's drawings ***require*** payment of consideration by at least some participants—as opposed to not requiring any participants to pay— they are lotteries, not sweepstakes.

119.    Unlike sweepstakes, where the sponsor bears the risk that the sales they generate will not cover the costs of the prize they offer, Omaze runs no risk of losing the money it has spent to advertise its lotteries if it is not held to its published drawing date; if its ticket sales do not cover the costs of the prize, it just extends the campaign and postpones the drawing date until it has generated enough money to cover its costs.

120.     Alternatively, if Omaze does not postpone drawings for campaigns where paid entries do not exceed costs, there would be no net proceeds to pass on to charity for those campaigns. Thus, if Omaze did not postpone its drawings for those campaigns, its representations that payments were supporting charity would be entirely false. Either way, Omaze is violating California law.

121.     Omaze's conduct differentiates it from legal sweepstakes such as those described in *People v. Shira*, 62 Cal. App. 3d 442, 458 (1976), because Omaze's putative "sweepstakes" are its sole source of income, and are operated specifically to make a profit from the sale of "entries" (i.e., tickets in the prize drawing), not to profit from sale of a good or service separate from the putative sweepstakes.  In a normal sweepstakes, the entity running the sweepstakes can stay in business even if no one participates in the sweepstakes. That is not true of Omaze; if people stopped purchasing "entries," it would go out of business.

122.     That Omaze's business model is a lottery is demonstrated by the code for its web pages, which used the term "lottery" to refer to certain aspects of Omaze's experience and payment pages.  For instance, a 2017 Omaze web page, when downloaded, contained displayable html/json code with variables such as "lotteryModal", "oz-lottery-spinner-informational__close-img," and "oz-lottery-modal__header."  The code for Omaze's current web pages continues to use the term "lottery" to this day.

## 2.     Omaze Offers More Entries to People Who Pay More Money, and Discriminates Between Paid and Free Entries.

123.     As noted above, California Penal Code 320.5(m) exempts raffles from certain legal requirements—such as payment of 90% of gross receipts to charity—if they satisfy all of the following requirements: (1) It involves ***a general and indiscriminate distribution of the tickets***; (2) ***the tickets are offered on the same terms and conditions as the tickets for which a donation is given***; and (3) the scheme does not require any of the participants to pay for a chance to win. For the reasons, discussed below, Omaze's conduct fails to satisfy the first two prongs of § 320.5(m).

### a.     Omaze Inadequately Disclosed the Ability to Enter for Free

124.    During most of its existence, Omaze made it substantially more difficult to enter its gambling contest without payment than with payment. At all times, Omaze has given paid and unpaid entrants different numbers of "entries." Omaze has also given paid entrants different numbers of "entries," with larger "donations" receiving a larger number of entries and a lower price per entry.

125.    For much of Omaze's history, the only mention of free entry on any experience page or any checkout page—if free entry was mentioned at all—was in fine print at the bottom of the page, which required scrolling far down through multiple sections of the webpage. That link did not always provide a convenient form of free entry. In contrast, each experience page contained a large radio button encouraging visitors to "enter to win" with "entries starting at $10 a pop." Clicking the radio button led to the shopping cart, where one could purchase entries online.

126.    For much of Omaze's history, likely into 2016 and perhaps later, consumers who wished to participate without paying any money had to submit certain information or a form by mail, with each mailing limited to a single entry.

127.    Somewhere between 2016-2018, Omaze introduced the ability to submit free entries online. However, Omaze continued to obscure the ability to submit free entries and made it difficult for consumers to find this option. According to statements in its own rules, Omaze provided a link to this option, called "Alternative Method of Entry," not adjacent to the donation options but **in fine print at the bottom of each experience page that was not visible unless the viewer scrolled through multiple pages of text**, where it was unlikely to be viewed.

128.    From some time in 2019 into at least 2020, each Omaze experience page contained a link, entitled "enter without contributing" that was listed in much smaller font beneath the large radio buttons inviting visitors to "donate." The link to enter without contributing leads to a page for an "Alternative Form of Entry," which requests contact information but which does not state how many entries will be assigned by this participation method.

129.     From some time in 2020 to the present, pursuant to its 2020 Settlement Agreement with the California Department of Charitable Trusts, Omaze has presented the opportunity to enter for free via a radio button next to the paid entry radio buttons.  However, the free entry radio button is deemphasized by making it the same color as the background (in contrast to brightly colored buttons for paid entry), and using smaller text than the paid entry radio buttons.

130.     Omaze's current web page layout facially violates its 2020 Settlement Agreement with the California Department of Charitable Trusts, as the Agreement required identical color and font size for solicitation of paid and unpaid entries, and Omaze's current web page does not do so.

131.     Omaze's conduct discriminated against free entrants for most of its history, by making it difficult to enter for free.  Omaze also discriminated against free entrants to the extent it provided them with fewer chances to win and thus a lower overall chance to win, by giving free entrants fewer entries in each prize drawing than people who made large donations.

> **b.**     **Omaze Discriminates Between Participants Based on Amount Paid to Participate, and Offers Prize-Drawing "Entries" on Different Terms to Paid and Unpaid Entrants**

132.     At all times from 2009 to present, Omaze has offered different terms and conditions to participants based on entry amount and payment vs. nonpayment. Accordingly, it is offering paid entries—or "tickets" for purposes of § 320.5(m)—on different terms and conditions than entries offered for free.  It is also discriminating between participants by offering entries on different terms based on amount paid. With respect to paid entrants, Omaze has always given better chances (more entries) to those who paid more money. Moreover, for at least the past few years, Omaze has given large donations extra entries, so that paying more to Omaze disproportionately increases the purchaser's likelihood of winning. Omaze has consistently and prominently marketed the advantage of larger donations, to provide an incentive for consumers to pay more money. See, e.g., Exhibits D & E.

133.     Omaze has changed how it has weighted free entries over time by giving unpaid requests to participate varying numbers of chances to win in the actual prize drawings. For a substantial period of time prior to July 2017, Omaze provided those who participate for free the

number of entries corresponding to the average "donation," which would be determined after the fundraising period closed. Starting around July 1, 2017, Omaze "automatically assigned 200 entries" to each free entry, which was "equivalent to the donation entries you get when you donate $20." In January 2020, Omaze stated "Each free entry is automatically assigned 2,000 entries (equivalent to the donation entries you get when you donate $100)." To date, free entrants continue to receive 2,000 entries.

