JEFFREY N. WILLIAMS (SBN 274008)
jwilliams@wargofrench.com
NICOLA A. GELORMINO (admitted *pro hac vice*)
ngelormino@wargofrench.com
WARGO & FRENCH LLP
601 S. Figueroa St., Suite 4625
Los Angeles, CA 90017
Tel: (310) 853-6300
Fax: (310) 853-6333

Attorneys for Defendant
OMAZE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREAS KNÜTTEL, MATTHEW JURANEK, AND ADRIANA CARLIN as individuals, on behalf of themselves, the general public and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OMAZE, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 2:21-cv-09034-SB-PVC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 11, 2022<br>Time: 8:30am<br>Courtroom: 6C<br><br>Complaint Filed: April 15, 2021<br>FAC Filed: December 15, 2021<br><br>Hon. Stanley Blumenfeld, Jr. |

TO ALL PARTIES HEREIN AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 11, 2022, at 8:30am in Courtroom 6C of the U.S. District Court for the Central District of California, 350 West 1st Street, Los Angeles, California 90012, Defendant Omaze, Inc. ("Omaze") shall move and hereby moves the Court for an order dismissing the First Amended Complaint ("FAC") filed by Plaintiffs Andreas Knüttel, Matthew Juranek, and Adriana Carlin ("Plaintiffs") with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Motion is made on the following grounds:

First, Plaintiffs' claims for violation of California's consumer protection statutes and for common-law fraud fail because reasonable consumers could not have been misled by Omaze's alleged omissions; Plaintiffs have failed to meet their pleading burden under Rule 9(b) to establish that the alleged omissions caused any of their supposed injuries; and Omaze's promotional sweepstakes comply with all relevant laws and are not "illegal lotteries" under governing law. Additionally, Plaintiffs cannot allege the required element of scienter for their fraud claim.

Second, these claims also fail because the remedies Plaintiffs seek would impose civil liability on a professional charitable fundraiser for purportedly failing to disclose exactly how much of each donation goes to charity, or would impose a mandatory injunction requiring such disclosures. Long-standing Supreme Court precedent holds that awarding such remedies would be flatly unconstitutional as a violation of the fundraiser's First Amendment rights. *Riley v. Nat'l Fed. Of the Blind of North Carolina*, 487 U.S. 781, 782-84, 108 S. Ct. 2667 (1988); *see also Urzua v. Nat'l Veterans Servs. Fund, Inc.*, No. 13CV2217-MMA (KSC), 2014 WL 12160751 (S.D. Cal. Jan. 28, 2014). Plaintiffs seek to sidestep these cases in the FAC by characterizing their claims as centering on affirmative statements by Omaze rather than omissions, relying on *Illinois ex rel. Madigan v. Telemarketing Associates Inc.*, 538 U.S. 600 (2003). But even setting aside that Plaintiffs never allege to have seen or heard these supposed statements (and therefore they are irrelevant to Plaintiffs'

claims), the FAC fails to invoke *Madigan* because there are no plausible allegations that Omaze made even a single misrepresentation.

Third, Plaintiffs' unjust enrichment claim fails because Plaintiffs received the benefit of their bargain, and unjust enrichment is not a proper theory to pursue claims that a person was misled into seeking that bargain in the first instance.

Fourth, all of Plaintiffs' claims fail because Plaintiffs suggest that if not for Omaze's alleged misrepresentations, they would simply have donated directly to designated charities while entering Omaze's sweepstakes for free. Plaintiffs therefore lack standing; if anything, the charities are the injured parties.

Fifth, to the extent that Plaintiffs' allegations attempt to predicate liability on conduct occurring outside the applicable statute of limitations—four years at most, based on Plaintiffs' asserted claims—those allegations are irrelevant and any claims based thereon should be dismissed (or stricken under Rule 12(f)).

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 20, 2021, in which the parties thoroughly discussed the substance and potential resolution of the filed motion by telephone.

This Motion is based upon this Notice of Motion and attached Memorandum of Points and Authorities, the Declaration of Jessica Segal ("Segal Decl.") [ECF No. 17] and Request for Judicial Notice ("First RJN") [ECF No. 18] previously filed, the Second Request for Judicial Notice filed concurrently herewith ("Second RJN"), the complete files and records in this action, and other matters as the Court may allow.

Dated:  January 12, 2022                    WARGO & FRENCH LLP

                                            By:  */s Jeff Williams*  _____
                                                 JEFFREY N. WILLIAMS
                                                 NICOLA A. GELORMINO

                                            Attorneys for Defendant Omaze, Inc.

1

# <u>TABLE OF CONTENTS</u>

2

**Page No.**

3

TABLE OF CONTENTS ............................................................................. i

4

TABLE OF AUTHORITIES ....................................................................... ii

5

MEMORANDUM OF POINTS AND AUTHORITIES ................................... 1

I. INTRODUCTION ................................................................................. 1

6

II. STATEMENT OF FACTS .................................................................... 2

7

  A. Sweepstakes Disclosures ............................................................ 3

8

  B. Funding Disclosures .................................................................... 5

9

  C. The FAC and Plaintiffs' Allegations ........................................... 6

10

III. LEGAL STANDARD ........................................................................... 8

11

IV. ARGUMENT ........................................................................................ 9

12

  A. Plaintiffs' CLRA, UCL, FAL and Fraud Claims Fail Because a Reasonable Consumer Could Not Plausibly Have Been Deceived by the Word "Donate" and They Are Barred by the First Amendment ........ 9

13

14

    1. A reasonable consumer would have understood that a portion of each donation would be used to pay sweepstakes fees/expenses. ................................................................. 11

15

16

    2. A reasonable consumer would have understood how many entries they were to receive, how to enter for free, and how free and paid entries were treated (that is to say, equally). .......... 14

17

18

    3. Plaintiffs' claims are barred by the First Amendment. ................ 15

19

    4. Plaintiffs lack standing to enforce the AG's consent agreement with Omaze, and fail to allege a violation in any event. ............. 18

20

21

  B. Plaintiffs' UCL Claim Fails Because Omaze's Sweepstakes Require No Consideration, Are Not Lotteries, and Comply With State Law ...... 20

22

  C. Plaintiffs' Unjust Enrichment Claim Lacks a Cognizable Basis ........... 24

23

  D. Plaintiffs' Claims All Fail Because Plaintiffs Lack Standing to Sue for Alleged Injuries to the Designated Charities ................................... 24

24

25

  E. Plaintiffs' FAC Improperly Rests on Conduct Outside of the Applicable Limitations Period ................................................................. 25

26

V. CONCLUSION ....................................................................................... 25

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page No.**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 8

*California Gasoline Retailers v. Regal Petroleum Corp.*,
  50 Cal. 2d 844 (1958) .......................................................... 15, 20, 21, 22

*Canales v. Fed. Home Loan Mortg. Corp.*,
  Case No. CV 11–2819, 2011 WL 3320478 (C.D. Cal. Aug. 1, 2011) ................... 25

*Cooper v. California*,
  No. C 02-03712 JSW, 2007 WL 1703829 (N.D. Cal. June 12, 2007) ................... 19

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2009) ................................................................ 8, 10

*Derbaremdiker v. Applebee's*,
  No. 12-CV-01058 KAM, 2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012) ......... 13, 24

*Dinan v. Sandisk LLC*,
  No. 18-CV-05420-BLF, 2019 WL 2327923 (N.D. Cal. May 31, 2019) .......... 10, 14

*Fagerstrom v. Amazon.com, Inc*.,
  141 F. Supp. 3d 1051 (S.D. Cal. 2015) ................................................... 13

*Freeman v. Time, Inc*.,
  68 F.3d 285 (9th Cir. 1995) ................................................... 10, 13, 23

*GECCMC 2005-C1 Plummer v. JPMorgan*,
  671 F.3d 1027 (9th Cir. 2012) ................................................................ 19

*Haskell v. Time, Inc*.,
  857 F. Supp. 1392 (E.D. Cal. 1994) .................................... 10, 12, 15

*Illinois ex rel. Madigan v. Telemarketing Associates Inc.*,
  538 U.S. 600 (2003) ......................................................................... 16

*Lapiner v. Camtek, Ltd.*,
  No. C 08-01327 MMC, 2011 WL 3861840 (N.D. Cal. Aug. 31, 2011) ................. 22

