UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:21-cv-09034-SB-PVC | Date: | February 22, 2022 |

| | |
|---|---|
| Title: | **_Andreas Knuttel et al. v. Omaze, Inc._** |

| | |
|---|---|
| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |

| | |
|---|---|
| Jennifer Graciano | N/A |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| N/A | N/A |

**Proceedings:**     **ORDER ON MOTION TO DISMISS FIRST AMENDED COMPLAINT [Dkt. No. 78], MOTION TO STRIKE NATIONWIDE CLASS ALLEGATIONS [Dkt. No. 79], AND MOTION TO STAY AND/OR BIFURCATE DISCOVERY [Dkt. No. 83]**

Plaintiffs Andreas Knuttel, Matthew Juranek, and Adriana Carlin all used Defendant Omaze, Inc.'s website to "donate" money to various charities and be entered for chances to win prizes. After learning that Omaze retained up to 85% of the donated funds, Plaintiffs filed this suit alleging that Omaze's marketing is deceptive and violates California law. Omaze now moves to dismiss Plaintiffs' First Amended Complaint (FAC), strike Plaintiffs' nationwide class allegations, and either stay discovery pending resolution of its motion to dismiss or else bifurcate discovery. Dkt. Nos. 78, 79, 83. Although the case is still at the pleading stage, the parties have filed more than 500 pages of briefing and exhibits in connection with these motions, in addition to hundreds more pages as to which they seek judicial notice or incorporation by reference. Having reviewed these voluminous submissions and considered the parties' arguments at the motion

hearing held on February 18, 2022, the Court grants the motion to dismiss in part and denies the other motions.

# I. <u>BACKGROUND</u>

Omaze operates an online platform offering the chance to win prizes in exchange for donations to selected charities. Dkt. No. <u>70</u> ¶ 27.[1]  Each potential prize is the subject of its own campaign, characterized as a distinct "sweepstakes" with its own "experience page" on Omaze's website. *Id.* ¶ 28.  Omaze was founded in 2009 and initially offered chances to win an experience with a celebrity in exchange for fixed donations. *Id.* ¶ 34.  For example, one campaign in association with actor Daniel Craig allowed the winner the opportunity to go to the Aston Martin track in New York and drive a unique Aston Martin car, which the winner then got to keep. *Id.* ¶ 69.  Starting in 2018, Omaze shifted to a new model of "Omaze-owned campaigns" in which Omaze purchased luxury cars, experiences, and other prizes without the involvement of celebrities. *Id.* ¶¶ 66, 69, 70.  The new model was financially successful and Omaze promptly reduced its celebrity experiences from 300 to 50 per year. *Id.* ¶¶ 70–71.

Omaze contracts directly with a single organization, Charities Aid Foundation of America (CAFA), which in turn delivers donated funds to designated charities. *Id.* ¶¶ 49.  For Omaze's celebrity experiences, 60% of the money donated goes to CAFA to be paid to the designated charity, but for Omaze-owned campaigns, Omaze keeps 85% of the donations and only gives 15% to the charity. *Id.* ¶¶ 50–51, 74–75.  Although the fine print at the bottom of Omaze's campaign pages discloses this arrangement, Plaintiffs allege that "Omaze's advertising tricks entry purchasers into believing all or most of their payments are donations to the promoted charities." *Id.* ¶¶ 5, 53.[2]

---

[1] For purposes of Omaze's Rule 12(b)(6) motion to dismiss, the Court accepts as true the well-pleaded allegations in Plaintiffs' FAC.

[2] Plaintiffs allege that "Omaze's disclosure of how much money goes to charity has changed over time, [but] has generally required users to actively investigate fine print and hunt for hidden disclosures." Dkt. No. <u>70</u> ¶ 47.  Plaintiffs' 63-page FAC contains extensive allegations regarding Omaze's conduct going back to 2009, but the Court focuses on the allegations within the statute of limitations involving Plaintiff's interactions with Omaze.

The shift in Omaze's business model has dramatically increased its profits while reducing the share of the money raised that is passed on to charities.  In 2017, the last year before Omaze introduced Omaze-owned campaigns, Omaze reported approximately $750,000 in revenue, with the substantial majority—approximately $450,000—passed through to CAFA.  *Id.* ¶ 98.  In 2020, Omaze reported $104 million in revenue, with only $20 million—less than one fifth—passed through to charity.  *Id.*  This rise in Omaze's profits has attracted approximately $115 million in investor funding from 2018 to 2021.  *Id.* ¶ 100.

Plaintiffs also allege that Omaze's charitable fundraising violates California law regulating raffles, sweepstakes, and lotteries, and "is just a front for illegal lotteries." *Id.* ¶ 4.  Although members of the public are able to enter for chances to win prizes without paying money, Omaze advertises increased opportunities to win in exchange for larger donations.  For example, Plaintiffs allege that donors who give $10 or $25 will receive 100 and 250 entries, respectively, while giving $50 or $100 will result in "double entries" of 1,000 and 2,000 entries, respectively.  *Id.* ¶ 39.  Plaintiffs allege that even though Omaze allows free entries, if it does not receive enough paid entries to cover the costs of the prize, Omaze extends the campaign and postpones the drawing date until it has generated enough money to cover its costs.  *Id.* ¶ 119.  Plaintiffs also allege that for much of Omaze's history, free entries could only be obtained by mail, and although Omaze started allowing free online entries between 2016 and 2018, it made it difficult for people to find and use that option, deemphasizing free entries relative to paid entries.  *Id.* ¶¶ 127–29.

Omaze's business model has been the subject of scrutiny, including multiple investigations by and settlements with state attorneys general.  *Id.* ¶ 80.  One of these investigations resulted in a January 2020 settlement agreement with the California Attorney General, which required Omaze to modify its website to more prominently advertise the opportunity to enter sweepstakes for free.  *Id.* ¶ 87.  Plaintiffs contend that Omaze has violated that agreement.  *Id.* ¶¶ 87–91.  Plaintiffs also identify various consumer complaints and online content characterizing Omaze as a scam.  *E.g.*, *id.* ¶¶ 91–92, 101–02.  Moreover, Omaze's founder and CEO, Matt Pohlson, acknowledged in an April 2020 interview that numerous legal experts had advised Omaze that its model was improper.  *Id.* ¶ 174.