134.    This discriminated against people who contributed a below-average amount, by giving them fewer entries than they could have gotten for free. For example, free entrants currently get 2,000 "entries" per entry form, whereas people donating $10 only get 100 "entries." Omaze also discriminated against small donors in favor of large donors, by giving large donors a better price per "entry" than small donors. In effect, Omaze penalized people who gave donations in below-average amounts.

135.    For example, Omaze's current experience pages solicit paid entries using brightly colored radio buttons listing differing payment amounts, with larger "donations" advertised as receiving larger numbers of entries, sometimes in exponentially larger amounts:

| Amount Paid (2021) | # Chances to Win / Entry | Price / Chance to Win |
|---|---|---|
| $10 | 20 | $0.50 |
| $20 | 125 | $0.16 |
| $50 | 500 | $0.10 |
| $100 | 1,000 | $0.10 |
| $200 | 2,000 | $0.10 |
| No Contribution | 2,000 | $0.00 |

136.    During at least the period from 2017 to January 2020, a single unpaid entry (i.e., request to participate) received fewer chances to win (prize-drawing entries) than entries submitted with higher than average payment amounts, because free entries were assigned a

number of chances to win equal to the average number of chances to win given to paid requests to participate.

137.    During this same period, participation entries received with lower than average payments were given a lower number of chances to win, and thus a lower overall chance of winning relative to entries submitted with larger than average payments.

138.    Looking at the payment options, with more chances assigned to larger amounts, consumers reasonably believe that (a) paying for entries will yield better chances than entering for free and (b) the more one pays, the better one's chances. Reasonable consumers have no reason to suspect that entering for free would result in better chances than some of the lower payment options; such a result is counterintuitive.

139.    In at least 2017 and 2018, Omaze represented on campaign pages that participants "[r]eceive bonus entries for donations." On those pages, Omaze also included coding for a "lottery spinner." Omaze explained the spinner as follows: "After you donate, spin this wheel for a chance to instantly score bonus entries, exclusive merch or even $1,000." Omaze encouraged participants to "Spin to win!"

140.    Omaze also promotes sales of "chances to win" at a discount as drawing dates near.  For instance, in response to the "How Money Works" YouTube story discussed earlier, a commenter going by "Mason," posted on YouTube that "[W]hen the giveaway is closer, they send out emails like 'get triple the # of tickets for the same price' . . . Diluting the number of people who paid in at 'regular' price."  It is unclear if Omaze offers discounted additional "chances to win" to people who enter without contributing.  If it does not, its failure to do so is an additional disadvantage to free entrants, and additional advantage to paid entrants.

141.    In addition to violating Penal Code § 320.5(m), Omaze's conduct also violates California Business & Professions Code § 17539.15(c), which states that "[s]weepstakes entries not accompanied by an order for products or services shall not be subjected to any disability or disadvantage in the winner selection process to which an entry accompanied by an order for products or services would not be subject."  In § 17539.15(c), "sweepstakes entries" refers to the request to participate in the drawing, since it is the request to participate that "may or may not be

accompanied by an order for products or services," and the "winner selection process" is a separate aspect of the process.

142.    When soliciting payments, Omaze uses "entry" or "chances to win" to refer to the number of prize-drawing tokens or lots entered into the actual prize drawing that each has a chance to win (i.e., the "winner selection process" of § 17539.15(c)).

143.    Omaze also asserts, in its Official Rules, that "[a]ll entries have the same chance of winning."  Again, as used by Omaze, "entries" in this statement refers to the "winner selection process" of § 17539.15(c).

144.    But "entry," as used in § 17539.15(c), refers to the request to participate in the sweepstakes.

145.    By using the term "entry" to refer to each "chance to win" (i.e., prize-drawing entries or tickets used in the winner selection process) provided to the person who submitted the request to participate, Omaze obfuscates its differing treatment of entries (i.e., request to participate) based on amount paid, and side-steps the fact that each entry (i.e., request to participate) is given a different number of "chances to win," and thus has a different overall chance of winning.

146.    Omaze's conduct also violates Cal. Bus. Prof. Code § 17539.15(d), which prohibits sweepstakes solicitation materials from representing that "an entry in the promotional sweepstakes accompanied by an order for products or services will . . . be more likely to win than an entry not accompanied by an order for products or services or that an entry not accompanied by an order for products or services will have a reduced chance of winning a prize in the promotional sweepstakes."

147.    The "entry in the promotional sweepstakes" in § 17539.15(d) is, or at least includes, the request to participate, as that is the "entry" that is "accompanied by an order" or not.

148.    To the extent Omaze's website discloses that increasing the donated amount will secure additional entries, it necessarily implies that people who donate will have a greater chance of winning than people who do not. It also necessarily implies that people who donate more will

have a greater chance of winning than people who donate less. This encourages people to donate more, which in turn increases Omaze's profit.

149.    At the same time, Omaze's website contained statements that purchasing entries would not affect one's chances of winning.  These statements were false, since entrants who made large payments were actually given far more prize-drawing "entries" than people who made below average "donations," and people who made below average "donations" were given fewer prize-drawing "entries" than unpaid entrants.

150.    Because the chances of winning are contingent on whether the participant makes a small or large donation, or no donation at all, Omaze does not engage in a general and indiscriminate dissemination of tickets. Beyond that, Omaze solicited payments in exchange for increased chances to win both by (a) by actually offering more entries to those who paid more money and (b) by misleading people to believe that paying money increased their chances relative to participating without payment, when that was actually only true if one paid a large enough amount of money to obtain a greater number of chances to win than a request for free entry. Each of Omaze's campaigns is therefore an illegal lottery, not a sweepstakes.

151.    Accordingly, Omaze solicits and receives payments from consumers in exchange for more chances to win.

### 3.    Omaze Violates Disclosure Laws Regarding Sweepstakes.

152.    Omaze's failure to publish accurate deadlines, rules, and odds of winning are further evidence that it is conducting illegal lotteries, as such failures are part of Omaze's efforts to hide the fact that it receives and requires consideration in exchange for chances to win prizes. But even if Omaze's drawings were deemed not to be lotteries (i.e., even if one did not view them as requiring consideration), Omaze's failure to publish accurate deadlines, rules, and odds of winning would still violate California law.