*Lavie v. Procter & Gamble Co*.,
  105 Cal. App. 4th 496 (2003) ............................................................... 10

*Ouiby Inc. v. Posey*,
  No. 17-CV-03847-EMC, 2018 WL 732493 (N.D. Cal. Feb. 6, 2018) ................... 24

*People v. Shira*,
   62 Cal. App. 3d 442 (1976) ....................................................................... 21, 22, 23

*Peterson v. Cellco P'ship*,
   164 Cal. App. 4th 1583 (2008) ................................................................................ 24

*Puri v. Costco Wholesale Corp.*,
   No. 5:21-CV-01202-EJD, 2021 WL 6000078 (N.D. Cal. Dec. 20, 2021) .............. 14

*Quine v. Beard*,
   No. 14-CV-02726-JST, 2017 WL 4082441 (N.D. Cal. Sept. 13, 2017) ................. 19

*Riley v. Nat'l Fed. Of the Blind of North Carolina*,
   487 U.S. 781, 108 S. Ct. 2667 (1988) ............................................................... 11, 15

*Romoff v. Gen. Motors LLC*,
   No. 21-CV-00938-WQH-BGS, 2021 WL 5741455 (S.D. Cal. Dec. 2, 2021) ........ 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S.Ct. 2499 (2007) ........................................................................ 9

*Urzua v. Nat'l Veterans Servs. Fund, Inc.*,
   No. 13CV2217-MMA, 2014 WL 12160751 (S.D. Cal. Jan. 28, 2014) ............. 17, 18

*Weisberg v. Takeda Pharm. Co. Ltd.*,
   No. CV 18-784 PA (JCX), 2018 WL 6219879 (C.D. Cal. May 7, 2018) .............. 10

*Wright v. Publishers Clearing House, Inc.*,
   439 F. Supp. 3d 102 (E.D.N.Y. 2020) ..................................................................... 13

**Statutes**

Cal. Bus. Prof. Code § 17537.1 .................................................................................. 23

Cal. Bus. Prof. Code § 17539.1(a)(1) ......................................................................... 23

Cal. Bus. Prof. Code § 17539.1(a)(3) ......................................................................... 23

Cal. Bus. Prof. Code § 17539.1(a)(4) ......................................................................... 23

Cal. Bus. Prof. Code § 17539.1(a)(7) ......................................................................... 23

Cal. Bus. Prof. Code § 17539.15(j) ............................................................................ 23

Cal. Bus. Prof. Code § 17539.5(e) .............................................................................. 23

Cal. Gov't Code § 12599 .............................................................................................. 1

Cal. Pen. Code § 319 .................................................................................................. 20

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................ 8

Fed. R. Civ. P. 12(f).................................................................... 25

Fed. R. Civ. P. 9(b) ................................................................... 8

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.  INTRODUCTION**

3         Charities are not always well-equipped to implement marketing solutions to

4    spread awareness about their cause and maximize charitable donations.  California

5    law thus contemplates that well-regulated "commercial fundraisers for charitable

6    purposes" may fill this role.  Cal. Gov't Code § 12599.  Omaze is registered for this

7    very purpose with the California Attorney General ("AG")'s Registry of Charitable

8    Trusts.  It has raised over $150 million to support over 350 charities around the world

9    by working with clients to design, administer and implement online sweepstakes that

10   promote their charitable work to potential donors.  Omaze's marketing team designs

11   content and creates advertisements, its experience team handles user inquiries, and its

12   technology team builds and maintains the platform through which individuals can

13   make donations or enter for free, as well as the dashboard by which donors and

14   potential donors can track their contributions and/or free entries.  Per one charity:

15   "Omaze provides marketing, content, tech and fulfillment services we simply can't

16   afford or get anywhere else.  It's these investments and expertise that drive the huge

17   return."  And of course, as Omaze frequently discloses, ***anyone*** may easily enter an

18   Omaze sweepstakes for free, at any time and all the way up to the entry limit.[1]

19        Plaintiffs now seek to represent a nationwide putative class seeking return of all

20   donations, alleging: (i) they believed all or nearly all of their donations went directly

21   to charity, yet Omaze omitted that a portion was used to cover prize expenses and run

22   its business; and (ii) Omaze's sweepstakes are illegal lotteries under California law.

23        Omaze moved to dismiss the Complaint, arguing among other things that it

24   lacked a plausible theory of how reasonable users could be misled by the alleged

25   omissions—much less did it describe with any particularity how the omissions caused

26

27   _____

     [1] Indeed, despite alleging she was "unable to [enter for free] easily" or that it was

28   "impossible to enter for free," Plaintiff Carlin, for example, entered for free dozens of
     times between 2017-2020.

**1**

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Plaintiffs any harm.  ECF No. 16.  Rather, the Complaint cobbled together irrelevant and misleading "background" allegations wholly untethered from Plaintiffs' alleged experiences.  Once Plaintiffs' actual interactions with Omaze were described, all pretense of showing a nexus between the "background" allegations and Plaintiffs' supposed harm dissolved into threadbare, conclusory language.  Further, Plaintiffs ignored prominent disclosures rebutting the alleged omissions, arguing only that they should not be considered at this stage.  (Yet the disclosures are judicially-noticeable and incorporated-by-reference under Rule 10(c).  *See* ECF Nos. 17-18.)

The Court ordered an amended complaint to respond to these defects.  Rather than establish a factual basis for ***Plaintiffs'*** claims, however, the FAC simply added more untethered "background" allegations.  It is no closer to stating a claim, as there is nothing of any substance added to the description of Plaintiffs' actual experiences.  Throwing more spaghetti at the wall changes nothing if none of it is cooked.

Instead, the added "background" allegations are no more than a failed attempt to transform this case from an "omission" case to a "misrepresentation" case.  As Plaintiffs concede, the U.S. Supreme Court has held that a fundraiser ***cannot*** be compelled to disclose the amount of each donation that goes to charity (even though Omaze voluntarily does so).  Plaintiffs' action therefore runs headlong into the First Amendment unless they can plausibly allege that Omaze actually misrepresented how donations would be allocated.  They cannot do so because: (i) they do not contend they relied upon—or even saw—any of the "background" misrepresentations they purport to allege; and (ii) even if they did, their allegations are misleading and implausible, clearly insufficient to meet their Rule 9(b) pleading burden.  For these and the other reasons described herein, the FAC must be dismissed.

## II.   <u>STATEMENT OF FACTS</u>

Omaze is a professional charitable fundraiser providing services that have helped raise tens of millions of dollars for charitable organizations.  FAC (ECF No. 70) ¶¶ 2, 27, 98.  Through its online platform, Omaze runs sweepstakes to raise

money for charity, offering participants the chance to win prizes, such as cars or vacation packages, or to share an experience with a celebrity. *Id.* ¶¶ 2, 66.

Participants can enter a sweepstakes by choosing to make a donation and selecting a contribution amount—for which they receive a designated number of entries as a thank you—or by free alternative method of entry ("AMOE"). *Id.* ¶¶ 9, 39, 79. Omaze discloses in multiple prominent locations throughout the browsing and donation process that, for example, "NO PURCHASE, PAYMENT, OR DONATION OF ANY KIND IS NECESSARY TO ENTER OR WIN. A PURCHASE, PAYMENT, OR DONATION WILL NOT INCREASE THE CHANCES OF WINNING." *Id.*, Ex. D; Segal Decl. (ECF No. 17), Exs. 1-9 (caps in original).

Plaintiffs allege that they each participated in Omaze sweepstakes by making donations to enter, and in so doing relied on Omaze's purportedly-inadequate website or ads. FAC (ECF No. 70) ¶¶ 178-98, 213. Yet as described below, Omaze provides robust and complete disclosures to participants about how its sweepstakes work, including within dedicated pages on its website for each sweepstakes experience ("Experience Pages") along with its Official Rules, Terms of Use and About Us pages accessible from each section of the Omaze website. *Id.* ¶¶ 31-32, 40-42.

### A.    Sweepstakes Disclosures

A user of the Omaze website ***must*** navigate an Experience Page to enter a sweepstakes, and Plaintiffs admit not only doing so but indeed that they "rel[ied] on" the Experience Pages when entering sweepstakes. *Id.* ¶¶ 28, 30-31, 178, 198, 209. In addition to the frequent disclosures that no purchase is necessary to enter or win any sweepstakes, the Experience Pages disclose, *inter alia*: (i) the prize to be won in the sweepstakes drawing; (ii) the name and a description of the designated charity; (iii) the exact number of entries a participant would receive as a thank-you if they chose to donate a particular amount (*e.g.*, "donate $25" for "250 entries to win"); and (iv) that a participant may "enter without contributing," along with a link to do so online. *Id.*, Ex. D; Segal Decl. (ECF No. 17), Ex. 1.