Plaintiffs each purchased multiple entries in prize drawings through Omaze.  Knuttel purchased entries at least twice, totaling at least $100 between 2017 and 2020.  *Id.* ¶¶ 177, 183.  In June 2019, Knuttel paid $50 to Omaze to be entered into a drawing for a Tesla 3 automobile after watching a video advertisement from

Casey Neistat, a YouTube influencer.  *Id.* ¶¶ 187–88.  In the video, Neistat states that Omaze has raised over $100 million in donations to charity since 2012 and that the money would go to the charity GivePower, both of which Plaintiffs allege were false.  *Id.* ¶ 188.[3]  Omaze initially advertised the deadline for the campaign as July 18, 2019 and stated "Winner announced:  August 1, 2019," but on August 3, 2019, Omaze informed Knuttel that the determination of the winner had been delayed.  *Id.* ¶¶ 190–91.

Plaintiff Matthew Juranek paid more than $100 to purchase multiple entries for Omaze campaigns in 2017 and 2018 and alleges that he believed, based on Omaze's representations, that the money would go to charity and that paying more would make him eligible for more entries.  *Id.* ¶¶ 195–203.  Plaintiff Adriana Carlin alleges that she paid approximately $650 to Omaze between 2016 and 2020 and believed that all or most of the money would go to charity.  *Id.* ¶¶ 208–20.

Plaintiffs filed this putative class action in the Northern District of California in April 2021, alleging claims under California law.  Dkt. No. 1.  Omaze moved to dismiss or transfer the case for improper venue, to dismiss the case for failure to state a claim, and to strike Plaintiffs' nationwide class allegations.  Dkt. Nos. 14, 15, 16.  In November 2021, Judge Jon Tigar granted the motion to transfer the case to this Court without ruling on the other two pending motions.  Dkt. No. 52.  Because Plaintiffs had requested leave to amend, this Court allowed Plaintiffs to file an FAC and denied as moot Omaze's motions challenging the original complaint.  Dkt. No. 62.  The Court's order cautioned Plaintiffs that if Omaze moved to dismiss the FAC for failure to state a claim, the Court did not expect to allow Plaintiffs again to amend their pleading to add allegations that could have been included in their FAC.  *Id.*

Plaintiffs filed their FAC, alleging claims for (1) violation of the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1750 *et seq.*; (2) violation of the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*; (3) common-law fraud; (4) violation of the False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500 *et seq.*; and (5) unjust enrichment.  Dkt. No. 70.  Plaintiffs seek injunctive relief and, on some of their claims, damages.[4]  Omaze

---

[3] The FAC contains a link to the video, which appears to have been posted on May 30, 2019 and can be found at https://www.youtube.com/watch?v=fxa0lifjXdk.

[4] Plaintiffs seek compensatory damages for their CLRA and fraud claims; statutory damages for their CLRA claim (and ostensibly for their fraud claim, although they

again moved to dismiss under Rule 12(b)(6) and to strike Plaintiffs' nationwide class allegations.  Dkt. Nos. 78, 79.  Omaze subsequently moved to stay discovery pending the Court's resolution of the motion to dismiss or, in the alternative, to bifurcate discovery if the case was not dismissed in full.  Dkt. No. 83.  All three motions, along with Omaze's requests for judicial notice, have been extensively briefed.

## II. REQUESTS FOR JUDICIAL NOTICE

In connection with its motions filed in the Northern District of California, Omaze filed a request for the Court to consider, either by judicial notice or incorporation by reference, 29 exhibits totaling more than 400 pages.  Dkt. No. 17, 18.  Although Omaze does not expressly reurge its request in connection with its new motions, it relies extensively on some of those exhibits and appears to assume that the request will be treated as still pending and applicable to Omaze's new motions.  *E.g.*, Dkt. No. 78 at 2; Dkt. No. 79 at 20.  Omaze also filed a Second Request for Judicial Notice and/or Incorporation by Reference in Support of Motion to Dismiss First Amended Complaint.  Dkt. No. 80.  This request "is intended to supplement, not replace," the first request, and asks the Court to consider a copy of Omaze's 2020 settlement agreement with the California Attorney General, which is referenced in the FAC.  *Id.* at 1 n.1.  Plaintiffs filed oppositions to both requests.  Dkt. Nos. 29, 87.

Omaze's attempt to introduce hundreds of pages of evidence in connection with its oversized motions is unnecessary and unhelpful.  District courts are generally precluded from considering material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6), and when "matters outside the pleading are presented to and not excluded by the court," the Rule 12(b)(6) motion converts into a motion for summary judgment.  Fed. R. Civ. P. 12(d); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  Although the doctrines of judicial notice and incorporation by reference can provide limited exceptions, the Ninth Circuit has cautioned against their "overuse and improper application":

---

identify no statutory source of damages for their common-law claim); punitive damages on their CLRA, fraud, and FAL claims; and, in the absence of an adequate remedy at law, restitution under the UCL, recission under the FAL and on their fraud claim, and non-restitutionary disgorgement on their unjust enrichment claim.  Dkt. No. 70 at 61–62.

> Defendants face an alluring temptation to pile on numerous
> documents to their motions to dismiss to undermine the complaint,
> and hopefully dismiss the case at an early stage.  Yet the unscrupulous
> use of extrinsic documents to resolve competing theories against the
> complaint risks premature dismissals of plausible claims that may turn
> out to be valid after discovery.

*Khoja*, 899 F.3d at 998.  Moreover, the documents on which Omaze relies are largely irrelevant.  For example, the 2020 settlement agreement, while referenced as background information in the FAC, does not form the basis of any of Plaintiffs' claims, as Plaintiffs themselves acknowledge.  *See* Dkt. No. 87 at 1.  Notwithstanding this concession, Omaze filed a reply brief urging the Court to consider the settlement agreement.  Dkt. No. 95.

To the extent that Omaze's evidentiary filings may contain a few documents that *are* referenced in and central to Plaintiffs' claims or properly subject to judicial notice, their relevance is lost in the thicket, and Omaze has not identified any need for the Court to consider them.  Because nothing in the Court's analysis turns on any of the documents on which Omaze attempts to rely, its requests for judicial notice or incorporation by reference are denied as moot.  The Court admonishes Omaze to exercise better judgment and more restraint in requesting judicial notice in the future.[5]

Although Plaintiffs have not requested judicial notice, they too have contributed to the unnecessary excess of filings by, among other things, incorporating by reference sections of previous briefs into a new brief that already meets the Court's page limit.  *See* Dkt. No. 89 at 3 n.2 ("The background facts relevant to this opposition are set forth in full in Plaintiffs' oppositions to the motions to dismiss/transfer, which facts are incorporated by reference.").  Counsel for both parties are advised that such circumvention of the Court's rules is inconsistent with their professional obligations and does not serve their client's interests.