153.    Promotions that use the offer of incentive (i.e., a prize) to induce the recipient to visit a location, attend a sales presentation, or contact a sales person are required to include a statement of the odds of receiving each incentive (i.e., prize) or a calculated estimate of those odds based on prior experience. Cal. Bus. Prof. Code § 17537.1(a)(1)(C). Omaze's sweepstakes

scheme is subject to § 17537.1, as Omaze is using the possibility of winning a prize to induce consumers to visit the location of Omaze's web site, attend a virtual sales presentation (in the form of web advertising), and/or contact a sales person (in the form of Omaze's online ticket seller).

154.    Under California law, it is unlawful for any person making an offer subject to California Business & Professions Code § 17537.1(a), or any employee, agent, or independent contractor employed or authorized by that person, to offer any incentive "when the person knows or has reason to know that the offered item will not be available in a sufficient quantity based upon the reasonably anticipated response to the offer." *Id.*, § 17537.1(b). To the extent Omaze has reason to know that prizes may not be awarded as advertised if lottery sales are insufficient, it has violated this prohibition.

155.    "It is unlawful for any person making an offer subject to [California Business & Professions Code § 17537.1(a)], or any employee, agent, or independent contractor employed or authorized by that person, to fail to provide any offered incentive which any recipient who has responded to the offer in the manner specified therein, who has performed the requirements disclosed therein, and who has met the qualifications described therein, is entitled to receive, unless the offered incentive is not reasonably available and the offer discloses the reservation of a right to provide a raincheck, or a like or substitute incentive, if the offered incentive is unavailable." *Id.*, § 17537.1(c). To the extent Omaze fails to award prizes on the dates originally advertised if lottery sales are insufficient, it has violated this prohibition.

156.    California Business & Professions Code § 17539 identifies "a compelling need for more complete disclosure of rules and operation of contests in which money or other valuable consideration may be solicited," finds that prior methods of disclosure were inadequate, and makes clear that §§ 17539.1 through 17539.3 "shall be interpreted so as to provide maximum disclosure to and fair treatment of persons who may or do enter such contests."

157.    Accordingly, it is illegal to misrepresent in any manner the odds of winning any prize in a sweepstakes. *Id.*, § 17539.1(a)(3). Further, "Solicitations made to persons in this state offering the opportunity to participate in a sweepstakes shall, with respect to each prize offered,

set forth clearly, conspicuously, and in easily readable letters the odds of receiving that prize, described in whole Arabic numerals in a format such as: '1 chance in 100,000' or '1:100,000.'" *Id.*, § 17539.5(e). "If the odds depend upon the number of entries and the number of persons solicited is controlled by the sponsor of the promotion, the solicitation shall set forth the reasonable expectation of entries." *Id.* Omaze must "disclose information about the date or dates the final winner or winners will be determined." *Id.*, § 17539.15(j). It is illegal for a person running a sweepstakes to "Fail[] to award and distribute all prizes of the value and type represented." *Id.*, § 17539.1(a)(7).

158.   It is illegal under California law to conduct a sweepstakes without "clearly and conspicuously disclos[ing], at the time of the initial contest solicitation, at the time of each precontest promotional solicitation and each time the payment of money is required to become or to remain a contestant, the total number of contestants anticipated based on prior experience and the percentages of contestants correctly solving each puzzle used in the three most recently completed contests conducted by the person." Cal. Bus. Prof. Code § 17539.1(a)(1).

159.   It is also illegal to misrepresent in any manner, the rules, terms, or conditions of participation in a contest. *Id.*, § 17539.1(a)(4). Pursuant to California Business & Professions Code § 17539 and the preamble of § 17539.1 (stating that "the following unfair acts or practices undertaken by, or omissions of, any person in the operation of any contest or sweepstakes are prohibited"), these prohibitions apply to both contests and sweepstakes.

160.   Because it controls the number of emails and ads for its lotteries, as well as access to its website, Omaze controls the number of persons it solicits for purposes of California Business & Professions Code § 17539.1(a)(3). Omaze has also conducted enough sweepstakes to estimate the number of entries expected for each campaign. (See, e.g., Matt Pohlson's interview statements, discussed above, where he describes Omaze will become more profitable over time as it becomes better at projecting campaign revenues.) Omaze also controls the minimum amount of money for which it will hold a drawing and the maximum number of entries it will provide to any one person. Omaze was required to calculate and to conspicuously disclose both the estimated number of entries expected and the estimated odds of winning its sweepstakes. *Id.*, § 17539.5(e).

161.    But Omaze does not publish the odds of winning its contests or a calculated estimate of those odds. Instead, Omaze simply states that "Odds of winning depend on the number of entries held." This fails to satisfy the requirements of California Business & Professions Code §§ 17539.1(a) and 17539.5(e).

162.    Omaze publishes a "deadline to enter" and "winner announced" date on each of its campaign experience pages, without publishing the need to obtain a certain amount of money or the possibility that the drawing will be delayed until that amount is reached. This violates multiple statutory requirements for sweepstakes, including California Business & Professions Code §§ 17539.1(a)(4) and 17539.15(j).

163.    There is evidence that Omaze has delayed or postponed drawings, or at least failed to announce winners in a timely manner.

164.    Exhibit E shows the campaign page for a Tesla Model S drawing on Omaze's web site.  Under "Deadline to Enter" The campaign page states "December 4, 2018," but then states on the following line, "*NOTE: This campaign has been extended. The new deadline to enter is January 4th, 2019."

165.    On the Better Business Bureau web page, a consumer complained in April 2018 that "This company is making false advertisement [sic] I have entered several times to win a prize when I enter for a raffle the date of drawing always change [sic] Each item have [sic] a countdown date or a countdown hour but when the time is come [sic] automatically it resets.

166.    Another consumer on the same site complained that Omaze had not conducted a drawing for or announced the winner of a trip to Rome, Italy, despite advertising that a winner would be announced in June 2018.  The consumer noted "Feels like I've been scammed for falsely believing I was donating to a good cause."  An Omaze representative identifying himself as Sharif, Manager of Customer Experience at Omaze, admitted the announcement of the winner had been delayed, without explaining why.

167.    Similarly, multiple consumers left complaints on pissedconsumer.com in August 2021 indicating that Omaze had published two drawings for a "Dream House," each depicting the

same house.  Other comments noted that Omaze had raffled off a house that was known to be located in a floodplain, and subject to recurring floods each year.