1      Each Experience Page also lays out a set of rules particular to that sweepstakes
2  (the "Experience Rules"), prominently demarcated by a large-font, bolded banner
3  stating: "**stuff our lawyers want you to read**." *Id.* (emphasis in original).  They
4  disclose, *inter alia*: (i) how and when the sweepstakes will be conducted; (ii) the
5  designated charity; (iii) methods of entry and entry limit; and (iv) that the "[o]dds of
6  winning depend on the number of eligible entries received during the Entry Period."
7  *Id*.  The Experience Rules also contain multiple prominent references to the Official
8  Rules, hyperlinked in underlined and different-colored font.  *Id.*  Below that is a
9  "funding transparency" section relating to disbursement of donations to the
10  designated charity and payment of fees and expenses, etc.  *Id.*

11      The Official Rules—which are linked on each Experience Page ***and*** the lower
12  banner spanning every section of the website—work with the Experience Rules to
13  govern every sweepstakes.  Segal Decl. (ECF No. 17), Exs. 2-9.  They provide a
14  prominent disclosure that, for example, "**[n]o purchase, payment, or donation of**
15  **any kind is necessary to enter or win.  A purchase, payment or donation will not**
16  **increase the chances of winning**." *Id.* (emphasis in original).  They describe in
17  detail the procedure for free entry and how entries are awarded in response to a
18  donation.  *Id.*  Indeed, even as of 2014—before any of the named Plaintiffs ***ever***
19  entered an Omaze sweepstakes—the Official Rules gave clear instructions for free
20  entry by mail while also including a prominently-marked, different-color hyperlink to
21  "view the online [AMOE]."  *Id.*, Ex. 9.  The Official Rules also disclose, *inter alia*, (i)
22  the equal weighting of all entries in the prize drawing; (ii) the number of entries
23  provided for free entry; (iii) that "[r]egardless of how you enter," there is a maximum
24  number of entries that can be reached by donation ***or*** by free entry; and (iv) other
25  rules and restrictions pertaining to the conduct of the sweepstakes.  *Id.*, Exs. 2-9.

26      The "About Us" page (formerly labeled "How it Works"), which similarly can
27  be accessed via a link at the top or bottom of every single section of Omaze's website,
28  describes Omaze's fundraising model in simple, non-legal language.  *Id.*, Exs. 10-16.

It explains that under the "traditional charitable fundraising model . . . [n]onprofits are held back from investing in marketing, tech and the top talent that could transform the scale of how they raise funds." *Id.*, Ex. 10.  Omaze, by contrast, professionalizes the work of fundraising and allows "charities to focus on their world-changing work, so we cover the marketing (all those Instagram ads you see), content (videos with your favorite celebs) and technology (this very website you're on!) on their behalf." *Id*. There is nothing on Omaze's website that states or implies donations cannot be used for sweepstakes expenses or that Omaze is not paid for its work out of the proceeds of the sweepstakes; in fact, the About Us page clearly explains that Omaze employs a commercial model that is a net benefit to charities (see *id.*):



**We believe in impact over percentages.**

VS.

90% of $100,000 = **$90,000**     60% of $500,000 = **$300,000**

A smaller percentage of a larger amount is more impactful than a bigger percentage of a smaller amount. And as Omaze experiences come at no-cost and no risk to the nonprofits, your donations make a big difference for organizations around the world.

### B.    Funding Disclosures

Since 2018, Omaze has fundraised for Charities Aid Foundation of America ("<u>CAF America</u>"), a globally-recognized, IRS-registered non-profit.  FAC (ECF No. 70) ¶ 49.  CAF America contracts with Omaze to design/administer a sweepstakes experience, and CAF America thus receives 100% of all the donations.  CAF America then grants a portion of the donations to the designated charity or charities and pays Omaze agreed-upon fees and expenses.  This arrangement is disclosed ***on the very front page*** of the website, and again on the "shopping cart" page, as follows:

**DREAM EXPERIENCES. GREAT CAUSES.**

Omaze experiences raise funds for Charities Aid Foundation America ("CAF America"), a US-registered, 501(c)(3) public charity. 100% of donations go to CAF America, which will then grant the donations, minus experience fees and costs, to the nonprofit(s) identified on the experience page. For more info, see the "Fundraising Transparency" section at the bottom of each experience page.

Segal Decl. (ECF No. 17), Exs. 24-26.

1    In fact, Omaze openly discloses how donor funds are used in *multiple* areas on

2    its website.  As indicated, one of those places is "at the bottom of each experience

3    page," that is, alongside the Experience Rules where there is a section prominently

4    labeled "Transparency" or "Fundraising Transparency."  FAC (ECF No. 70), Ex. D;

5    Segal Decl. (ECF No. 17), Ex. 1.  For "Premiere Experiences" (those in which the

6    prize is donated, like dinner with a celebrity) "60% of the total donations goes to the

7    Designated Grantee(s) via a grant from [CAF America] . . .  Omaze uses the

8    remaining amount to pay for the Experience costs, such as Prize costs, payment

9    processing fees, and advertising to awesome people like you, and to cover our

10   operating costs of providing and maintaining the technology and team that makes this

11   all happen."  *Id.*, Ex. 1.  For "Owned Experiences" (those in which Omaze purchases

12   the prize) the allocation is similar except that 15% of total donations go to the

13   Designated Grantee, with more to expenses.  *Id.*  More information is available in a

14   section of the "About Us" page prominently-labeled "Where Your Money Goes":

15   
16       When you donate for the chance to win an experience with a celebrity
         prize (set visit, dinner date, tickets to a premiere, etc.), 60% of your
         donation is guaranteed to go to the identified nonprofit beneficiary, via
17       a grant from CAF America.  For these experiences, typically 25%, on
         average, is used to pay for experience costs, such as advertising and
         content creation costs and payment processing fees.
18
19       When you donate for the chance to win an experience with a non-
         celebrity prize (like a car, vacation, or cash), 15% of your donation is
20       guaranteed to go to the identified nonprofit beneficiary, via a grant from
         CAF America. Typically between 65-75%, on average, is used to pay
21       for experience costs, such as Prize costs, advertising and content
         creation, and payment processing fees.

22   *Id.*, Ex. 10; *see also generally* Exs. 11-16.

23   **C.    The FAC and Plaintiffs' Allegations**

24   Despite all of the foregoing, the FAC's manufactured "background" allegations

25   go back to *2009*—referring to disclosures Plaintiffs never saw and are outside any

26   conceivable statute of limitations—to cherry-pick portions of Omaze's website in an

27   effort to malign the very concept of a commercial charitable fundraiser.  *E.g.*, FAC

28   (ECF No. 70) ¶¶ 30-35.  The crux is that Omaze's use of the word "donate" was

misleading because a portion of donated funds were used to cover fees and expenses, including the costs of procuring the sweepstakes prize.  *Id.* ¶¶ 53-55.  The FAC also wrongly suggests that Omaze's sweepstakes are illegal lotteries under California criminal statutes (*id.* ¶¶ 104-122); that Omaze fails to properly disclose how donor entries are weighed in relation to free entries, or "inadequately" disclosed how to enter for free (*id.* ¶¶ 123-151); and that Omaze fails to provide certain disclosures required by California statutes and regulations, including the odds of winning any particular sweepstakes (*id.* ¶¶ 152-169).