---

[5] In addition to its requests for judicial notice, Omaze makes improper factual assertions that are neither found in the FAC nor contained in the documents Omaze produces.  *E.g.*, Dkt. No. 78 at 1 n.1 (stating that Carlin "entered for free dozens of times between 2017–2020").

### III. <u>MOTION TO DISMISS</u>

#### A.   <u>Legal Standard</u>

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Assuming the veracity of well-pleaded factual allegations, a court next must determine whether they plausibly give rise to an entitlement to relief.  *Id.* at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Id.*

#### B.   <u>Global Arguments</u>

In addition to challenging Plaintiffs' ability to state a claim as to each of their causes of action, Omaze raises two global arguments, which the Court addresses first.

Omaze argues that Plaintiffs lack standing to assert their claims because only the charities are injured by Omaze's alleged failure to give the charities a greater share of the donated money.  Plaintiffs do not bring claims on behalf of the charities; they allege that Omaze's misleading advertising induced them to pay Omaze money they would not have paid if they had known the true facts about how the money would be used or about their ability to enter for free.  Omaze suggests that Plaintiffs' theory indicates they would have given the same sum of money to the charities if they had not donated through Omaze, but even if that were true, it would not defeat standing.  Omaze cites no legal authority to suggest that the standing of a fraud victim depends on how the victim would have used the money in the absence of the fraud.  Plaintiffs plainly have standing.

Omaze also argues that Plaintiffs' claims should be dismissed to the extent they rely on allegations of conduct before April 15, 2017, which falls outside the statute of limitations, and in the alternative that the allegations pertaining to Defendant's conduct should be stricken as immaterial.  The Court construes Plaintiffs' claims as limited to the conduct within the statute of limitations and accepts Plaintiffs' representation that the additional allegations are included only as background material.  Nor has Omaze shown that these allegations should be stricken as impertinent or immaterial.  Apart from the demanding standard required for striking allegations under Rule 12(f), which Omaze has not even addressed, it appears that at least some of the background facts are relevant to Defendant's challenged conduct.

## C.    __Misrepresentation-Based Claims__

Omaze focuses its first challenge on Plaintiffs' misrepresentation-based claims, which include not only fraud but also parts of Plaintiffs' claims under the CLRA, UCL, and FAL.

The CLRA proscribes specified "unfair methods of competition and unfair or deceptive acts or practices."  Cal. Civ. Code § 1770(a).  Plaintiffs identify seven specific subsections of § 1770(a) in their pleadings, relating primarily to allegedly misleading statements about the allocation of donations and the failure to provide effective notice about the availability of free entries.  Dkt. No. 70 ¶ 235.

The UCL prohibits any "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Because the statute is written in the disjunctive, "it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent," each of which is separately prohibited.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Plaintiffs allege all three varieties of violation.  To prevail under the UCL, a private plaintiff must demonstrate both injury in fact and a loss of money or property caused by unfair competition.  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008).

The FAL prohibits, in connection with the sale of goods or services, making any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  Cal. Bus. & Prof. Code § 17500.  The FAL permits "[a]ny person who has suffered

injury in fact and has lost money or property as a result of a violation" of the FAL to pursue injunctive relief.  Cal. Bus. & Prof. Code § 17535.

Omaze raises several arguments challenging Plaintiffs' misrepresentation-based claims, and in this context the parties largely combine their analysis of Plaintiffs' claims for fraud and for violations of the CLRA, UCL, and FAL.[6] Courts often address these claims together.  *See O'Shea v. Epson Am., Inc.*, No. CV 09 -8063 PSG CWX, 2011 WL 3299936, at *4 (C.D. Cal. July 29, 2011) (explaining that "the standard for deceptive practices under the 'fraudulent' prong of the UCL applies equally to misrepresentation-based claims under the CLRA and FAL" and collecting cases analyzing them together).  Because they are all grounded in fraud, Plaintiffs' common-law fraud, CLRA, FAL, and UCL causes of action must all satisfy the heightened pleading requirements of Rule 9(b) by alleging "the who, what, when, where, and how" of the fraudulent statement and why it is false.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018).  Plaintiffs allege that Omaze misled them in two principal ways:  (1) by suggesting that most or all of the donated money would go to charity and (2) by suggesting that Plaintiffs would be more likely to win prizes if they made donations than if they entered for free.

### 1.    Alleged Misrepresentations Regarding Omaze's Keeping a Portion of Donated Funds

All three Plaintiffs allege that based on Omaze's characterization of their payments as "donations" and its use of the "donate" language in its website and advertisements, they believed that most of the money they paid to Omaze would go to charity.  Dkt. No. 70 ¶¶ 180, 200, 214.  Knuttel also viewed Neistat's online video soliciting donations to Omaze for a chance to win a Tesla 3 automobile.  *Id.* ¶ 188.  In the video, Neistat stated that the organization had raised over $100 million in donations to charity since 2012 and that the money donated in connection with the Tesla 3 would be given to GivePower.  *Id.*  Plaintiffs allege that these statements were false because they did not disclose the substantial portion of the money received that Omaze had deducted and would deduct for the cost of prizes and for its fees.  *Id.*

---

[6] The CLRA and UCL claims also allege liability based on other statutory violations, which will be addressed separately.

Omaze argues that these claims fail because (1) a reasonable consumer would have understood that a portion of the donations would be used for expenses and fees, especially in light of Omaze's disclosure that it was retaining a portion of the proceeds, and (2) the First Amendment precludes the imposition of liability or the injunctive relief Plaintiffs seek.  The parties' arguments turn largely on two Supreme Court decisions:  *Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988), and *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003).

In *Riley*, the Supreme Court struck down portions of a North Carolina statute that prohibited professional fundraisers from retaining excessive fees (with a presumption of unreasonableness for fees above 35% of gross receipts) and required them to disclose to potential donors their average percentage of gross receipts actually turned over to charities based on past solicitations.  The Court explained that its prior cases hold that "the solicitation of charitable contributions is protected speech, and that using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud," but emphasized the availability of North Carolina's antifraud law to address false statements.  *Riley*, 487 U.S. at 789, 795.  Similarly, in striking down the compelled disclosure requirement as an imprecise and burdensome prophylactic rule, the Court again emphasized the availability of antifraud laws as a "more benign and narrowly tailored option[]."  *Id.* at 800 ("[T]he State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements.").