168.   An October 13, 2017 complaint on pissedconsumer.com describes purchasing "100 chances to win a stay for my wife at Disney World Cinderella's Castle, with a deadline of October 13, 2017.  The consumer reports receiving an email from Omaze that day indicating that "they are extending deadline [sic] to enter which then increases the number of possible entries and reduces the chance of winning for those that already entered. I was offered bonus chances but ONLY if I bought more chances. That is a breach of contract and fraud in my opinion. I entered with a defined timeline and you don't change the rules after you sold the chances. I have never heard of a contest that does this. Completely unacceptable."

169.   Omaze's conduct described above is unlawful, and violates the public policy of the State of California requiring full, fair, and accurate disclosure of rules and odds of winning for sweepstakes.

### 4.   Omaze Profits from the Amount Gambled.

170.   In a promotional sweepstakes, entries are given to those who pay for separate products or services. If a consumer purchases the product or service on more than one occasion (e.g., visiting McDonald's on two different dates), the company may provide an entry for each purchase, but the company also has to actually provide additional products or services to the consumer for each purchase.

171.   Here, Omaze provides additional entries and collects additional profit for larger amounts of money, *without providing any additional product or service to the consumer* (other than the lottery entries themselves). Once the consumer reaches the experience page and is willing to donate to the marketed charity, the only difference between donating $10 and $50 is the amount of money being transferred and the number of entries Omaze provides; there is no other good or service that Omaze provides at that point.

172.   Moreover, Omaze does not collect a small, fixed amount for its services and then donate everything else (however much it may be) to the promoted charity. Rather, Omaze retains the majority of every dollar collected for Omaze-owned campaigns and about 40% of each dollar

received in other campaigns. So the additional money solicited largely goes to Omaze for the cost of running the lottery and for its own profit (and that of its investors).

**5.      Omaze's Founders Knew, or Should Have Known, That Their Business Model Is Illegal and That Its Advertising Is False and Misleading.**

173.    Omaze's business model is not an accident, but an intentional effort to exploit a perceived loophole in anti-gambling laws that Omaze created by intentionally misinterpreting California's laws.

174.    According to Matt Pohlson, in an interview published April 30, 2020 on entrepreneur.com, "We had to figure out the legal framework to make this happen. So we talked to every law professor in University of Pennsylvania.  All of them told us this wouldn't work. We went to like twenty different lawyers in New York, and finally one gave us a legal opinion saying the structure we're proposing would work.  When all those people kept saying no to us, like, we just persisted through it."

175.    The above story demonstrates that Omaze was informed early on that their business model was likely illegal.  Even granting the one legal opinion they obtained opining that their business model was legal, Mr. Pohlson admitted to receiving dozens of legal opinions, including several from professors at the University of Pennsylvania law school, informing him the model was not legal.

176.    Omaze also knew that their statements that payments for "chances to win" were "donations" was false, because Omaze knew how much money actually went to charity. Omaze also knowingly made false statements that it had raised "$130M" for charities, since it reported the actual amounts given to charity—which were much lower—to the California Department of Charitable Trusts. Omaze also knowingly induced third parties to make these and similar false statements on its behalf, by engaging third party influencers and personalities to repeat its own false and misleading claims.

**PLAINTIFFS' EXPERIENCES**

**Andreas Knüttel**

177.    During the period from 2018 to 2020, Plaintiff Andreas Knüttel purchased Omaze drawing entries on at least two occasions. Mr. Knüttel entered Omaze contests involving prize items (e.g., cars).

178.    Relying on Omaze's experience pages for the above campaigns (as well as others), Knüttel visited the Omaze website, where Omaze asked him to "donate" money to various, specified charities. Mr. Knüttel created an Omaze account, signed up for Omaze's emails, and purchased numerous entries into at least two drawings.

179.    When Mr. Knüttel clicked on an email or ad to view a given Omaze campaign, he was taken to that campaign's experience page. These pages consistently characterized money paid for drawing entries as "donations."

180.    Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Mr. Knüttel believed that most of the money he paid went to charity.

181.    On each experience/campaign page, Omaze represented that paying more would result in more entries (i.e., chances to win), and thus that higher payments would be assigned more weight (i.e., an overall higher chance of winning) for purposes of the drawings

182.    Mr. Knüttel believed that paying to participate in the drawing awarded more entries than "free" entry.

183.    All told, to the best of his memory, Mr. Knüttel paid at least one hundred dollars to Omaze during the period from roughly 2017 until October 2020.

184.    Several of Mr. Knüttel's "donations" were in the amount of $50.

185.    Mr. Knüttel was not aware that people who entered for free received more entries (i.e., chances to win) than people such as him who donated money up to a certain amount. If Mr. Knüttel had been aware that he was not competing on the same terms as people who entered for free, and that he was at a disadvantage relative to those who entered for free, Mr. Knüttel would not have purchased the drawing entries, or would have purchased fewer of them.

186.    Mr. Knüttel was interested in participating in Omaze's drawings for free, but was unable to do so easily, and believed that free entries had a lower chance of winning than paid entries. Combined with the belief that money he paid would go to charity, this led him to purchase drawing entries he would not have purchased if he could have submitted multiple free entries at one time.

187.    In approximately June of 2019, Mr. Knüttel paid Omaze money, in an amount of approximately $50, for entries into a drawing for a Tesla 3 automobile. This campaign was advertised as benefitting GivePower.

188.    Mr. Knüttel purchased his entries after viewing a video ad from Casey Neistat, an influencer on YouTube.  The ad is still visible online at https://www.youtube.com/watch?v=fxa0lifjXdk.  The ad falsely promoted Omaze as an organization that had raised over $100M in donations to charity since 2012.  The ad falsely says the money donated will be given to GivePower.  The ad did not disclose Omaze's fees, nor the fact that it would deduct the cost of the car from the gross receipts prior to distributing funds to charity.  It also did not disclose the odds of winning or the date of the drawing.

189.    Mr. Knüttel went to Omaze's website and purchased his entries by going through Omaze's experience page for the Tesla 3 drawing.

190.    As of June 14, 2019, Omaze advertising the deadline for the GivePower Tesla 3 campaign as July 18, 2019. Omaze actually failed to publish any drawing date, listing the "timing" as "TBD."  Omaze also stated "Winner announced: August 1, 2019."

191.    On August 3, 2019, Omaze informed Mr. Knüttel that the determination of the winner had been delayed, stating "we're just as excited as you are to figure out who won, however the process is taking a little longer than usual."

192.    Omaze's current web site displays information that contradicts its email to Mr. Knüttel. Specifically, Omaze's web site indicates that the winner for the Tesla 3/GivePower campaign was "announced August 1, 2019," even though Omaze notified Mr. Knüttel two days later that the process of determining a winner was still ongoing. This suggests that Omaze has covered up its delayed drawings by publishing false information on its web site.