*Plaintiffs'* allegations, by contrast, have no connection to the manufactured "background" that precedes them, and certainly claim no reliance on any alleged misrepresentations by Omaze.  Mr. Knüttel, for example, states only that Omaze's website "characterized money paid for drawing entries as 'donations'" and ***"[b]ased on the 'donate' verbiage*** . . . [he] believed that most of the money he paid went to charity."  FAC (ECF No. 70) ¶¶ 179-80 (emphasis added).  He vaguely asserts that he was "unable to [enter for free] easily," and he "would have purchased fewer" entries if he knew how many entries were allotted for donations versus AMOE.  *Id.* ¶¶ 185-86.  These allegations fail to satisfy his Rule 9(b) heightened pleading burden and are contradicted by the very disclosures he claims to have relied on.  *See, e.g., id.* Ex. D (Experience Page displays entries at each donation level and links to Official Rules); Segal Decl. (ECF No. 17), Ex. 1 (same), Exs. 2-9 (Official Rules identify entries per AMOE).  Only once does Mr. Knüttel discuss a specific sweepstakes he entered, and blatantly misrepresents it by contending the Experience Page stated: "Winner announced: August 1, 2019."  FAC (ECF No. 70) ¶¶ 190-92.  The actual language of Omaze's Experience Pages reads: "Winner Announced: ***On or around*** [date]," and he does not allege this was inaccurate.  *Id*, Exs. D-E (emphasis added).

Mr. Juranek and Ms. Carlin make similarly-conclusory allegations; *e.g.*, relying solely on Omaze's use of the word "donation" to conclude that "most of the money [they] paid went to charity," notwithstanding the bevy of prominent disclosures

identifying exactly how their donations would be allocated.  FAC (ECF No. 70) ¶¶ 195-222.  Each purport to identify a sweepstakes they entered,[2] but neither identify how they were was misled into entering, and the sweepstakes identified by Ms. Carlin was in 2016, well outside the statute of limitations.  *Id.* ¶ 196, 208.  They also do not identify how they were misled into entering these sweepstakes, and none of the Plaintiffs describe how their purported characterization of Omaze's fundraising model as an "illegal lottery" or Omaze's purported violation of sweepstakes disclosure laws affected them at all.  Thus, when stripped of the obvious—and failed—attempts to connect their allegations to the manufactured "background" allegations preceding them in the FAC, Plaintiffs' bare-bones allegations set forth no more than a theory that they thought more of their donations would go directly to charity—a theory clearly foreclosed by the very disclosures they admit relying upon.

Plaintiffs ultimately assert five claims for relief: (i) violation of the California Consumers Legal Remedies Act ("CLRA"); (ii) violation of the California Unfair Competition Law ("UCL"); (iii) fraud, deceit, and/or misrepresentation; (iv) violation of the California False Advertising Law ("FAL"); and (v) unjust enrichment.  *Id.* at pp. 50-61.  All are subject to dismissal for the reasons discussed below.

## III.   LEGAL STANDARD

A complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Because Plaintiffs' UCL, FAL, CLRA and common law fraud claims all sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2009).

---

[2] Mr. Juranek is incorrect.  He did ***not*** enter the sweepstakes he identifies, as he seems to concede by adding a "to the best of his memory . . ." disclaimer to what he had alleged in the original Complaint.  *Compare* Compl. (ECF No. 1) ¶ 116.  He also fails to include this sweepstakes in the table in his FAC.  FAC (ECF No. 70) ¶ 197.

1    On a motion to dismiss, "courts must consider the complaint in its entirety, as

2    well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions

3    to dismiss, in particular, documents incorporated into the complaint by reference, and

4    matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues &*

5    *Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499 (2007); RJN (ECF No. 18) at 1-5.

6    **IV.   ARGUMENT**

7    The clear goal of the FAC is to muddy the waters with supposed "background"

8    allegations—whether or not they relate to things Plaintiffs saw or relied on, or events

9    occurring within the limitations period—so as to distract from the sheer implausibility

10   and conclusory nature of Plaintiffs' actual allegations.  Indeed, the majority of the

11   FAC is ***irrelevant*** to Plaintiffs' claims because it pleads no connection at all between

12   Omaze's alleged conduct and Plaintiffs' supposed harm.  The lead theory of the FAC,

13   properly distilled, is therefore simply that Omaze's use of the word "donate" was

14   inherently misleading, and Plaintiffs believe Omaze should have explained in more

15   detail how each dollar donated was intended to be used.

16   Plaintiffs cannot state a claim on this basis because any reasonable consumer

17   would have known that Omaze's commercial charitable fundraising model required

18   portions of each donation to be used to cover sweepstakes fees and expenses.  And

19   because the First Amendment bars any claims that a charitable fundraiser is required

20   to disclose the percentage of each donation that went to charity, the fact that none of

21   the Plaintiffs sufficiently identify reliance on a single alleged misrepresentation by

22   Omaze is independently fatal to their claims.  For this and the other reasons described

23   below, the FAC abjectly fails to state a claim.

24   **A.    Plaintiffs' CLRA, UCL, FAL and Fraud Claims Fail Because a Reasonable Consumer Could Not Plausibly Have Been Deceived by the Word "Donate" and They Are Barred by the First Amendment**

25

26   To establish a claim under the CLRA, the fraudulent/unfair prongs of the UCL,

27   or the FAL, Plaintiffs must plead and prove that "members of the public are likely to

28   be deceived" by Omaze's alleged conduct.  *Freeman v. Time, Inc.,* 68 F.3d 285, 289

9

1   (9th Cir. 1995); *Davidson*, 889 F.3d at 965 n.2.  The "reasonable consumer" test

2   requires that "a significant portion of the general consuming public or of targeted

3   consumers, acting reasonably in the circumstances, could be misled."  *Lavie v.*

4   *Procter & Gamble Co*., 105 Cal. App. 4th 496, 507-08 (2003).  Courts have thus

5   granted motions to dismiss claims under the CLRA, UCL, and FAL on the basis that

6   the conduct alleged was not deceptive as a matter of law.  *Freeman*, 68 F.3d at 290;

7   *Haskell v. Time, Inc*., 857 F. Supp. 1392, 1398 (E.D. Cal. 1994); *Dinan v. Sandisk*

8   *LLC*, No. 18-CV-05420-BLF, 2019 WL 2327923, at *6-8 (N.D. Cal. May 31, 2019).

9        Additionally, because Plaintiffs' claims sound in fraud, they are subject to a

10   heightened pleading standard under Rule 9(b) whereby Plaintiffs must allege with

11   particularity "what is false or misleading about the purportedly fraudulent statement,"

12   "actual reliance on the allegedly deceptive or misleading statements," and that "the

13   misrepresentation was an immediate cause of [their] injury-producing conduct."

14   *Davidson*, 889 F.3d at 964; *Weisberg v. Takeda Pharm. Co. Ltd.*, No. CV 18-784 PA

15   (JCX), 2018 WL 6219879, at *4 (C.D. Cal. May 7, 2018). [3]

16        Yet Plaintiffs' allegations in Paragraphs 177-222 of the FAC are vague and

17   conclusory, alleging no nexus between the "background" allegations in Paragraphs

18   27-176 and their supposed injury with any particularity at all.  By and large, Plaintiffs

19   do not even allege to have seen the statements or been affected by the issues set out

20   therein.  The FAC is too voluminous to discuss all of the irrelevant "background"

21   allegations, but as but just one example, the FAC attempts to contend that Omaze

22   made inconsistent disclosures about the allocation of "net" versus "gross" proceeds to

23   the designated charities.  FAC (ECF No. 70) ¶¶ 58-59.  Yet nowhere do ***Plaintiffs***

24   state they were aware of these disclosures or relied on them.  Thus, the "background"

25   allegations have no bearing on the viability of Plaintiffs' claims in this case.

26   _____

27   [3] Plaintiffs' fraud claim also carries the additional element of scienter.  Plaintiffs do
     not plead how Omaze's alleged conduct met this element, other than with bald and
28   conclusory language that Omaze "intended to induce Plaintiffs and those similarly
     situated to alter their position to their detriment."  FAC (ECF No. 70) ¶ 260.

1

>*1.      A reasonable consumer would have understood that a portion of*
>*each donation would be used to pay sweepstakes fees/expenses.*

Plaintiffs themselves, by contrast, only allege they "would not have purchased the Omaze sweepstakes entries, or would have purchased fewer of them, had [Omaze] not misrepresented the purchase as donations to the charities identified." *E.g.*, *id.* ¶ 203.  It cannot be determined from this conclusory allegation **how** Plaintiffs were misled, especially given the conspicuous disclosures describing just how donations were allocated.  Rather, Plaintiffs simply characterize Omaze's use of the word "donate" as inherently misleading because it leads a participant to believe that "all, or the overwhelming majority" of their donations are going to charity when the "lion's share" is taken by Omaze, and that the involvement of CAF America is used as a "bait-and-switch" to further this mistaken belief. *Id.* ¶¶ 1, 3, 95.