Fifteen years later, the Supreme Court underscored the limits of its holding in *Riley*.  In *Madigan*, the Illinois Attorney General sued for-profit fundraising corporations that solicited charitable contributions for veterans but retained 85% of the proceeds while representing that "a significant amount of each dollar donated" would be paid to the veterans organizations.  *Madigan*, 538 U.S. at 605.[7]  The state supreme court affirmed the dismissal of the complaint, concluding that it was barred by *Riley* and earlier Supreme Court precedent.  The United States Supreme Court reversed, emphasizing that while the mere failure to disclose high fees was

---

[7] The complaint in *Madigan* also attached affidavits regarding specific misrepresentations made to prospective donors during telephone solicitations, including that 90% or more of the money would go to the veterans and that donations would not be used for labor expenses because all the members were volunteers.  *Madigan*, 538 U.S. at 608.

insufficient for a fraud claim, intentionally misleading statements could give rise to liability:

> Our prior decisions do not rule out, as supportive of a fraud claim against fundraisers, any and all reliance on the percentage of charitable donations fundraisers retain for themselves. While bare failure to disclose that information directly to potential donors does not suffice to establish fraud, when nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener, the First Amendment leaves room for a fraud claim.

*Id.* at 606.

As Omaze correctly argues, *Madigan* and *Riley* make clear that "[h]igh fundraising costs, without more, do not establish fraud. And mere failure to volunteer the fundraiser's fee when contacting a potential donee, without more, is insufficient to state a claim for fraud." *Madigan*, 538 U.S. at 624 (citing *Riley*). Offering a particularly relevant example, *Madigan* explained that "*Riley* would support swift dismissal" of a complaint that charged fraud based solely on the fundraiser's retention of 85% of donations or its failure to alert donors of its fee arrangement. *Id.* at 617. But, as Plaintiffs correctly argue, fraud allegations "targeting misleading affirmative representations about how donations will be used"—like those in *Madigan*—are viable and not barred by the First Amendment.[8] *Id.* at 619.

Plaintiffs rely heavily on Omaze's use of the word "donate" or "donation" as misleading. Indeed, the only basis asserted by Plaintiffs Juranek and Carlin for their belief that most of the money they paid to Omaze would be passed on to charity is Omaze's use of the word "donate." By itself, the mere reference to "donation" is not an affirmative misrepresentation that renders fraudulent Omaze's retention of up to 85% of the money it receives. Accordingly, Plaintiffs Juranek

---

[8] Although *Madigan* discusses the sufficiency of the fraud allegations, it does so through the lens of its First Amendment analysis. Unlike in *Riley* and *Madigan*, no government actor is a party to this action. Although they do not address the distinction, both parties assume that the Supreme Court's analysis applies here, apparently because Omaze's First Amendment rights are implicated by the remedies Plaintiffs seek. Because the parties accept *Madigan* as controlling law governing the viability of Plaintiffs' fraud claims, the Court applies it as such.

and Carlin have not pleaded plausible misrepresentation-based claims relating to Omaze's use of the donated funds.  *See also Madigan*, 538 U.S. at 625 (Scalia, J., concurring) ("[T]here can in general be no reasonable expectation on the part of donors as to what fraction of the gross proceeds goes to expenses.  When that proposition is combined with the unquestionable fact that one who is promised, without further specification, that his charitable contribution will go to a particular cause must reasonably understand that it will go there *after* the deduction of legitimate expenses, the conclusion must be that the promise is not broken (and hence fraud is not committed) by the mere fact that expenses are very high.").

Plaintiff Knuttel, in contrast, alleges that he paid $50 for entry into a 2019 drawing for a Tesla 3 after watching a video advertisement in which Casey Neistat stated that the money donated to the campaign "will be given to GivePower."  Dkt. No. 70 ¶ 188.  Viewing the allegations in the light most favorable to Plaintiffs, this was an affirmative misrepresentation that could mislead reasonable consumers into believing that all or substantially all of the donated money in fact would go the designated charity.[9]  Even if, as Omaze contends, its website contained terms and conditions disclosing its fee arrangement, it is plausible, at least at the pleading stage, that a reasonable consumer would be misled by an affirmative misstatement in an advertisement notwithstanding the disclosure of the truth in the fine print of Omaze's website.  Omaze therefore has not shown that it is entitled to dismissal of Knuttel's misrepresentation-based claim arising from the 2019 Tesla 3 campaign.[10]

## 2.    Alleged Misrepresentations Regarding Chance to Win Prizes

Although its terms and conditions have changed over time, Omaze has consistently given donors different numbers of entries to win prizes based on the size of their donation.  Plaintiffs allege that currently a $10 donation results in 20

---

[9] Omaze does not discuss the Neistat video in either its motion to dismiss or its reply in support thereof.  Plaintiffs do not allege facts indicating that Neistat knew that his statements were false, but in the absence of a contrary argument by Omaze, it appears reasonable to infer at the pleading stage that Neistat produced the video advertisement at the direction of Omaze, whose employees would have known that much of the donated money would not go to GivePower.

[10] Plaintiffs allege a clearer misrepresentation in connection with a 2018 campaign involving a McLaren luxury car, in which the spokesperson stated that "all proceeds go to men's health research."  Dkt. No. 70 ¶¶ 61, 70.  No Plaintiff claims to have donated to that campaign, however.

entries ($0.50 per entry); a $20 donation results in 125 entries ($0.16 per entry); and donations of $50, $100, and $200 result in 500, 1,000, or 2,000 entries, respectively ($0.10 per entry). Dkt. No. 70 ¶ 135. For free entries (which can be selected online, although Plaintiffs allege that Omaze has attempted to obscure this option), Omaze in July 2017 began to automatically assign 200 entries, which at the time was equivalent to the entries earned by donating $20. *Id.* ¶ 133. Starting in January 2020, Omaze began assigning 2,000 entries when someone entered for free—the same number assigned for donations of $200. *Id.* Thus, donors who make donations in any amount smaller than $200 receive fewer entries than people who enter for free.[11]

Plaintiffs allege that based on Omaze's representations that making larger donations would result in a greater number of entries, they each believed that free entries would result in a lower chance of winning than paid entries, and they therefore paid for entries they would not have purchased if they had known they could submit multiple free entries at one time. *Id.* ¶¶ 185–86, 201–03, 220–21. But Plaintiffs do not identify any misrepresentations by Omaze regarding its treatment of free and paid entries, and indeed allege that Omaze identifies on its donation pages how many entries will be awarded for paid entries.[12] Because they identify no misrepresentations regarding the number of entries Omaze provided for donations or free entires, much less allege such misrepresentations with the specificity required by Rule 9(b), their misrepresentation-based claims arising from the relative value of paid and free entries are dismissed.