193.     On August 12, 2019, Mr. Knüttel purchased 1,000 entries into a drawing for a Tesla Model X P100D for $50, the proceeds of which were also advertised as benefiting GivePower.  Mr. Knüttel purchased the second set of "entries" in response to direct marketing by Omaze.

194.     Omaze's gambling solicitations to Mr. Knüttel all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.  Omaze also failed to announce a winner by the date originally published for the Tesla 3 campaign.  They were also fraudulent, deceptive, and misleading, to the extent Omaze misrepresented the amounts being donated to charity.

**Matthew Juranek**

195.     Starting in 2015, Plaintiff Matthew Juranek has purchased multiple Omaze drawing entries. Mr. Juranek entered Omaze Contests involving consumer experiences (e.g., attending the Star Wars movie premiere) and prize items (e.g., cars).

196.     To the best of his memory, on or about November 9, 2018, Mr. Juranek paid Omaze money, in an amount of $25, for entries into a drawing for a Tesla automobile (Omaze Experience #100824), only to later be informed that the drawing would not occur on the published date.

197.     In other instances, particularly prior to 2019, Mr. Juranek wished to participate in the drawings without paying, but either (1) was unable to do so because information on how to do so was not easily accessible or (2) paid to enter because "free" entry was more onerous than paying.   The drawings for which Mr. Juranek purchased chances to win since 2017 includes at least the following:

| Omaze Campaign "Experience" | Date Purchased | Total Amount Paid |
|---|---|---|
| SKU#103594, EXP#100429 | November 23, 2017 | $25 |
| SKU#104392, EXP#100504 | March 17, 2018 | $10 |
| Go On a Game of Thrones® Tour of Northern Ireland with Liam Cunningham | July 11, 2018 | $25 |
| Meet Gal Gadot & Patty Jenkins and Be in Wonder Woman 1984 | July 26, 2018 | $10 |
| Dungeons & Dragons with Joe Manganiello | May 10, 2020 | $25 |

198. Relying on Omaze's experience pages for the above campaigns (as well as others), Juranek visited the Omaze website, where Omaze asked him to "donate" money to various, specified charities. Mr. Juranek created an Omaze account, signed up for Omaze's emails, and purchased numerous entries into multiple drawings.

199. When Mr. Juranek clicked on an email or ad to view a given Omaze campaign, he was taken to that campaign's experience page. These pages consistently characterized money paid for prize-drawing entries as "donations."

200. Mr. Juranek liked the fact that the money he was paying would go to charity, and purchased the donations due, at least in part, to the representation that the money would go to charity. Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Mr. Juranek believed that most of the money he paid went to charity.

201. On each experience/campaign page, Omaze represented that paying more would result in more entries and would make him eligible for additional entries through a lottery spinner and/or other opportunities, and thus that higher payments would be assigned more weight for purposes of the drawings.

202. Based on the tiered pricing structure, the greater number of chances to win given to higher payments, and the availability of bonus and/or discounted entries for those who paid,

Mr. Juranek believed that paying to participate in each prize drawing awarded a higher overall or cumulative chance to win than a "free" entry.

203.    All told, Mr. Juranek paid more than $100 to Omaze during the period from 2015 until October 2020. Plaintiff Juranek would not have purchased the Omaze drawing entries, or would have purchased fewer of them, had Defendant not misrepresented the purchase as donations to the charities identified by Omaze.

204.    Many of Mr. Juranek's "donations" were in the $25-$50 range.

205.    Mr. Juranek was not aware that people who entered for free received more entries than people such as him who donated money up to a certain amount. If Mr. Juranek had been aware that he was not competing on the same terms as people who entered for free, and that he was at a disadvantage relative to those who entered for free, Mr. Juranek would not have purchased the drawing entries, or would have purchased fewer of them.

206.    Mr. Juranek was interested in participating in Omaze's drawing for free, but was unable to do so easily. The ability to enter for free was not disclosed on the campaign page. When he was able to find information on entering for free, he initially found it impossible to enter for free online, because only paid entries were allowed to enter online. This led him to purchase drawing entries that he would not have paid for if he could have entered for free online. Combined with the belief that money he paid would go to charity, this led him to purchase drawing entries he would not have purchased if he could have submitted multiple free entries at one time.

207.    Omaze's gambling solicitations to Mr. Juranek all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.

**Adriana Carlin**

208.    In or around March 2016, Plaintiff Angela Carlin learned of an Omaze drawing for a chance to "Sit Front Row At Kobe's Last Game Ever." Omaze's drawing included the chance to high-five Kobe and his teammates on the court before the game, with airfare and four-star hotel accommodations included.

209.    Ms. Carlin visited the Omaze website, where Omaze solicited her for contributions, using a campaign experience page that stated money donated would go to three charities: the Kobe & Vanessa Bryant Family Foundation, dedicated to improving the lives of youth and families in need; the Positive Coaching Alliance LA, a nonprofit working with youth and high-school athletes to develop "better athletes, better people"; and After-School All-Stars, Los Angeles, which provides underserved youth with exciting and enriching after-school programs.  Ms. Carlin created an Omaze account, signed up for Omaze's emails, and purchased $100 worth of entries into the "Kobe's Last Game" drawing.

210.    Ms. Carlin was excited by the opportunity to see Kobe's last game, and was also happy that the money paid would go to charity. At no time did Plaintiff Carlin realize that only 15% of their donation would actually go to the charity beneficiary identified in the Omaze campaign.

211.    In just three-and-a-half weeks, the Kobe Bryant campaign raised a "gross" total of over $680,000. Omaze publicized the "gross" total, but did not publicize the net total that was actually delivered to the charities.

212.    After the Kobe Bryant drawing ended, Ms. Carlin continued to receive Omaze solicitations via email and Facebook.

213.    When Ms. Carlin clicked on an email or ad to view a given Omaze campaign, she was taken to that campaign's experience page. These pages consistently characterized money paid for prize-drawing entries as "donations."

214.    Ms. Carlin liked the fact that the money she was paying would go to charity, and purchased the donations due, at least in part, to the representation that the money would go to

charity.  Based on the "donate" verbiage of Omaze's ads, emails, experience pages, and payment page, Ms. Carlin believed that 80-90% of the money she paid went to charity.