It is unreasonable as a matter of law to rely on a mere assumption that no part of a donation will be used to pay for fundraising expenses.  *See Riley v. Nat'l Fed. Of the Blind of North Carolina*, 487 U.S. 781, 793, 108 S. Ct. 2667 (1988) (mere fact of charitable fundraiser's professional status provides "notice that at least a portion of the money contributed will be retained"); *id.* at 804 ("[D]onors are assuredly aware that a portion of their donations may go to solicitation costs and other administrative expenses—whether the solicitor is a professional, an in-house employee, or even a volunteer…") (Scalia, J., concurring in part).  Indeed, in the analogous *Romoff v. Gen. Motors LLC*, No. 21-CV-00938-WQH-BGS, 2021 WL 5741455, at *4 (S.D. Cal. Dec. 2, 2021), car buyers alleged that a dealership surreptitiously included a mark-up for profit within a "Destination Charge" line item that should have solely reflected the cost of moving the car from manufacturer to dealer.  *Id.* at *4.  The court dismissed their CLRA and UCL claims, finding that "Destination Charge" did not inherently suggest the absence of a profit component—just as "donation" does not inherently suggest no portion may be used for fundraising expenses and fees.  *Id.*

Further—although it was not required to do so in order to prevent its use of the word "donate" from being unreasonably misconstrued—Omaze frequently and

prominently disclosed *exactly the information Plaintiffs profess they needed*.  For example, the 2017 "How It Works" page clearly disclosed that Omaze's "for-profit model means Omaze receives 20% of net funds," *i.e.*, after payment of expenses, for the type of sweepstakes being offered at the time.  Segal Decl. (ECF No. 17), Ex. 15.  Similarly, the 2017 Terms of Use disclosed that "[w]hen you make a Donation, a certain percentage of the amount of your donation is retained by Omaze to cover the costs of providing the Services," *e.g.*, "the costs of producing and fulfilling all Prizes and rewards." *Id.*, Ex. 21 at ¶ 3.

In later years, Omaze added even more disclosures to its website, including multiple prominent explanations of Omaze's relationship with CAF America and the allocation of each donation under the "**stuff our lawyers want you to read**" heading and the "Fundraising Transparency" or "Transparency" subheading.  FAC (ECF No. 70), Ex. D (emphasis in original); Segal Decl. (ECF No. 17), Ex. 1 (same); *see also supra* Part II.B.  The description of the "net proceeds" model was updated to reflect the "gross proceeds" model that is now applicable to both Premiere (60% gross proceeds to charity) and Owned (15%) Experiences.  *Id.*, Exs. 1, 11.  The website also stated in clear, non-legal terms exactly how Omaze's commercial fundraising model brings higher total proceeds than traditional fundraising—*even if*, as Plaintiffs contend, a larger percentage of each donation is used to pay fees and expenses relating to the sweepstakes under Omaze's model.  *Id.*, Ex. 10.

Any reasonable Omaze user was thus on notice that a portion of their donation would be used to pay for sweepstakes expenses, including Omaze's fee.  This subjects Plaintiffs' claims to dismissal.  In *Haskell*, as here, the plaintiff attempted to claim that the defendant's sweepstakes disclosures were misleading without specifically presenting the full set of disclosures for the court's review.  857 F. Supp. at 1396-97.  The court held that the defendant would be permitted to present the full disclosures on its motion to dismiss under the incorporation by reference doctrine—since declining to do so would unfairly allow the plaintiff to present a one-sided view—and that a

comparison of allegations to disclosures mandated dismissal.  *See id. at 1403* (claim that "mailer exaggerates the prize by failing to disclose that it is paid over time," for example, lacked merit where materials showed "Time fully and repeatedly discloses that the payments are made in installments rather than as a lump sum").

It is also immaterial that Plaintiffs allege they did not review some disclosures, as they were contained in governing documents such as the Experience Pages (which Plaintiffs admit they "relied upon") and the Official Rules (to which they were prominently directed).  It was therefore unreasonable for Plaintiffs to ignore them. *See Freeman*, 68 F.3d at 290 ("[W]hen read reasonably and in context, the promotion makes no such false representation."); *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1070 (S.D. Cal. 2015) ("The test, however, is whether Plaintiffs had a 'reasonable opportunity' to understand important terms, not whether Amazon outlined the terms with maximum clarity . . . The Consumer Rules . . . require no special web-browsing expertise to locate.").  Indeed, a pair of recent analogous cases demonstrates that plaintiffs place their head in the sand as to sweepstakes terms at their own peril. *See Derbaremdiker v. Applebee's*, No. 12-CV-01058 KAM, 2012 WL 4482057, at *6 (E.D.N.Y. Sept. 26, 2012) ("Because the terms and conditions of the Sweepstakes were fully disclosed in the Official Rules, which consumers were directed to review by both the receipts given to customers and the Website, a reasonable consumer that read the Official Rules as directed would not have been misled by the statements on the receipt."); *Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 119 (E.D.N.Y. 2020) ("In light of the disclosures in the rules for the contests, which PCH explicitly instructed the Plaintiffs to read, no reasonable consumer would believe that buying a PCH product would increase their chance of winning.").

Finally, to the extent that Plaintiffs attempt to rescue their otherwise-deficient claims by vaguely averring that some Internet content creators and "commenters" have indicated their displeasure with Omaze's sweepstakes, FAC (ECF No. 70) ¶¶ 91-92, 101-03, 140, 165-68, these allegations are "not enough to nudge [their] claims

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

of consumer deception from possible to plausible." *Puri v. Costco Wholesale Corp.*, No. 5:21-CV-01202-EJD, 2021 WL 6000078, at *7 (N.D. Cal. Dec. 20, 2021).  In *Puri*, class action plaintiffs unsuccessfully attempted to use "consumer survey results" to buttress their claims of deception. *Id.* at *7.  The allegations here do not even purport to include any such scientific evidence—evidence the *Puri* court still rejected—but rather consist of a few unverified YouTube videos, BBB complaints, and anonymous or pseudonymous comments thereon.  Plaintiffs' reliance on such supposed 'evidence' is more telling about their case than Omaze's model.

> 2. *A reasonable consumer would have understood how many entries they were to receive, how to enter for free, and how free and paid entries were treated (that is to say, equally).*

Plaintiffs' claims they were misled into donating rather than entering for free also fail to plausibly allege that a reasonable consumer would have been deceived.

Each Experience Page clearly states how many entries are to be received as a thank you when a user makes a donation (*e.g.*, "donate $25" and receive "250 entries to win" as a thank you).  FAC (ECF No. 70), Ex. D; Segal Decl. (ECF No. 17), Ex. 1. The Official Rules similarly state in a section prominently titled "**Entry Weighting**" exactly how many entries will be received for each free entry, and clearly state that all "entries are treated equally." *Id.*, Exs. 2-9 (emphasis in original).  The Official Rules also gave clear descriptions of the procedure to enter for free, either by mail or online. *Id.*, Exs. 2-9.  Free online entry was available at all times relevant to this action, and both the Experience Rules and Official Rules stated ***repeatedly*** that "[n]o purchase, payment, or donation of any kind is necessary to enter or win" and "[a] purchase, payment or donation will not increase the chances of winning." *Id.*, Exs. 1-9.

Thus, "[w]hat ultimately dooms Plaintiff's claims is that Defendant tells the consumer exactly what she is getting." *Dinan*, 2019 WL 2327923 at *7.  Reasonable consumers would not have been misled by Omaze's clear disclosures, nor can Plaintiffs claim they had no reason to view items as critically important to their sweepstakes entries as the Experience Rules or Official Rules.  Indeed, to the extent

they claim they thought they would have better odds if they made a donation, that is clearly inconsistent with the aforementioned disclosures.  *See Haskell,* 857 F. Supp. at 1403 (claim that "use of terms such as 'valued customer' creates the impression that a purchase order will increase the odds of winning" was contradicted by "[t]he rules and materials [which] repeatedly state that no purchase is required").

Plaintiffs' claims that it was impossible or burdensome to submit a free entry online also lack merit because: (i) it was not only possible but easy to do so, *see supra* Part II.A; and (ii) even if free online entry was not easy, Plaintiffs do not and cannot dispute they knew free entry was ***available***, and it is of no moment that free online or mail entry might require a modicum of additional effort compared to other entry.  *See California Gasoline Retailers v. Regal Petroleum Corp.*, 50 Cal. 2d 844, 862 (1958) (free entry upheld as legitimate even where "a ticket holder must go to the place of business of the sponsor of the scheme to deposit the ticket stub"); *Haskell,* 857 F. Supp. at 1404 (requiring free entrants to utilize mail and pay for their own postage did not impermissibly burden free entry relative to paid entry).