---

[11] Plaintiffs' allegations regarding the numbers of entries given in different circumstances are inconsistent across the FAC. *E.g.*, *compare* Dkt. No. 70 ¶ 134 (people donating $10 currently get 100 entries), *with id.* ¶¶ 39, 135 (people donating $10 currently get 20 entries); *compare id.* ¶ 133 (free entries given number of entries of average donation until July 2017, when they began getting 200 entries), *with id.* ¶ 136 (free entries given number of entries of average donation from 2017 to January 2020). Regardless, it is clear that entries were not all weighted equally at any time: at all times, larger donations received more entries than smaller donations, so people who entered for free necessarily received either more or fewer entries than at least some donations.

[12] Referencing documents outside the pleadings, Omaze argues that it also truthfully and clearly explained on its website the number of entries assigned to free entries. Plaintiffs do not dispute the accuracy of those disclosures, but the Court confines its analysis to the pleadings.

D.      **Claims Based on Unlawful Conduct**

Plaintiffs also allege that Omaze violates various California laws regarding the operation of lotteries, raffles, and sweepstakes.  Although the parties' briefing focuses primarily on the unlawful prong of the UCL, which prohibits violations of all other laws, the allegations of unlawfulness are also implicated in Plaintiffs' claim under the CLRA, which alleges that Omaze advertised an illegal product in violation of Cal. Civ. Code § 1770(a)(26).  Dkt. No. 70 ¶ 235.

Plaintiffs first contend that Omaze operates an illegal lottery in violation of several provisions of the California Penal Code.  A lottery is defined as

> any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.

Cal. Penal Code § 319.  A lottery has three elements:  (1) a prize; (2) distributed by chance; and (3) consideration.  *Cal. Gas. Retailers v. Regal Pet. Corp.*, 50 Cal. 2d 844, 851 (1958).  Where, as here, the first two elements are undisputed, the legality of a promotional giveaway scheme turns on consideration.  The scheme is legal if anyone can participate without paying for a chance to win.  *People v. Shira*, 62 Cal. App. 3d 442, 459 (1976).

Plaintiffs do not dispute that free entries in Omaze's campaigns are available to anyone who wants to claim them.  They argue, however, that Omaze's business model requires that enough entrants make donations to at least cover the cost of the prize, and if Omaze does not initially receive enough paid entries, it postpones the drawing to avoid losing money.  Thus, Plaintiffs contend, even though no individual person must pay to enter, *some* people are required to pay in order for the prize to be awarded, making the campaign an illegal lottery rather than a sweepstakes or raffle.  Plaintiffs rely solely on *Shira*, in which the court held that a game called "RINGO," which combined elements of chance and skill, was a lottery because the vast majority of players were unable to successfully toss small rings over pegs and therefore had to pay to continue playing the game.  *Id.*

In reaching its conclusion, the *Shira* court considered the California Supreme Court's decision in *Regal*. In *Regal*, the court held that a promotional scheme in which tickets were both provided to people who made purchases at gas stations and also distributed for free was not a lottery because "any person could have received a ticket, or tickets, free for the asking, or even without a request and without any necessity of making any kind of purchase." *Regal*, 50 Cal. 2d at 858. The court in *Shira* distinguished *Regal* and other similar cases, explaining that "[t]he controlling distinction between [those] cases and the game of RINGO is that in RINGO Any and All persons Cannot participate in the chance to win the prize without payment of consideration" because 88% of the players were unable to succeed at the initial ring tossing and therefore could only reach the "Bingo" round of the game by paying 25 cents. *Shira*, 62 Cal. App. 3d at 459. Here, in contrast, no similar obstacle prevents any person who so wishes from entering Omaze's contests for free. As in *Regal*, and unlike in *Shira*, free entry is available to any individual who wishes to participate.

To be sure, the opinion in *Shira* contains language that arguably could support Plaintiffs' theory. The *Shira* court explained that "if some of the players of RINGO had to pay in order to have a chance at the prize or conversely if some of the players could not have played the entire game without paying some monetary consideration the element of consideration is established with regard to a violation of section 319." *Id.* at 460–61. In isolation, the phrase, "if *some* of the players of RINGO had to pay" could support either a collective reading of the word "some" (*i.e.* "if the game required that some people (but not any specific people) had to pay") or an individual reading (*i.e.* "if there were any individuals who could only participate by paying"). The former reading might support Plaintiffs' theory that Omaze's campaigns were illegal lotteries because Omaze would not close a campaign, and thus no entrant had a chance of winning, until some people—at least enough to cover the cost of the prize—made "donations" to the campaign. But the rest of the sentence does not support Plaintiff's collective reading of the language in *Shira*. The court explained its intended meaning by stating—"or conversely if some of the players could not have played the entire game without paying some monetary consideration the element of consideration is established," suggesting a focus on whether individual entrants were unable to play for free. *Id.* at 461.

This interpretation of *Shira* is consistent with, and arguably required by, the analysis in in *Regal*. The California Supreme Court stressed in *Regal* that the question of consideration under § 319 is whether those receiving prize tickets "could have received them for free." 50 Cal.2d at 855-56. The court explained:

> If any person could receive a ticket or tickets without paying anything
> therefor, it would appear that the question of consideration should not
> rest on the percentage of those receiving tickets with purchases as
> opposed to those receiving tickets without such purchases.

*Id*. at 859.  The court found this to be true even though one group of defendants
"raised the price of gasoline one cent per gallon to the consumer in order to finance
the advertising program."  *Id*. at 857.   In other words, one group of ticket holders
(those who purchased gasoline) largely paid the costs of the giveaway program,
while another group (those who did not purchase gasoline) paid nothing.
Seemingly critical to the *Regal* court's holding, however, was the fact that any
consumer had the option of participating in the program for "free"—a fact not
altered by the economic reality that a subset of participating consumers were
subsidizing the overall program costs.  *Id*.

Because any person who wishes to participate in Omaze's campaigns may
receive free entries upon request, the dispositive circumstance in *Shira*—that "[t]he
chance to win the prize is not open to Any person without the payment of
consideration"—is not present here.  *Id.* at 459.  Instead, as in *Regal*, "any person
could have received a ticket, or tickets, free for the asking . . . without any
necessity of making any kind of purchase."  *Regal*, 50 Cal. 2d at 858.  Under *Regal*
and *Shira*, the contests therefore do not require consideration and are not lotteries
within the meaning of § 319 of the California Penal Code.[13]  This is not to say that
the alleged postponement of the drawing date to generate additional funds is lawful
under other provisions of California law—specifically, Cal. Bus. & Prof. Code
§ 17539.15(j), a question discussed *infra*.