215.    Over the following years, Ms. Carlin purchased entries into numerous Omaze campaigns, all under the belief that all or most of the money "donated" was going to charity.  A nonexclusive list of campaigns that Ms. Carlin participated in (in addition to the Kobe Bryant experience), and the amounts she paid, is listed below:

| Omaze Campaign "Experience" | Date Purchased | Total Amount Paid |
|---|---|---|
| 1)  Win $100,000 to Help You<br>2)  Win an Airstream Caravel | August 4, 2020 | $30.00 |
| 1)  Win/Customize Tiny Home<br>2)  Win $100,000 to Help You<br>3)  Win an Airstream Caravel<br>4)  Win a 2020 BMW<br>5)  Win a 2020 Porsche | July 9, 2020 | $22.00 |
| 1)  Go to a Game with David Ortiz<br>2)  Win $1000,000 to Help You | June 24, 2020 | $20.00 |
| Create Ultimate PC | June 3, 2020 | $25.00 |
| Win $100,000 to Change Life | May 6, 2020 | $10.00 |
| Win $100,000 to Change Life | May 1, 2020 | $25.00 |
| Have Dinner with Mark Hamill | December 1, 2019 | $10.00 |
| 1)  Have dinner with Mark Hamill<br>2)  Meet Adam Driver<br>3)  Meet Daisy Ridley | December 1, 2019 | $45.00 |
| Cross Tokyo Off Your Bucket List | July 9, 2019 | $10.00 |
| Meet Tom Hiddleston for a Drink | May 4, 2019 | $10.00 |
| Game of Thrones Finale Party | May 4, 2019 | $10.00 |

| Omaze Campaign "Experience" | Date Purchased | Total Amount Paid |
|---|---|---|
| Enjoy the Financial Freedom | April 17, 2019 | $12.00 |
| Win a Luxurious Trip to Paris | April 10, 1019 | $12.00 |
| Fly First Class to Anywhere in the World | April 9, 2019 | $12.00 |
| Win a Luxurious Trip to Paris | April 9, 2019 | $10.00 |
| Assemble with Chris Evans | April 2, 2019 | $20.00 |
| Hang with Danai Gurira | April 2, 2019 | $16.00 |
| Smash Red Carpet - Mark Ruffalo | March 19, 2019 | $12.00 |
| Meet Benedict Cumberbatch | March 19, 2019 | $12.00 |
| Emilia Clarke - Hand of the Queen | March 19, 2019 | $16.00 |
| Win Disney's Fairy Tale Wedding | January 31, 2019 | $27.00 |

216. All told, Ms. Carlin paid approximately $650 to Omaze during the period from March 2016 until October 2020. Plaintiff Carlin would not have purchased the Omaze drawing entries, or would have purchased fewer of them, had Defendant not misrepresented the purchase as donations to the charities identified by Omaze.

217. In every case, Ms. Carlin purchased her "chances to win" (i.e., "entries") via Omaze's experience pages, as described above, which included prominent visible representations the payments were "donations," with no visible representation that Omaze would deduct its costs and fees.

218.    Ms. Carlin also received emails informing her of discounts on additional "chances to win" after her initial purchase.  She sometimes purchased additional "chances to win" in response to these emails form Omaze.

219.    Many of Ms. Carlin's "donations" were in the $10-$25 range.

220.    Ms. Carlin was not aware that people who entered for free received more entries than people such as her who donated money up to a certain amount. If Ms. Carlin had been aware that she was not competing on the same terms as people who entered for free, and that she was at a disadvantage relative to those who entered for free, Ms. Carlin would not have purchased the drawing entries, or would have purchased fewer of them.

221.    Ms. Carlin was interested in participating in Omaze's prize-drawings for free, but was unable to do so easily. The ability to enter for free was not disclosed on the campaign page. When she was able to find information on entering for free, she initially found it impossible to enter for free online, because only paid entries were allowed to enter online.  This led her to purchase drawing entries that she would not have paid for if she could have entered for free online. After Omaze provided an online form for free entry, she discovered that she could do only a single submission, with a cooldown required before doing additional entries, even though no such limitation was disclosed on the campaign page. Combined with the belief that money she paid would go to charity, this led her to purchase drawing entries she would not have purchased if she could have submitted multiple free entries at one time.

222.    Omaze's gambling solicitations to Ms. Carlin all violated California law by failing to properly disclose the odds of winning or a calculated estimate of the odds of winning each contest. They also violated California law by failing to disseminating tickets in a manner that discriminated against free entrants and people who purchased less than the average amount of paid entries. They further violated California law by failing to donate the majority of their gross revenues to the listed charities.

**CLASS ALLEGATIONS**

223.     Plaintiffs bring this class action lawsuit on behalf of the following proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

The Class: All natural persons within the United States who between April 13, 2017, or earlier date within the applicable statute of limitations, and the date of preliminary approval donated money to charity via Omaze.

The Omaze-Owned Campaign Subclass: All Class Members who donated money to charity through an Omaze-owned campaign on the Omaze platform.

The California Subclass: All Class Members who reside in the State of California.

The California Omaze-Owned Campaign Subclass: All California Subclass Members who donated money to charity through an Omaze-owned campaign on the Omaze platform.

224.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

225.     Numerosity:  Plaintiffs do not know the exact size of the Class, but they estimate it is composed of tens of thousands, and potentially hundreds of thousands, of Class Members. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

226.     Common Questions Predominate:  This action involves questions of law and fact common to the potential class members because each class member's claim derives from the same deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover.  The questions of law and fact common to the Class include, but are not limited to, the following:

    a.   Whether Defendant's conduct violates the CLRA;

    b.   Whether Defendant deceptively misrepresented or misled consumers to believe that consumers' payments were "donations" to charities;

    c.   Whether Defendant operated illegal lotteries;

    d.   Whether Defendant violated laws governing raffles and/or sweepstakes;

e.   Whether Defendant's conduct is unlawful or unfair in violation of the Unfair

Competition Law, California Business and Professions Code §17200, *et seq*.;

f.   The amount of profits and revenues earned by Defendant as a result of the

misconduct;

g.   Whether class members and/or the general public are entitled to restitution,

injunctive and other equitable relief and, if so, what is the nature (and amount) of

such relief; and

h.   Whether class members are entitled to payment of actual, incidental,

consequential, exemplary and/or statutory damages plus interest thereon, and if so,

what is the nature of such relief.