### 3. *Plaintiffs' claims are barred by the First Amendment.*

The FAC also ***independently*** fails because it seeks to impose liability for allegedly omitting to disclose the allocation of each donation to the designated charity (even though Omaze did disclose exactly that on multiple occasions).  FAC (ECF No. 70) ¶¶ 238, 251, 262.  It then seeks an injunction "mandat[ing] that Defendant. . . conspicuously and adequately inform consumers how much of each payment goes to Omaze and how much goes to each identified charity."  *Id.* ¶¶ 237, 253, 274, 278.

The Supreme Court has long held that "[t]he solicitation of charitable contributions is protected speech" under the First Amendment and has ***prohibited*** any requirement that a fundraiser disclose the percentage of contributions retained and/or disbursed to the charity.  *Riley*, 487 U.S. at 782-84.  It explained:

> [T]here are several legitimate reasons why a charity might reject the State's overarching measure of a fundraising drive's legitimacy—the percentage of gross receipts remitted to the charity.  For example, a

1
2
3

> charity might choose a particular type of fundraising drive, or a
> particular solicitor, expecting to receive a large sum as measured by
> total dollars rather than the percentage of dollars remitted. Or, a
> solicitation may be designed to sacrifice short-term gains in order to
> achieve long-term, collateral, or noncash benefits. . . .

4

> The State presumes that the charity derives no benefit from funds
> collected but not turned over to it. Yet this is not necessarily so.

5   *Id.* at 792, 798.

6        The benefits described by the Court are in fact the same benefits that Omaze

7   provides for CAF America and the designated charity grantees, while the concerns

8   about a relatively lower "percentage of dollars remitted" exactly mirror Plaintiffs'

9   complaints here.[4]  As sweepstakes have gotten bigger, costs to run them have gone

10  up, but there is no denying that the net benefit to charity has increased.  Plaintiffs

11  cannot stand in the charities' shoes to dictate how they should raise money.

12       After Omaze made this argument, Plaintiffs now attempt to plead an exception

13  to *Riley*.  They claim the FAC goes beyond alleging a mere ***omission*** (even though,

14  again, Omaze does clearly disclose the allocation of funds to the designated charities)

15  to allege that Omaze's "nondisclosure is accompanied by intentionally misleading

16  statements designed to deceive the listener."  FAC (ECF No. 70) ¶¶ 62-63.  They rely

17  on *Illinois ex rel. Madigan v. Telemarketing Associates Inc.*, 538 U.S. 600 (2003),

18  where a fundraiser was alleged to have ***affirmatively*** represented that "a significant

19  amount of each dollar donated would be paid over to [the charity]," while knowing

20  that "15 cents or less of each dollar" was "available to [the charity] for its purposes."

21  *Id.* at 618.  It also "told prospective donors their contributions would be used for

22  specifically identified charitable endeavors" when they were not so used.  *Id.* at 608.

23       There are two main problems with Plaintiffs' argument.  The first is, again,

24  Plaintiffs themselves fail to identify any affirmative misrepresentation at all when

25

---

26  [4] Indeed, Omaze clearly discusses this concept on its website.  *See, e.g.,* Segal Decl.
    (ECF No. 17), Ex. 10 ("A smaller percentage of a larger amount is more impactful

27  than a bigger percentage of a smaller amount.").  Plaintiffs also concede that the total
    dollar amount to charity has substantially increased year-over-year, from $463,000 in

28  2015 to $22 million in 2019.  FAC (ECF No. 70) ¶ 98.

describing their interactions with Omaze and the purported harm they suffered.  They only describe, at best, their purported reliance on omissions (*e.g.*, assumptions about the meaning of the word "donate").  Thus, to the extent the FAC adds "background" allegations concerning supposed misrepresentations by Omaze, these allegations are irrelevant because they have no connection to Plaintiffs' actual claims, much less one pleaded with the requisite particularity.  The second problem is that the FAC's attempt to allege misrepresentations—none of which Plaintiffs saw or relied on—independently fails as disingenuous and facially implausible:[5]

- Plaintiffs spuriously allege that in 2020, Omaze lied that it "raised $130M for charity" rather than as its gross revenue.  FAC, ¶ 60.  While the FAC is vague on this point, Plaintiffs either meant to suggest Omaze stated it raised $130 million for charity ***during 2020***—which their own FAC reveals is incorrect—or they simply fail to allege any plausible basis to believe the $130 million was gross revenue.  Either way, they fail to allege a misrepresentation with the particularity required by Rule 9(b).  Perhaps more importantly, they also do not state the supposed 'actual' amount to charity, or how the magnitude of any difference in this figure was material to any decision to donate.

- Plaintiffs allege that Omaze's ***2017*** website described a "net proceeds" model of allocating donations, and this was inconsistent with a ***2019*** CAF America agreement reflecting a "gross proceeds" model.  *Id.* ¶¶ 58-59.  Plaintiffs intentionally omit that the website was updated to similarly reflect the gross proceeds model in 2019.  *E.g.*, Segal Decl. (ECF No. 17), Ex. 13.

- Plaintiffs then allege that Omaze's 2017 website "indicate[d] Omaze splits net proceeds (which could be $0) with CAFA" and that this is inconsistent with an interview in which Omaze's co-founder stated that charities receive a fixed percentage of gross proceeds.  FAC (ECF No. 70) ¶¶ 75-77.  Again, however, the interview was in 2021, well after the CAF America agreement and website were updated to reflect the gross proceeds model in 2019.  *Id.*

Plaintiffs thus cannot adequately allege a misrepresentation, meaning their claims concerning the allocation of donations are ***exactly*** like those dismissed in *Urzua v. Nat'l Veterans Servs. Fund, Inc.*, No. 13CV2217-MMA (KSC), 2014 WL 12160751 (S.D. Cal. Jan. 28, 2014).  There, plaintiff alleged defendant claimed to "use[] donations for a charitable purpose, *i.e.*, providing a wide array of direct aid to

---

[5] These appear to be the allegations in the FAC most squarely aimed at meeting the *Madigan* hurdle (though they miss the mark).  That said, Omaze clearly does not intend to concede any other allegations not specifically addressed here.

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

our nation's veterans and their families.  However, a mere incidental portion of the funds raised from unsuspecting donors actually goes to those in need." *Id.* *3.  The court ruled these allegations "run headlong into the First Amendment":

> Plaintiff attempts to nuance his allegations to fit under *Madigan*'s umbrella.  He argues that this case resembles *Madigan* because "the fraud arises when a donor sees the representations on NVSF's website about all the charitable uses for their 'donation' when the fact of the matter is that a mere incidental portion of their donation would go to direct aid." The Court disagrees. The allegations in Madigan provided, in part, that the telemarketers affirmatively represented that "a significant amount of each dollar donated would be paid over to [the charity]," while, in reality, the telemarketers knew that "15 cents or less of each dollar" was "available to [the charity] for its purposes." Here, Plaintiff fails to allege any misrepresentation, let alone one of such flagrant nature.

*Id.* at *4 (internal citations omitted).[6]

Plaintiffs similarly fail to adequately allege any misrepresentation by Omaze. The First Amendment therefore bars their claims for the same reasons.

### 4.   *Plaintiffs lack standing to enforce the AG's consent agreement with Omaze, and fail to allege a violation in any event.*

Finally, in an attempt to stave off dismissal, Plaintiffs have also added "background" allegations to the FAC regarding Omaze's consent agreement with the AG, claiming that Omaze has violated the agreement by "fail[ing] to depict 'Enter without Contributing" in the same font and color as the 'donate' buttons." FAC (ECF No. 70) ¶ 90.  Again, as described above, these "background" allegations are ***irrelevant*** because Plaintiffs never connect them to their claims (*e.g.*, by stating why the font and color made any difference to them at all).  But in any case, these allegations fail to assist in stating a claim for at least two other reasons.