Plaintiffs also argue that Omaze violates § 320.5(m) of the California Penal
Code, but that provision merely exempts raffles from the other requirements of
§ 320.5 if they satisfy three requirements.  A raffle is defined to require, among
other things, paper tickets with detachable stubs.  Cal. Penal Code § 320.5(b).
Omaze does not purport to operate raffles, and § 320.5 is inapposite.[14]

---

[13] This interpretation is also consistent with the principle recognized in *Shira* that
§ 319 must be construed strictly because it is a criminal statute.  *Shira*,  62 Cal.
App. 3d at 460 (acknowledging "the salutary rule which requires strict construction
of penal statutes" (quoting *United States v. Raynor*, 302 U.S. 540, 552 (1938))).

[14] Plaintiffs allege that in 2012, years before their donations and far outside the
statute of limitations, Omaze described its process as working "just like a charity

Finally, Plaintiffs allege that Omaze violates the laws governing sweepstakes found in §§ 17537.1(a)(1)(C), 17539.1(a)(3), (4), and (7), 17539.15(c) and (j), and 17539.5(e) of the California Business and Professions Code.  Dkt. No. 70 ¶¶ 141–45, 153–62.[15]  Most of these statutes are not properly implicated by the facts alleged.

Section 17537.1(a)(1)(C) requires disclosure of the odds of winning in advertisements that "offer any incentive as an inducement to the recipient to visit a location, attend a sales presentation, or contact a sales agent."  Cal. Bus. & Prof. Code § 17537.1(a).  Here, Omaze solicited donations, and Plaintiffs have not plausibly alleged that it tried to induce recipients to visit any location, attend a sales presentation, or contact a sales agent.

Section 17539.1(a)(3) prohibits "[m]isrepresenting in any manner the odds of winning any prize."  Id. § 17539.1(a)(3).  Plaintiffs do not identify any statement by Omaze about the odds of winning a prize that they contend is false. Instead, they suggest that by falsely advertising the drawing dates and then changing them, Omaze misrepresents the odds of winning, which are a function of

---

raffle," Dkt. No. 70 ¶ 42, but there is no allegation that Omaze at any relevant time has claimed to operate a raffle.  At the motion hearing, Plaintiffs' counsel argued that Plaintiffs had just learned that Matt Pohlson, Omaze's founder and CEO, made similar statements in interviews as recently as 2018.  Even if Plaintiffs were given leave to amend to allege that Pohlson made more recent statements (which Plaintiffs did not hear before their participation), Plaintiffs identify no facts to support a plausible allegation that Omaze's campaigns *are* raffles subject to § 320.5—they plainly are not—or that Omaze represents them to be raffles.

[15] Plaintiffs also allege a violation of Cal. Bus. & Prof. Code § 17539.1(a)(1), but they expressly abandon this claim in their opposition.  Dkt. No. 88 at 17.  On the other hand, Plaintiffs argue in their opposition that "the FAC alleges that Omaze fails to include 'a clear and conspicuous statement of the no purchase or payment necessary message' in the official rules for the sweepstakes, as required by Cal. Bus. Prof. Code § 17539.15(b)." *Id.* at 15.  No such allegation is found in the FAC.  Regardless, Plaintiffs' own exhibit to the FAC, which they reference to argue that the required statement is "buried at p. 6 of disclosures," in fact includes the required statement that "No donation or payment is necessary to enter or win this sweepstakes" both on the first page and again on the second page, next to the buttons for donating.  Dkt. No. 70-4.

the amount of time the entries are on sale.  While the practice of changing the drawing date may be otherwise problematic, as discussed below, it is not a representation about the odds of winning, and § 17539.1(a)(3) is inapplicable.

Section 17539.1(a)(4) prohibits "[m]isrepresenting in any manner, the rules, terms, or conditions of participation in a contest."  *Id.* § 17539.1(a)(4).  The statutory definition of "contest" requires a game, puzzle, or similar contest in which the outcome is "determined by skill or any combination of chance and skill."  *Id.* § 17539.3(e).  Plaintiffs appear to concede that Omaze's sweepstakes do not include any element of skill, but they argue that the prologue of § 17539.1, which prohibits the enumerated unfair acts in "any contest or sweepstakes," indicates that subsection (a)(4) should apply to both sweepstakes and contests. Plaintiffs cite no legal authority in support of this argument, which the Court finds unpersuasive.  That the statute contains general prohibitions relevant to both sweepstakes and contests does not mean that those prohibitions expressly addressing one apply to the other.  This provision is therefore inapplicable.

Section 17539.1(a)(7) prohibits "[f]ailing to award and distribute all prizes of the value and type represented."  *Id.* § 17539.1(a)(7).  Plaintiffs do not identify any prize that Omaze has failed to distribute in the value and type represented by its campaign.  Instead, they once again urge an expansive reading of the statute, unsupported by any legal authority, to construe its language to require prizes to be awarded on the *dates* advertised.  This subsection specifically focuses on the "value and type" of the prize, and Plaintiffs make no plausible allegation that a delay in distributing any of Omaze's prizes caused the prize to change in value or type.  Plaintiffs have not alleged a plausible claim arising from § 17539.1(a)(7).

Section 17539.5(e) contains specific disclosure requirements for sweepstakes:

> Solicitations made to persons in this state offering the opportunity to participate in a sweepstakes shall, with respect to each prize offered, set forth clearly, conspicuously, and in easily readable letters the odds of receiving that prize, described in whole Arabic numerals in a format such as: "1 chance in 100,000" or "1:100,000."  If the odds depend upon the number of entries and the number of persons solicited is controlled by the sponsor of the promotion, the solicitation shall set forth the reasonable expectation of entries.  If the odds depend upon the number of entries received and the number of persons solicited is not controlled by the sponsor of the sweepstakes, a

statement to the effect that the odds depend on the number of entries received shall be sufficient.

*Id.* § 17539.5(e).  Plaintiffs allege that "Omaze does not publish the odds of winning its contests or a calculated estimate of those odds.  Instead, Omaze simply states that 'Odds of winning depend on the number of entries held.'"  Dkt. No. 70 ¶ 161.  This is precisely the statement required by the statute when the odds depend upon the number of entries and "the number of persons solicited is not controlled by the sponsor of the sweepstakes."  Cal. Bus. & Prof. Code § 17539.5(e). Plaintiffs argue that Omaze controls the number of people solicited through its emails and social media ads, but it is unclear how Omaze allegedly controls, for example, the number of people who view videos on YouTube like the one Knuttel watched before making a donation in hopes of winning the Tesla 3.  Accordingly, while Omaze may control some forms of its solicitation, Plaintiffs have not plausibly alleged that it controls the number of people solicited so as to be in violation of  § 17539.5(e).