227.   Typicality:  Plaintiffs' claims are typical of the claims of other members of the

Class because, among other things, all such claims arise out of the same wrongful course of

conduct by Defendant, as described herein. Further, Defendant's wrongful conduct caused the

damages of each member of the Class. Plaintiffs and the Classes have suffered injury in fact as a

result of Defendant's false representations. Plaintiffs and the Classes each gave money to Omaze

under the false impression that they were donating all proceeds to charity, as part of an illegal

lottery run by Defendant in violation of the law.

228.   Adequacy of Representation:  Plaintiffs will fairly and adequately protect the

interests of all class members because it is in their best interests to prosecute the claims alleged

herein to obtain full compensation due to them for the unfair and illegal conduct of which they

complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests

of class members. Plaintiffs have retained highly competent and experienced class action

attorneys to represent their interests and that of the classes. By prevailing on their own claims,

Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel

have the necessary financial resources to adequately and vigorously litigate this class action, and

Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are

determined to diligently discharge those duties by vigorously seeking the maximum possible

recovery for class members.

229.     Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

230.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### CAUSES OF ACTION
### PLAINTIFFS' FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Plaintiffs, the Class and the Subclasses**

231.     Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

232.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of services to consumers.

233.     Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

234.     The operation of the Omaze Platform to solicit, facilitate, and/or effectuate donations to the promoted charities (or "Designated Grantees"), the operation of the Omaze Platform to market and sell lottery entries, and the lottery entries purchased through the Omaze Platform are "goods" and/or "services" within the meaning of Cal. Civ. Code § 1761(a), (b).

235.    Omaze's acts and practices described herein have violated, and continue to violate, § 1770(a)(1), -(2), -(5), -(9), -(13), -(14), and –(a)(26) of the CLRA. Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help," as well as mischaracterizing its gross revenues as money "raised for charity," to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free. Omaze also advertised an illegal financial product, for reasons set forth herein, in violation of § 1770(a)(26).

236.    These violations were intended to and did result in Plaintiffs and similarly situated consumers paying more money to Omaze than they would have if Omaze had not engaged in such violations and/or if Plaintiffs and consumers had known the truth about the matters alleged herein.

237.    Plaintiffs seek, on behalf of themselves, the Class and Subclass Members, and the general public, an injunction to (i) enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2) and (ii) mandate that Defendant, without limitation, stop misrepresenting that purchases of "entries" or "chances to win" are donations to certain charities; conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity; conspicuously and adequately inform consumers of the entries assigned when entering

for free; conspicuously and adequately inform consumers of their estimated odds of winning each Omaze drawing; and cease all violations of California's laws governing lotteries, sweepstakes, and raffles. Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's conduct on Plaintiffs and the public at large.  If the injunction is not entered and Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs, the Subclass Members, and the general public will continue to suffer harm.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it was not entitled.  Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

238.    On or around December 3, 2020, Plaintiffs provided Defendant with notice and demand that, within 30-days, it correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, statutory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

239.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

### PLAINTIFFS' SECOND CAUSE OF ACTION
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.* ("UCL"))**
**On Behalf of Plaintiffs, the Class, and the Subclasses**

240. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

241. Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

242. Defendant has engaged, and continues to engage, in unlawful and unfair practices by, without limitation (i) violating the CLRA as described herein; (ii) violating California Penal Code §§ 319, 320, 321, and 322, which prohibit operating or participating in illegal lotteries; (iii) violating Cal. Penal Code § 320.5, which requires 90% of gross receipts for raffles to go to charity and prohibits online raffles; (iv) violating Cal. Bus. & Prof. Code §§ 17537.1, 17539.1, 17539.15, and 17539.5, which regulate sweepstakes, and (v) violating Cal. Business & Prof. Code 17500 et seq. (False Advertising Law), as discussed below in count 4.

243. Omaze's conduct violates all three prongs of the UCL.  It violates the fraud prong for the reasons discussed above and in count 3, below.  It violates the unlawful prong by violating each of the laws and statutes listed above.  Omaze also violates the unfair practices prong of the UCL, because California has announced a public policy against private lotteries, and a policy that operators of sweepstakes must disclose full and accurate rules and disclosures so that members of the public can make informed decisions before gambling their money.  Omaze's conduct violates these policies.

244. Plaintiffs and those similarly situated were harmed by Omaze's unlawful and unfair business practices. But for Omaze's violations of law and public policy regarding lotteries, sweepstakes, and raffles, Plaintiffs Carlin, Knüttel, and Juranek and those similarly situated would not have paid any money at all to enter into Omaze's drawings or would have paid less.

245. Defendant has also engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) falsely representing that Plaintiffs' and consumers' payments were "donations" to certain charities; and (ii) misleading Plaintiffs and similarly situated consumers into believing that paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.

246. Plaintiffs and those similarly situated relied to their detriment on Omaze's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Omaze, they would not have paid any money at all to enter into Omaze's drawings or would have paid less.

247. Defendant's acts and omissions are likely to deceive the general public.

248. Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

249. As a direct and proximate result of such actions, Plaintiff and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the class members lost the amount they "donated" through Omaze.

250. As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

251. Plaintiff seeks, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

252.    Plaintiff seeks, on behalf of those similarly situated, and the general public, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

253.    Plaintiff seeks, on behalf of themselves, those similarly situated, and the general public, an injunction to (i) prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein and (ii) mandate that Defendant, without limitation, stop misrepresenting that payments are donations to certain charities, conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity, stop conducting illegal lotteries, assign equal weight to all methods of entry, conspicuously and adequately inform consumers of the entries assigned when entering for free, and conspicuously and adequately inform consumers of their true odds of winning each Omaze drawing or Omaze's best estimate of the odds of winning. Such misconduct by Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's ongoing and future conduct on Plaintiffs and the public at large. Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled.  Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

254.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Code Civ. P. § 1021.5.

### PLAINTIFFS' THIRD CAUSE OF ACTION
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of All Plaintiffs, the Class and the Subclasses**

255.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class

Action Complaint as if set forth herein.

256.    Defendant has fraudulently and deceptively informed Plaintiffs and the Class Members that led reasonable consumers to believe that they were donating to charity when, in fact, the bulk of revenues went to Omaze.  Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help" to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.  Defendant also omitted the fact that it was operating an illegal lottery as a for-profit enterprise.

257.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase entries into Omaze's lotteries. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

258.    Omaze had a duty to disclose the above facts. Under Cal. Bus. & Prof. Code §§ 17537.1, 17539.1, 17539.15, and 17539.5, Omaze had a duty to disclose accurate drawing dates, rules, and estimated odds of winning.