*First*, Plaintiffs, as non-parties, simply lack standing to enforce the agreement. "Pursuant to Ninth Circuit authority, parties that benefit from a government contract

---

[6] To the extent Plaintiffs speciously contend that this case is like *Madigan* because in certain instances 15% of a donation goes to charity, the obvious distinction is that they know this specifically ***because*** Omaze freely discloses it and did not represent otherwise—unlike the telemarketers in *Madigan*.  FAC (ECF No. 70) ¶ 63.

are generally assumed to be incidental beneficiaries, and **may not enforce the contract absent a clear intent to the contrary**."  *Quine v. Beard*, No. 14-CV-02726-JST, 2017 WL 4082441, at \*2 (N.D. Cal. Sept. 13, 2017) (emphasis added, internal citations omitted); *see also* *GECCMC 2005-C1 Plummer v. JPMorgan*, 671 F.3d 1027, 1033 (9th Cir. 2012) ("This 'clear intent' hurdle is a high one.  It is not satisfied by a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind.") (internal citations omitted).

Here, there is no "clear intent" to benefit Plaintiffs.  The government's purpose was identified as "supervising charitable trusts, protecting charitable assets, and enforcing the laws regulating charitable fundraising and raffles in California"—not benefitting sweepstakes participants.  Second RJN, Ex. D at ¶ 2.  Participants may of course be impacted by provisions in the agreement mentioning them, but this evinces no more "clear intent" than in *Quine*, where prison inmates lacked standing to enforce an agreement that "allow[ed] inmates . . . access to property items."  2017 WL 4082441, at \*2.  The agreement also states which non-parties are bound by/may enforce it, including "successors, assignees and any entity owned or operated by Omaze," and the AG itself with respect to other charitable trust registrations it may issue.  Second RJN, Ex. D at ¶ 8.  If the parties "clearly intended" to provide rights to sweepstakes participants, they could have said so in this very paragraph, but did not.  *See* *Cooper v. California*, No. C 02-03712 JSW, 2007 WL 1703829, at \*2 (N.D. Cal. June 12, 2007) (listing certain parties with enforcement rights suggested no clear intent to give rights to non-listed parties); *Quine*, 2017 WL 4082441, at \*3 (citing *Cooper* and finding no clear intent to benefit non-party inmates when agreement gave court jurisdiction to hear only "disputes between the parties").

*Second*, the agreement simply does not say what Plaintiffs claim it says.  To the contrary, in full accordance with the agreement, Omaze "prominently disclose[s], in a


clear and conspicuous manner, that no payment is required to participate in a campaign" and permits free entries "on the same terms and conditions" as donated entries.  Second RJN, Ex. D at ¶ 5; *compare* Segal Decl. (ECF No. 17), Ex. 1 ("no payment required" disclosures), Exs. 2-3 (same, and also describing equal weighting of 'free' and 'donated' entries all the way up to the entry limit).

**B.    Plaintiffs' UCL Claim Fails Because Omaze's Sweepstakes Require No Consideration, Are Not Lotteries, and Comply With State Law**

Plaintiffs' claims under the CLRA or the UCL's "unlawful" prong also fail to the extent they allege that Omaze violates lottery and sweepstakes laws.

*First,* Omaze's sweepstakes are not lotteries because they lack the required element of consideration.  Cal. Pen. Code § 319.  Under California law, where a winner is selected via drawing, entries must be provided through a "general and indiscriminate" distribution, which means that while entries may be distributed in response to paid activity no purchase may be ***required*** to obtain entries.  *Regal*, 50 Cal. 2d at 856-858.  Here, Omaze offers free entry to every single participant on equal terms, which ensures that the consideration element required for a lottery is not met.

Plaintiffs concede, as they must, that ***any*** individual may enter for free but still seek to manufacture the missing element by claiming Omaze "requires consideration from consumers as a group."  FAC (ECF No. 70) at p. 26.  This novel theory of "group consideration" has no legal basis and Plaintiffs cite no case in which anything resembling such a theory has been applied to find that a game should be considered an illegal lottery.  Indeed, the *Regal* Court rejected a similar argument "that patronage from the ticket holders as a whole constituted consideration for the distribution of the prize even though the individual holders of tickets had not parted with consideration for the individual ticket held by them."  *Regal*, 50 Cal. 2d at 854.  It explained:

> Since it clearly appears from the record that any person could have received a ticket, or tickets, free for the asking, or even without a request and without any necessity of making any kind of purchase[,] it would seem that the relative numbers of tickets distributed with purchases or without purchases should not be determinative of the issue involved[,] which is whether the holder, or holders, of the tickets paid,

1        or promised to pay a valuable consideration for the chance of winning a prize.

2   *Id.* at 858.  In fact, those who made purchases in *Regal* often received **more** tickets

3  than those who did not, and the Court still found that the element of consideration was

4  lacking.  *Id.* at 857-58.  *A fortiori*, where a user can obtain free entries up to the entry

5  limit under Omaze's sweepstakes, the element of consideration is clearly lacking.

6        Plaintiffs misinterpret *People v. Shira*, 62 Cal. App. 3d 442 (1976) to require

7  something more than *Regal*.  FAC (ECF No. 70) ¶ 113.  *Shira* involved a game of

8  skill and chance in which a participant would receive one free opportunity to throw a

9  ring over a peg and would receive free bingo cards if she was successful.  62 Cal.

10  App. 3d at 446-50.  If not, she could purchase two bingo cards with the chance to be

11  reimbursed if she succeeded in a follow-up ring toss.  *Id.*  This scheme required

12  consideration because there was some subset of participants—those who did not

13  succeed in either ring toss—who could not enter for free.  *Id.*

14        *Shira* is distinguishable because Omaze makes free entries available to all users

15  at the very outset of the entry process, all the way up to the same entry limit for

16  entries obtained through donations.  *See, e.g.*, Segal Decl. (ECF No. 17), Ex. 9 at ¶ 1

17  (providing instructions to "enter without a donation" and stating "[e]nter as often as

18  you wish"), Ex. 2 at ¶ 2 ("Individuals may submit the '*Alternative Method of Entry*'

19  form as many times as desired," up to the entry limit).  Notably, **nowhere do**

20  **Plaintiffs make any allegation that they were denied free entry for participation in**

21  **the sweepstakes or denied the opportunity to win because of the absence of a**

22  **donation**.[7]  Nor do they identify any subset of individuals who are prohibited from

23  entering for free.  Rather, they seek return of every donation they ever made to charity

24  based solely on a novel and unsupported "group consideration" theory where the only

25  authority supports Omaze's position.  This claim is legally untenable.

26

27  ———————————

[7] Indeed, they cannot.  Again, Omaze frequently disclosed that there was no purchase necessary to enter or win.  *See supra* Parts II.B, IV.A.2.  And Plaintiffs themselves

28  participated for free—often frequently.  *See* FAC (ECF No. 70) ¶ 221; *supra* n.1.

1    Plaintiffs' theory that Omaze sometimes "postpones or cancels drawings" to

2  cover costs and therefore effectively "require[s] consideration" to enter is similarly

3  unavailing.  FAC (ECF No. 70) ¶ 118.  This theory is predicated on rank speculation

4  that a postponement may be effected for nefarious rather than simple administrative

5  purposes, which is insufficient to satisfy Rule 9(b).  *See, e.g., Lapiner v. Camtek, Ltd.,*

6  *No. C 08-01327 MMC, 2011 WL 3861840, at \*5 (N.D. Cal. Aug. 31, 2011)* (mere

7  speculation that inventory increases were caused by improperly recognized sales held

8  insufficient to state a claim).  It also fails because Plaintiffs misconstrue the test for

9  establishing consideration.  "The question of consideration is not to be determined

10  from the standpoint of the defendant."  *Regal*, 50 Cal. 2d at 854-55.  "The question is:

11  Did the holders of prize tickets pay a valuable consideration for the chance? Certainly

12  those who received prize tickets without buying an admission ticket did not pay

13  anything for the chance of getting the prize. They did not hazard anything of value."

14  *Id.*  It does not matter how much or how little consideration ***Omaze*** allegedly

15  received, it only matters whether ***Plaintiffs*** had an unrestricted opportunity to enter

16  without tendering consideration.  They admit they did.