Section 17539.15(c) provides that "[s]weepstakes entries not accompanied by an order for products or services shall not be subjected to any disability or disadvantage in the winner selection process to which an entry accompanied by an order for products or services would not be subject."  Cal. Bus. & Prof. Code § 17539.15(c).  Plaintiffs contend that Omaze's use of the term "entry" to refer both to the process of entering the sweepstakes and to a chance to win the sweepstakes (of which hundreds or thousands may be provided for one free "entry" or donation) obfuscates its different treatment of free and paid entries.  Even if Omaze's verbiage is confusing, it does not violate § 17539.15(c), since that statute prohibits only treating entries that are "accompanied by an order for products or services" more favorably than those that are not, and Plaintiffs do not allege that any of Omaze's campaigns involved orders for products or services.  Because § 17539.15(c) does not address distinctions in the treatment of free entries and entries accompanied by donations, it is not implicated by the facts alleged in this case.

Finally, § 17539.15(j) provides that "[t]he official rules for a sweepstakes shall disclose information about the date or dates the final winner or winners will be determined."  *Id.* § 17539.15(j).  Neither side cites any authority interpreting this requirement or identifying precisely what information must be disclosed. Plaintiffs allege that although Omaze publishes a "deadline to enter" and "winner announced" date on each of its campaign experience pages, if it does not receive enough donations to cover the cost of the prize and earn a profit, it simply

postpones the drawing until it receives enough donations, effectively changing the rules of its sweepstakes mid-contest.  Dkt. No. 70 ¶¶ 8, 11, 119, 163–68.  Plaintiffs also allege that the 2019 Tesla 3 campaign to which Knuttel donated initially advertised the drawing date as "TBD" and stated, "Winner announced:  August 1, 2019"; that the video advertising the campaign did not disclose the date of the drawing; that on August 3, 2019, Omaze notified Knuttel that the drawing had been postponed; and that Omaze's website currently (and inconsistently with the notification Knuttel received) states that the campaign winner was "announced August 1, 2019."  *Id.* ¶¶ 188–92.  Similarly, Plaintiffs allege that Juranek paid $25 to enter a drawing for a Tesla in November 2018 "only to later be informed that the drawing would not occur on the published date."[16]  *Id.* ¶ 196.

At the motion hearing, Omaze's counsel argued that Plaintiffs' UCL claims based on § 17539.15(j) fail because Plaintiffs have not—and could not—allege that they relied on or were injured by the delayed announcement of the winners, and that a change in the drawing date does not affect entrants' chances of winning if the entry deadline remains unchanged.  The FAC alleges that when Omaze has not received enough "donations" to cover the cost of its prize, "it just extends the campaign and postpones the drawing date until it has generated enough money to cover its costs."  Dkt. No. 70 ¶ 119; *accord id.* ¶ 8 ("Omaze simply postpones the 'drawing' for the prize until it has received enough payments to make a profit.").  Viewing the FAC in the light most favorable to Plaintiffs, it plausibly alleges that when Omaze delays a drawing date, it does so in conjunction with extending the campaign to allow additional donations and entries.  Additional entries, of course, decrease the likelihood that people who have already entered will win the prize, and Plaintiffs plausibly allege that "participants would be less likely to spend money on 'entries' if they knew that Omaze retained the right to postpone the drawing" until it receives enough donations to ensure a profit.  *Id.* ¶ 13.  Whether Plaintiffs will be able to establish that Knuttel and Juranek in fact were injured by the delays in the campaigns to which they contributed can be better determined after discovery.  Given the plausible allegations that Omaze may have provided incorrect information regarding the drawing dates for Knuttel's and Juranek's campaigns, Omaze has not shown that it is entitled at this stage to dismissal of their claims based on violations of § 17539.15(j).  Plaintiff Carlin, however, does

---

[16] At the motion hearing, Plaintiffs' counsel represented that Juranek's recollection appears to have been mistaken—the drawing he entered was in March, not November, of 2018—but he stood by the allegation that the drawing date was changed.

not allege any errors or changes in the information provided about the drawing dates for the campaigns in which she participated, and therefore fails to state a claim based on § 17539.15(j).

In sum, Plaintiffs' claims under the UCL and CLRA based on unlawful conduct are dismissed, except for Knuttel's and Juranek's claims alleging a violation of Cal. Bus. & Prof. Code § 17539.15(j).

## E.     UCL Claim Based on Unfair Conduct

In addition to the UCL's broad prohibition on business practices that are fraudulent or forbidden by other laws, its "unfair" prong can also reach conduct that is not specifically proscribed by some other law.  *Cel-Tech*, 20 Cal. 4th at 180.  "A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits."  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).  The determination whether a practice is unfair "is one of fact which requires a review of the evidence from both parties" and generally is not suitable for a motion to dismiss.  *Id.*  However, where the practice alleged to be unfair overlaps entirely with the practices addressed under the fraudulent and unlawful prongs of the UCL, the former may be dismissed when the latter prongs do not survive.  *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017).

Omaze summarily argues that Plaintiffs' UCL unfairness claim should be dismissed because it relies on the same allegations as their fraudulent and unlawful claims.  Because some of Knuttel's and Juranek's claims survive under those prongs, their unfairness claim is not subject to dismissal on that basis.  Plaintiff Carlin, however, alleges no facts distinct from her other claims that could support an unfairness claim under the UCL.  Accordingly, her claims are dismissed.

## F.     Unjust Enrichment

Omaze correctly argues that Plaintiffs' unjust enrichment claim should be dismissed because California does not recognize a cause of action for unjust enrichment.  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010).  Plaintiffs cite *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015), to argue that the Ninth Circuit recognizes unjust enrichment as a quasi-contract cause of action.  *Astiana* acknowledged that "in California, there is not a standalone cause of action for 'unjust enrichment,'" but stated that courts may

construe a claim for unjust enrichment as a quasi-contract claim. *Id.* Because the plaintiff had alleged that she was entitled to relief under a "quasi-contract" cause of action, the Ninth Circuit reversed dismissal of the claim. *Id.* Here, in contrast, Plaintiffs' make no reference to "quasi-contract" claims either in their cause of action for unjust enrichment or anywhere else in their 63-page FAC. Plaintiffs' unjust enrichment claim is not cognizable under California law and is dismissed.

## IV. <u>LEAVE TO AMEND</u>

Plaintiffs summarily request leave to amend to add additional facts if the Court deems the FAC deficient. Although "[t]he court should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend may be denied for such reasons as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," *Foman v. Davis*, 371 U.S. 178, 182 (1962).