259.    Plaintiffs and the Class Members relied to their detriment on Defendant's

misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not paying any money at all to enter into Omaze's drawings or paying less.

260. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, (a) purchase entry into Defendant's lotteries under the belief that they were donating to charity; (b) purchase lottery entries on terms that disadvantaged Plaintiffs; (c) pay a price premium for lottery entries based on Defendant's fraud, deceit, misrepresentations and/or omissions.

261. Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's fraud, deceit, misrepresentations and/or omissions, and, accordingly, were damaged by Defendant.

262. As a direct and proximate result of Defendant's' fraud, deceit, misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid to Omaze.

263. Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiffs, the Class and the Subclasses**

264. Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

265. Within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising, marketing, and sale of entries into it illegal lotteries.

266. Defendant made representations and statements (by omission and commission)

that led reasonable consumers to believe that they were donating to charity when, in fact, the bulk of revenues went to Omaze. Among other things, Omaze used the misleading word "donate" in conjunction with a description of specific charities who consumers would "support" and "help" to mislead Plaintiffs and similarly situated reasonable consumers to believe that all, or the overwhelming majority, of their payments would go to the marketed charities and that Omaze was obligated to direct all, or the overwhelming majority, of their payments to the marketed charities. Omaze also prominently informed Plaintiffs and similarly situated consumers that higher payments corresponded to more entries and better chances to win the drawings; at the same time, Omaze did not provide effective notice around the "donate" buttons either that participants could easily enter for free or of the number of entries provided to those who entered without paying. As a result, Plaintiffs and similarly situated consumers reasonably believed that (a) entering for free was more difficult than paying, would result in fewer entries or less chances to win, and/or was otherwise disadvantageous relative to paying to enter; and (b) paying or "donating" certain amounts would lead to better chances to win drawings, or at least not put them at a disadvantage relative to participants who entered for free.  Defendant also omitted the fact that it was operating an illegal lottery as a for-profit enterprise.

267.    Plaintiffs and the Class Members relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not paying any money at all to enter into Omaze's drawings or paying less.

268.    Defendant's acts and omissions are likely to deceive the general public.

269.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

270.    The aforementioned practices, which Defendant used, and continues to use, to its

significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

271.    As a direct and proximate result of such actions, Plaintiffs and the Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and Class Members lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased or paid for entry into Defendant's lotteries but for representations and omissions that they were donating to charity; (b) they would not have purchased lottery entries on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for lottery entries based on Defendants' misrepresentations and omissions; and/or (d) Defendant's lotteries did not have the characteristics, benefits, or quantities promised.

272.    In the event that Plaintiffs are unable to establish a legal claim for damages, they will have no adequate remedy at law.  Plaintiffs seek, in the alternative, on behalf of themselves and the Class Members, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

273.    Plaintiffs seek, on behalf of themselves, the Class Members, and the general public, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

274.    Plaintiff seeks, on behalf of themselves, those similarly situated, and the general public, an injunction to (i) prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein and (ii) mandate that Defendant, without limitation, stop misrepresenting that payments are donations to certain charities, conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity, stop conducting illegal lotteries, assign equal weight to all methods of entry, conspicuously and adequately inform consumers of the entries assigned when entering for

free, and conspicuously and adequately inform consumers of their true odds of winning each Omaze drawing or Omaze's best estimate of the odds of winning. Such misconduct by Defendant's conduct is an ongoing violation of law, and creates the potential to mislead both Plaintiffs and other members of the public. Plaintiffs' remedies at law are inadequate to remedy the effects of Defendant's ongoing and future conduct on Plaintiffs and the public at large. Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated, and the general public, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Further, in the event legal remedies are not available to Plaintiffs, equitable remedies such as restitution may be necessary and appropriate.

### PLAINTIFFS' FIFTH CAUSE OF ACTION
#### (Unjust Enrichment)
#### On Behalf of Plaintiff Ross, the Class, and the Subclasses

275.    Plaintiffs reallege and incorporate the above paragraphs of this Class Action Complaint as if set forth herein.

276.    Plaintiffs and members of the Class conferred benefits on Defendants by paying to participate in Omaze drawings for prizes.

277.    Defendants have knowledge of such benefits. Defendants have been unjustly enriched in retaining the financial profits derived from Plaintiff and Class members' purchases of Omaze lottery entries. Retention of those moneys under these circumstances is unjust and inequitable because Defendant operated an illegal lottery and misrepresented the lottery purchases as donations to charity. These misrepresentations and charges caused injuries to Plaintiff and members of the Class because they would not have paid Defendants' lottery fees had the true facts been known.

278.    In the event that Plaintiffs have no adequate remedy at law, because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, Defendant must provide non-restitutionary disgorgement of the financial profits that it obtained as a result of their unjust conduct to Plaintiffs and members of the Class for their unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, those similarly situated, and the general public, respectfully requests that the Court enter judgment against Defendant as follows:

A.  Certification of the proposed Class and Subclasses, including appointment of Plaintiffs' counsel as class counsel;

B.  An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including, without limitation, conducting any illegal lottery, raffle, or sweepstake, and misrepresenting to members of the public that all donations made to Omaze go to charity;

C.  An award of compensatory damages in an amount to be determined at trial on all causes of action except number two (UCL), number four (FAL), and number five (UNJUST ENRICHMENT);

D.  An award of statutory damages in an amount to be determined at trial on all causes of action except number two (UCL), number four (FAL), and number five (UNJUST ENRICHMENT);

E.  An award of punitive and/or exemplary damages in an amount to be determined at trial on all causes of action except number two (UCL), and number five (UNJUST ENRICHMENT);

F.  In the event an adequate remedy is not available at law, an award of restitution in an amount to be determined at trial on cause of action number two (UCL), and/or recission under causes of action three (Fraud, Deceit, and Misrepresentation) and four (FAL);

G.  In the event an adequate remedy is not available at law, an award of non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of their unjust conduct in an amount to be determined at trial on cause of action number five (UNJUST ENRICHMENT);

H.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.   For reasonable attorneys' fees and the costs of suit incurred; and

J.   For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

///

Dated: December 15, 2021                        **GUTRIDE SAFIER LLP**


                                   __/Anthony J. Patek/_____

                                   Anthony J. Patek
                                   Seth A. Safier, Esq.
                                   Anthony Patek, Esq.
                                   100 Pine Street, Suite 1250
                                   San Francisco, CA 94111