17    *Second,* contrary to Plaintiffs' allegations, Omaze's sweepstakes are "a form of

18  commercial promotion."  FAC (ECF No. 70) ¶ 113.  Plaintiffs themselves make this

19  clear by arguing McDonald's—allegedly the quintessential example of a promotional

20  sweepstakes—promotes sale of its food and drink items by providing customers with

21  entries as a thank-you for purchasing.  *Id.*  Yet Omaze does the same thing by using

22  sweepstakes to promote charitable donations and provides entries as a thank-you for

23  donating.  This model does not convert Omaze's offering into an "illegal lottery"

24  simply because the object of the promotion is less tangible than a hamburger or soda

25  (not to mention a great deal more socially desirable).  Further, *Shira* is again

26  inapposite; there it was held that "[t]he payment of 25 cents in RINGO in exchange

27  for a small white ring and two 'Bingo' cards is not a purchase as such because the

28  player is not entitled to keep the ring or the cards.  It is a wager."  62 Cal. App. 3d at

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

458. Here, by contrast, an Omaze donor *does* get to keep the concomitant benefits of his or her donation (the satisfaction of donating to charity, a tax write-off, etc.).

*Third,* Plaintiffs have not identified any state-law disclosure requirements that are actually applicable to Omaze and which Omaze violates:

- Cal. Bus. Prof. Code § 17537.1: This statute concerns "as part of an advertising plan or program . . . any incentive as an inducement to the recipient to visit a location, attend a sales presentation, or contact a sales agent in person." The obvious applicability is to timeshare presentations or similar. Despite Plaintiffs' specious efforts to twist the statute, it does not apply to Omaze, which has offered no incentive to induce anyone to visit any location, attend a sales presentation, or contact a sales agent. FAC (ECF No. 70) ¶¶ 153-55.

- Cal. Bus. Prof. Code § 17539.1(a)(1), (4): These statutes expressly apply only to a "contest." *Id.* ¶¶ 158-59. A "contest" is a game of "skill or any combination of chance and skill and which is, or in whole or part may be, conditioned upon the payment of consideration." *Freeman*, 68 F.3d 285 at 290. They do not apply to games of pure chance like sweepstakes. *Id.* Nor would it make any sense to apply them to sweepstakes because they require disclosures like, for example, "the percentage of contestants correctly solving each puzzle" and there are no puzzles to solve in a sweepstakes.

- Cal. Bus. Prof. Code § 17539.1(a)(3): This statute forbids the operator of a "contest or sweepstakes" from misrepresenting the odds of winning, but Plaintiffs make no allegation that Omaze has done so. FAC (ECF No. 70) ¶ 160. Indeed, their own FAC evidences that Omaze simply states: "Odds of winning depend on the number of entries held." *Id.* ¶ 161, Ex. D.

- Cal. Bus. Prof. Code § 17539.1(a)(7): This statute forbids the operator of a "contest or sweepstakes" from failing to award and distribute the prize, but Plaintiffs make no allegation that Omaze has ever refused to award a prize except in one instance, where pursuant to agreement with the AG, Omaze cancelled the drawing and refunded all donations. *Id.* ¶ 86.

- Cal. Bus. Prof. Code § 17539.15(j): This statute requires the operator of a sweepstakes to disclose "the date or dates the final winner or winners will be determined." *Id.* ¶ 96. Again, Plaintiffs' own FAC shows that Omaze does so. *Id.*, Ex. D (winner to be determined "[w]ithin 10 business days of campaign close" and announced "on or around October 14, 2020").

- Cal. Bus. Prof. Code § 17539.5(e): This statute provides: "If the odds depend upon the number of entries received and the number of persons solicited is not controlled by the sponsor of the sweepstakes, a statement to the effect that the odds depend on the number of entries received shall be sufficient." *Id.* ¶ 157. Omaze provides that very disclosure (*id.* ¶ 161, Ex. D), and it may do so because it does not control the number of persons to whom entries are offered. While Omaze places ads on certain platforms, it cannot possibly know exactly how many people will click those ads, much less enter. Further, anyone can enter at any time through Omaze's website.

1   Thus, Plaintiffs cannot allege any "unlawful" acts to support their claims.

2   **C.      Plaintiffs' Unjust Enrichment Claim Lacks a Cognizable Basis**

3   California does not recognize a claim for "unjust enrichment." *Quiby Inc. v.*

4   *Posey*, No. 17-CV-03847-EMC, 2018 WL 732493, at *4 (N.D. Cal. Feb. 6, 2018).

5   Even if recast as a claim for restitution under a quasi-contract theory, however,

6   Plaintiffs cannot dispute that they received the benefit of their bargain with Omaze.

7   They allege to have donated in exchange for entries into a sweepstakes.  Whether they

8   won, should have had a better chance of winning, or would have entered for free if

9   they had only known some other fact(s) is irrelevant to a claim in quasi-contract.  So

10  long as Omaze entered Plaintiffs in sweepstakes drawings—which Plaintiffs do not

11  and cannot dispute—unjust enrichment is not a plausible theory to advance claims

12  that they were somehow misled into entering in the first instance.  *See Peterson v.*

13  *Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008) ("There is no equitable reason for

14  invoking restitution when the plaintiff gets the exchange which he expected.");

15  *Derbaremdiker*, 2012 WL 4482057, at *8 (sweepstakes entrant "received exactly

16  what was represented to him," *i.e.*, a chance to win).

17  **D.      Plaintiffs' Claims All Fail Because Plaintiffs Lack Standing to Sue
            for Alleged Injuries to the Designated Charities**

18  Plaintiffs' claims also fail because they lack standing to assert them.  Indeed,

19  Plaintiffs allege they "liked the fact that the money [they were] paying would go to

20  charity, and purchased the donations due, at least in part, to the representation that the

21  money would go to charity."  FAC (ECF No. 70) ¶¶ 200, 214.  They were "interested

22  in participating in Omaze's sweepstakes for free, but w[ere] unable to do so easily,"

23  and "[c]ombined with the belief that money [they] paid would go to charity, this led

24  [them] to purchase sweepstakes entries [they] would not have purchased if [they]

25  could have submitted multiple free entries at one time."  *Id.* ¶¶ 186, 206, 221.

26  In effect, Plaintiffs simultaneously allege that they donated to sweepstakes to

27  benefit the designated charities, yet the damages from their lawsuit should be

28

funneled to them and their counsel.  This is nonsensical.  Even assuming this premise—which Omaze disputes—Plaintiffs' own theory indicates that the parties supposedly-injured by Omaze's alleged conduct are the charities, depriving Plaintiffs of standing.  *See id.* ¶ 12 (if not for Omaze's alleged conduct, "almost everyone would enter for free and Omaze's business would collapse"), ¶ 48 ("Reasonable consumers believe that they are donating to the particular charities . . . not paying the bulk of their money to Omaze").  The charities, of course, are not parties to this case and in fact have spoken highly of Omaze's services.  *See supra* Part I.

### E.    Plaintiffs' FAC Improperly Rests on Conduct Outside of the Applicable Limitations Period

Finally, in the event Plaintiffs' claims are not fully dismissed as above, the Court should nevertheless dismiss any claims concerning events outside the statute of limitations—four years under the UCL and FAL, thus implicating any events prior to April 15, 2017.  FAC (ECF No. 70) ¶ 223.  Yet the FAC goes all the way back to *2009*.  None of the named Plaintiffs even contend to have entered Omaze sweepstakes in this timeframe, as the earliest entry alleged was in 2015.  FAC (ECF No. 70) ¶ 195.  Plaintiffs' clear goal is to fling mud at Omaze before discussing any actual allegations within the limitations period (which are bald and conclusory in comparison).[8]  The Court should therefore dismiss claims predicated upon conduct occurring prior to April 15, 2017, or alternatively, strike the allegations as immaterial and impertinent pursuant to Fed. R. Civ. P. 12(f).

### V.    CONCLUSION

For the foregoing reasons, the Court should grant this Motion and dismiss Plaintiffs' FAC in its entirety with prejudice.

*//*

---

[8] As but one example, Plaintiffs allege that Omaze "indicat[ed] that its sweepstakes work 'just like a charity raffle'" in an attempt to gin up a misrepresentation claim, but allege the latest date Omaze made this statement was in 2015—six years before their complaint was filed.  *Id.* ¶ 43.  This is not "context," but a deliberate attempt to use a time-barred allegation to support an otherwise-deficient claim for relief.

1

Dated:  January 12, 2022              WARGO & FRENCH LLP

2

By:  */s Jeff Williams*
_____

3

JEFFREY N. WILLIAMS
NICOLA A. GELORMINO

4

Attorneys for Defendant Omaze, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28