This case was filed nearly a year ago, in April 2021. After Omaze moved to dismiss Plaintiffs' original complaint, the Court granted Plaintiffs' request for leave to amend but put Plaintiffs on notice that they needed to include all relevant allegations in their FAC, stating: "**Plaintiffs are cautioned that if Defendant moves to dismiss [the FAC] for failure to state a claim, the Court does not expect to allow Plaintiffs again to amend their pleading to add allegations that could have been included in their [FAC].**" Dkt. No. 62 at 2 (emphasis in original). Plaintiffs made substantial amendments, adding 8 pages of allegations to their FAC. Indeed, the 63-page FAC contains ample description of Omaze's practices and Plaintiffs' experiences. Plaintiffs do not identify any additional facts they would allege in a Second Amended Complaint that would cure the deficiencies in their dismissed claims, much less facts that could not have been included in the FAC. Moreover, most of the claims the Court finds deficient are dismissed because Plaintiffs misconstrue the relevant law, which would make amendment futile in any event. Accordingly, Plaintiffs' alternative request for leave to amend is denied.

## V. <u>MOTION TO STRIKE CLASS ALLEGATIONS</u>

Omaze moves under Rules 12(f) and 23 to strike Plaintiffs' allegations relating to a nationwide class, arguing that Plaintiffs lack standing to assert claims under the laws of other states, and the claims of putative class members residing in

other states will not be governed by California law.  Dkt. No. 79.  Class allegations generally are not tested at the pleadings stage, but a court may grant a motion to strike class allegations if it is clear from the complaint that the class claims cannot be maintained.  *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012).

Plaintiffs do not purport to allege claims under the law of any state but California.  Omaze's motion includes 15 pages of choice-of-law analysis that relies primarily on *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), which held that the claims of out-of-state class members who purchased vehicles in other states were not governed by California law, such that certification of a nationwide class alleging claims under California law was inappropriate.  It is not clear from the FAC, however, that *Mazza*'s conclusion applies in this case, which does not involve the purchase of vehicles in other states and in which Omaze concedes that most of the relevant versions of its rules include a California choice-of-law provision.  *See* Dkt. No. 79 at 5.  Thus, striking the class allegations at this point would be premature.  *See Kisliuk v. ADT Sec. Servs., Inc.*, 263 F.R.D. 544, 547 (C.D. Cal. 2008) (denying motion to strike as premature and collecting cases suggesting that dismissal of class allegations at the pleading stage should be done rarely and that the better course is to deny such a motion to allow class action to evolve through discovery).

Additionally, in light of the Court's ruling on the motion to dismiss, which rejects Plaintiffs' theory of fraud except to the extent it is tied to the specific misrepresentation related to one campaign in which Knuttel participated, it is unclear whether Plaintiffs will seek class certification, and if so, the scope of any class they would seek to certify.  If they do, the Court will be better positioned at that time to evaluate, if necessary, the choice-of-law questions raised by Omaze in the context of the class Plaintiffs seek to certify.  Accordingly, Omaze's motion to strike the nationwide class allegations in the FAC is denied.

## VI. <u>MOTION TO STAY OR BIFURCATE DISCOVERY</u>

Finally, Omaze moves to stay discovery pending the Court's resolution of its motion to dismiss, or, if the motion is denied, to bifurcate discovery.  Dkt. No. 83.  The Court's ruling on the motion to dismiss moots the motion to stay, which is therefore denied.

Omaze's alternative request seeks an order prohibiting merits discovery until after the Court rules on an anticipated class certification motion and limiting pre-

certification discovery to class-related matters. Omaze represents that Plaintiffs' discovery requests have imposed heavy burdens on it, and Omaze expects that it will have to retain an e-discovery vendor at a cost of more than $100,000.[17] Plaintiffs respond that class issues are intertwined with merits issues, rendering bifurcation unjustified and unworkable.

"District courts have broad discretion to control the class certification process," including whether to allow discovery. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009). In their joint Rule 26(f) report, Omaze asked the Court to bifurcate discovery, and Plaintiffs opposed bifurcation. Dkt. No. 66. The Court declined to bifurcate discovery and ordered that fact discovery must be completed by September 16, 2022. Dkt. No. 68. The deadline for a hearing on class certification is June 3, 2022. *Id.* Thus, Omaze requests that Plaintiffs be prevented from conducting discovery on the merits of their claims during the vast majority of the discovery period. As observed above, it is uncertain whether Plaintiffs will even seek class certification following the Court's ruling on the motion to dismiss. Moreover, Omaze has not shown that a clear distinction exists between merits and class discovery in this case. Under these circumstances, Omaze has not shown that a modification to the Court's scheduling order is warranted. The motion to bifurcate is therefore denied. However, the Court's ruling on the motion to dismiss narrows the relevant issues for discovery, and to the extent Omaze continues to believe Plaintiffs' discovery requests are unreasonably burdensome, it is free to seek appropriate relief from the magistrate judge if the parties are unable to resolve discovery disputes.

## VII. ORDER

Omaze's motion to dismiss is **GRANTED IN PART** as follows: All claims of Plaintiff Adriana Carlin are **DISMISSED** on the merits with prejudice. All of Plaintiff Matthew Juranek's claims except his claims under the UCL and CLRA based on violation of Cal. Bus. & Prof. Code § 17539.15(j) are **DISMISSED** on the merits with prejudice. Plaintiff Andreas Knuttel's misrepresentation-based claims relating to the relative value of paid and free entries, his UCL and CLRA

---

[17] In connection with the motion to stay or bifurcate, the parties collectively produce hundreds of pages of exhibits regarding their past discovery requests and disputes, and each side finds fault with the other's conduct. The magistrate judge has ruled on multiple disputes, and nothing before the Court requires it to determine the relative unreasonableness of the parties' conduct.

claims based on unlawful conduct other than violation of Cal. Bus. & Prof. Code § 17539.15(j), and his claim for unjust enrichment are all **DISMISSED** on the merits with prejudice.  The motion to dismiss is otherwise **DENIED**.  Juranek's UCL and CLRA claims based on violation of Cal. Bus. & Prof. Code § 17539.15(j) and Knuttel's claims for common-law fraud and violation of the CLRA, UCL, and FAL remain for trial, subject to the limitations discussed above.  Plaintiffs' request for leave to amend is **DENIED**.

Omaze's requests for judicial notice, motion to strike nationwide class allegations, and motion to stay or bifurcate discovery are all **DENIED**.